FILED

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

2025 AUG 25 P 4: 11

ALEXANDRIA DIVISION

LAMONT A THOMAS, *PRO SE*

Plaintiff,

vs.

CREDIT ACCEPTANCE CORPORATION ET AL,

Defendant

Case No.: 1: 25cv 1397

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION

---

**PLAINTIFF'S COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTOVE RELIEF, AND RECHARACTERIZATION**

**Introduction**

Plaintiff Lamont A. Thomas respectfully moves this Court for declaratory and injunctive relief arising from a mischaracterized financial transaction dated **February 29, 2024.** This action seeks recharacterization of the transaction as a securities borrowing/lending arrangement-not a traditional consumer loan-based on mandatory compliance with federal accounting standards, including the **Accounting Standards Codification (ASC)**, **Federal Financial Institutions Examinations Council (FFIEC)** guidelines, and applicable federal securities and tax regulations.

Plaintiff asserts that defendant Credit Acceptance Corporation failed to properly account for the transaction under **ASC 860** and **ASC 210**, resulting in unlawful retention of Plaintiff's payments, concealment of beneficial ownership rights, and violations of Virginia's usury statutes. Plaintiff's payments, when accurately classified under **26 C.F.R. § 1.118-1,** constitute *capital contributions* to Defendant's securitization trust, not debt service. The transaction's structure-confirmed by Defendant's own SEC filings-mandates recognition of Plaintiff's receivable as collateral in a secured borrowing, triggering offset rights, restitution, and declaratory relief.

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 1

This is not a request for extraordinary relief. It is a demand for accurate accounting and legal recognition of the transaction's true economic substance. Plaintiff. Appearing *pro se*, invokes this Court's authority under the Declaratory Judgment Act, **28 U.S.C. §§ 2201-2202**, and Federal rules of Civil Procedure, including **Rule** 57, for an order:

**(1)**. A declaration that the transaction is governed by the economic substance doctrine and **26 C.F.R. § 1.118-1**;

**(2)**. Recharacterization of Plaintiff's payments as **capital contributions** and Defendant's accounting as a **secured borrowing** under **ASC 860-30**;

**(3)**. Recognition of Plaintiff's beneficial ownership and offset rights under **ASC 210-20-45-1**;

**(4)**. Release of the DMV lien and restoration of vehicle title to LAMONT ANDRE THOMAS;

**(5)**. Injunctive relief barring collection, repossession, or credit reporting;

**(6)**. Statutory damages under **Va. Code § 6.2-303(F)** and litigation costs under **26 U.S.C. § 7430**;

**(7)**. Full restitution, including return of all payments made under the void contract, return of the finance charge as cash collateral, and recognition of the full contract value as the fair value of the transferred asset, consistent with **ASC 860-30, ASC 210-20**, IRS valuation principles, and FFIEC reporting standards;

**(8)**. Enforcement of federal compliance obligations under FFIEC, SEC, and IRS reporting rules;

**(9)**. An order striking the arbitration clause as unenforceable; and

**(10)**. Recovery of attorneys' fees and costs, and such other relief as the Court deems just and proper.

This motion is supported by the pleadings, exhibits, and controlling authority cited herein.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction under **28 U.S.C. § 1331** because Plaintiff's claims arise under federal law, including mandatory accounting standards under ASC (**Accounting Standards Codification) 860 and ASC 210**, federal banking regulations issued by the **Federal Financial Institutions Examinations Council (FFIEC)**, federal tax regulations under **26 C.F.R. § 1.118-1, IRS Notice 97-21 (26 C.F.R. § 1.7701(l)-3-Recharacterizing financing arrangements involving fast-pay stock))**, and **§ 1.1273-1**; federal securities disclosures enforced by the **Securities and Exchange Commission (SEC)**.

These federal mandates form the basis of Plaintiff's claims for declaratory and injunctive relief. This Court also has supplemental jurisdiction under **28 U.S.C. § 1367** over Plaintiff's related state law claims, including violations of Virginia's usury statutes (**Va. Code §§ 6.2-303, 1500, and 1501**), which arise from the same transaction and share a common nucleus of operative fact.

Venue is proper in the Eastern District of Virginia, Alexandria Division, under **28 U.S.C. § 1391(b)**, because the events giving rise to the claims occurred in Prince William County, Virginia, and Defendant conducts business in this District.

## EXECUTIVE SUMMARY

This case arises from a consumer finance transaction that was structurally deceptive, economically mischaracterized, and legally void. On February 29, 2024, Plaintiff entered into a retail installment contract with Defendant Credit Acceptance Corporation ("CAC") for the purchase of a vehicle. While the contract purported to extend credit, its actual structure-reflected in CAC's securitization filings and accounting treatment-constitutes a securities lending arrangement governed by federal law.

Plaintiff's payments were not applied to a legitimate debt obligation. Instead, they were funneled into CAC's securitization trust and treated as cash collateral under **ASC 860-3-** and treated as cash collateral under **ASC 860-30 and ASC 210-20**. Defendant failed to disclose this structure, concealed the true

finance charge, and enforced an arbitration clause procured through fraud. Plaintiff now seeks declaratory judgment to recharacterize the transaction under federal accounting and tax standards, restitution of all payments made, release of the vehicle lien, and recognition of beneficial ownership rights in the trust proceeds.

The relief sought is grounded in federal statutory and regulatory mandates, including:

- **ASC 860** and **ASC 210** (secured borrowing and offsetting)
- **26 C.F.R. § 1.118-1** (capital contributions)
- **15 U.S.C. § 1605** (Truth in Lending Act finance charge definition)
- **SEC** and **FFIEC reporting standards**

Plaintiff also seeks statutory damages under **Va. Code § 6.2-303(F)** and litigation costs under **26 U.S.C. § 7430,** as well as injunctive relief to prevent further collection, repossession, or credit reporting. The transaction lacks economic substance violating federal disclosure mandates and cannot be enforced under Virginia law.

## FACTUAL BACKGROUND

On February 29, 2024, the Plaintiff sought a vehicle from the dealership, Woodbridge Auto Sales, in Woodbridge, Virginia. The dealership, represented by Jose Diaz, informed Plaintiff does not offer in-house financing, and the transaction would be "funded" by the Defendant. Plaintiff agreed to the terms of the contract under the belief that Defendant was funding the purchase directly to Plaintiff.

In order to finalize the contract, the dealership informed Plaintiff that "Credit Acceptance" demanded a down payment of **$2,700**. Plaintiff asked the dealership if they were going to keep the down payment for themselves and they clarified that Defendant required that exact down payment before they could accept the contract. The defendant did not present any information that it customarily requires a down payment in such amount (**$2,700**) and professionally qualified buyers may be able finance a vehicle with no money down. (See Credit Acceptance website: "*CAN I BUY A CAR WITH NO MONEY DOWN?*")

The option to finance a vehicle from Defendant with no money down is afforded to consumers who are well-qualified based on a number of factors, including credit scores. Defendant requires down payments in various amounts based off the model used in qualifying potential buyers which are based off the buyer's credit history, price of vehicle financed, and other factors. Further, before the Plaintiff settled on the vehicle purchased, he sought a different vehicle financed by the Defendant and Defendant required **$3,600** for that particular vehicle.

[1]The Plaintiff paid **$2,700** to the dealership and signed the Installment which obligated him to make principal and interest payments to the Defendant in the amount of **$622.96** on the 29th of every month beginning March 29, 2024. The **Annual Percentage Rate (APR)** was 23.99%, which the Defendant stated was [2]"lawful" in the Commonwealth of Virginia. The Finance Charge on the contract was **$18,386.90** and the amount financed was

(1). **See Exhibit C-Plaintiff's Auto Installment Contract**

(2). **See Exhibit E-Defendant's response to Plaintiff's Notice to file Arbitration Suit**

**$22,728.46**. Adding the down payment of **$2,700**, the total *sales price* or *stated redemption price at maturity* was **$43,815.36**.

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 5

The dealership strongly suggested that Plaintiff should get an extended warranty to ensure if any break down of the vehicle's engine, transmission etc., he would be covered up to a certain amount. In fear of not having any protection at all, Plaintiff chose to get the protection. Unbeknownst to Plaintiff, the purchase price of **$22,728.46** already included the *service contract* and *GAP protection*-before Plaintiff agreed to the add-on products.

Also included in the purchase price was:

- Fees Paid to Public Officials for Perfecting, Releasing or Satisfying a Security Interest: **$40.75**

- Sellers Processing Fee (Applicable to Cash and Credit Sales): **$995.00**

- Payment to Phoenix American Administrator, Inc for GAP Protection: **$887.00**

- Dealer track fee for CVR Electronic Filing Fee: **$10.00**

- Prince William County Business Tax Fee: **$25.00**

The Truth-In-Lending disclosures on Plaintiff's Installment Contract displayed fees totaling **$4,190.75**, which was ***included*** in the purchase price of the vehicle that increased the purchase price of the vehicle, a 2016 Mercedes-Benz GLE 350, to **$22,728.46**. However, the total amount financed at the time of purchase was[3] **$18,386.90**, leaving **$14,196.15** unaccounted for. At the time of the purchase, the Kelley Blue/Black book value of the vehicle with approximately 75,000 miles was worth around **$12,255**, over **$30,000** less than the total amounts Plaintiff would pay to fulfill the contractual obligation.

On the very next day, March 1, 2024, Plaintiff noticed major discrepancies with the contract, and being notified that Defendant was being sued by the Consumer Financial Protection Bureau (CFPB) and the Attorney General of New York (since then, the CFPB has dropped its suit against Defendant), Plaintiff chose to investigate Defendant further. Over the course of the next year, Plaintiff researched thousands of documents, SEC filings, former lawsuits, and all regulations governing the Defendant's operations, including prior [4]settlements for the same alleged conduct. The Plaintiff placed several recorded phone calls to the Defendant, one in which Defendant's

---

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-TERIZATION - 6

(3). **See Exhibit B (B.5)**-Defendant admits in their **2024 Form 10-Q** that the finance charge includes administrative costs and fees charged to the Dealer that were passed off to consumers which were not disclosed to Plaintiff in the 'Truth-In-Lending' disclosures on the contract.

(4). See ***Palm Tran, Inc. Amalgamated Transit Union Local 1577 Pension Plan v. Credit Acceptance Corporation***, *No. 20-12698 (Defendant settled with investors for similar conduct alleged by Plaintiff in this lawsuit)*.

representative confirmed that the Defendant did not directly loan Plaintiff any funds but rather served as the broker between Plaintiff and the investors to the Defendant's Automobile Receivables Trust 2024-A (or 2024-1). He also sent numerous correspondences to Defendant alerting them to virtually the same claims raised here and every time, Defendant chose to stand behind the contract in a **form over substance** manner. In some communications, which involved a lengthy delay in response, if any, the Defendant never addressed the core claims but rather redirected the topic to the contract or informed Plaintiff that he "misquoted" the regulations or statutes. (See Exhibit **E**). However, the Defendant remained silent when Plaintiff used Defendant's own filings and admissions as evidence to support his claims. The defendant has continued to make payments on the contract as of July 3, 2025, and now moves this Court, among other things, for an injunction to prevent Defendant from pursuing repossession efforts or any collections in any manner because Plaintiff contends that the Defendant is prohibited from doing so under **Va Code § 6.2-1501**.

I.      **The Defendant's Portfolio Program**

Upon research and extensive investigation into the operations of Defendant, Plaintiff learned from Defendant's own SEC Form **8-K, 10-K, 10-Q** filings, that there was an existing ***dealer agreement*** with the dealer, Woodbridge Auto Sales. In Defendant's 10-K and 10-Q filing as of December 31, 2023, and

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-TERIZATION - 7

September 30, 2024, the Defendant explains in detail that the existing dealer agreement between the dealer and the Defendant positioned Plaintiff to serve as the **accommodation party** to the transaction and not a traditional borrower. The [5]"Dealer Servicing Agreement" stipulates that the dealer *assigns the responsibilities for administering, servicing, and collecting the amounts due on Consumer loans from the Dealer to us.*" Per the Plaintiff's [6]*Retail Installment Contract*, the dealer *assigned* the contract to the Defendant. This assignment took place instantly after Plaintiff signed the contract.

---

[5] **See Exhibit B (B.4)-Defendant admits that for accounting purposes, the transactions described under the Portfolio Program are not considered to be loans to <u>consumers</u>. Instead, "our accounting reflects that of a lender to the Dealer."  This affirms Plaintiff's position that the transaction lacks consumer loan treatment and constitutes a capital contribution under federal tax doctrine. Id. at p. 55 Form 10-K.**

[6.] **See Exhibit B (B.3)-Defendant admits that they are an *indirect* lender, and their Form 10-Q evidence that Defendant still maintains effective control over Plaintiff's contract as a Dealer Loan and has not relinquished control over the said under ASC 860.**

This assignment coincides with the stipulations made in the existing dealer agreement, which states in relevant part:

**"A Consumer Loan is originated by the dealer when a consumer enters into a contract with the Dealer that sets forth the terms of the agreement between the consumer and the Dealer for the payment of the purchase price of the vehicle. The amount of the Consumer loan consists of the total principal and interest that the consumer is required to pay over the term of the Consumer Loan. Consumer Loans are <u>written on a contract form provided or approved by us</u>. <u>Although the Dealer is named in the Consumer Loan contract, the Dealer generally does not have legal</u>**

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 8

**ownership of the Consumer Loan for more than a moment, and we, not the Dealer, are listed as the lien holder on the vehicle title. Consumers are obligated to make payments on the Consumer Loan directly to us, and any failure to make such payments will result in our pursuing payment through collection efforts."** ("Microsoft Word - 2023.01.03 - CAC Complaint - For Filing")

Per the Defendant's own 10-K and 10-Q filings with the SEC, the Defendant established a *Portfolio program* with a network of dealerships, including Woodbridge Auto Sales. The Portfolio Program is Defendant's primary business model where they provide financing solutions to independent auto dealers like Woodbridge Auto Sales. **This is not traditional consumer lending** – it is a dealer *financing* arrangement with specific risk allocation structures[7].

[7] **See Credit Acceptance Corp.,** *Form 10-K,* **filed March 28, 2024, at p.3 ("We are an indirect lender from a legal perspective, meaning the Consumer Loan is originated by the Dealer and assigned to us".). This admission defeats any exemption from Virginia Code § 6.2-1501 licensing and confirms CAC's business model relies on consumer credit origination indirectly through dealer advances.**

The February 29, 2024 (the "transaction") occurred within Defendant's "Portfolio Program", a sophisticated dealer financing structure that Defendant's own SEC filings explicitly distinguish from consumer lending. According to Defendant's Form 10-K (Page 55):

**"For accounting purposes, the transaction described under the Portfolio Program are not <u>considered to be loans to consumers</u>. <u>Instead, our accounting reflects that of a lender to the Dealer</u>**. This admission confirms that the dealer served as the primary obligor in a tri-party **securities borrowing/lending arrangement**, with Plaintiff functioning as an accommodation party whose debt instrument (security) provided collateral for Defendant's financing operations.

Under the Portfolio Program structure, Defendant advances funds to independent dealers like Wood-bridge Auto Sales, who use these advances to purchase vehicle inventory and finance Plaintiff's transaction. Plaintiff's Consumer Installment contract served as the **security/collateral** securing the dealer advances rather than Plaintiff's direct consumer debt obligation. This arrangement creates the precise securities borrowing/lending structure mandated for FFIEC reporting:

Credit Acceptance as **"securities borrower"** receives consumer debt instruments as collateral for dealer financing, while Plaintiff serve as **"securities lender"** providing the debt instrument at the stated redemption price. The Defendant's February 27, 2024, SEC 8-K filing confirms this structure by describing the transaction as **"secured financing"** and **"conveyance"** rather than loan origination, using securities lending terminology throughout.

The dealer did not risk any of its assets in providing financing to Plaintiff which would give them any legal ownership of plaintiff's vehicle title to anyone. The plaintiff contends that he served as the mechanism for the repayment of the dealer's own indebtedness to the Defendant. The Plaintiff strongly suggests that he is the ***accommodation party*** to this arrangement and not a borrower at this phase of the transaction. In the said 10-K filing, it read in relevant part:

**"We record the amount advanced to the dealer Loan, which is classified within Loans Receivable in our consolidated balance sheets. Cash advanced to the Dealer is automatically assigned to the Dealer's open pool of advances. Dealers make an election as to how many Consumer loans (either 50 or 100) will be assigned to an open pool before it is closed...All advances within a Dealer's pool are secured <u>by the future collections on the related Consumer Loans assigned to the pool...We perfect our security interest with respect to the dealer Loans by obtaining control or taking possession of the Consumer Loans, which list us as the lien holder on the vehicle title"</u>.**

The Plaintiff asserts again, that Defendant used dealer as the vehicle to obtain the *receivable* from Plaintiff with the dealer, as part of its compensation (which is customary to accept an amount significantly less that the stated purchase price of the vehicle purchased), the **down payment** from Plaintiff,

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-TERIZATION - 10

the same down payment the dealership's sale agent, Jose Diaz, stated would go to the Defendant. Relying on the Defendant's own words again, their 10-K filing supports Plaintiff's belief:

**"Under the Portfolio Program, we advance money to Dealers** (*referred to as a "Dealer Loan"*) *in exchange for **the right to service the underlying Consumer Loans**.*" ("Credit Acceptance Corporation Annual Report 2024 Form 10-K (NASDAQ: CACC ...")

Under the Portfolio Program, as payment for the vehicle, the dealer generally receives the following:

- A **down payment** from the consumer
- A **cash advance** from us; and
- After the advance balance (cash advance and related Dealer Loan fees and costs) has been recovered by us, **the cash payments made on Consumer Loan,** net collection costs and our servicing ("SEC.gov") ("Dealer Holdback")


**I.a The Portfolio Program's tri-party structure transforms Plaintiff's payment obligations into capital contributions supporting Credit Acceptance's securitization operations rather than direct debt service.**

Under 26 C.F.R. § 1.118-1, corporations such as the Defendant, exclude from gross income, "*any contribution of money or property to the capital of the taxpayer*" including "*voluntary pro rata payments*" when corporations "*require additional funds for conducting business*". Plaintiff's payments, based on Defendant's own SEC-filing admissions and belief, flow through Defendant's [8]Automobile Receivables Trust 2024-1 to support the **$625.2 million** in securitized assets and investor returns, perfectly matching this capital contribution framework.

The Portfolio Program's **dealer reserve** structure, where the Defendant held/holding Plaintiff's Original Issue Discount (OID) amounts at the rate of approximately **$18,387.50** "*for the purpose of securing obligations*" to trust investors, confirms this **capital contribution** funneled through the Portfolio Program rather than **consumer debt characterization.**

(8). **See CAC *Form 8-K*, filed March 28, 2024, Item 2.03 (reporting conveyance of approximately $625.2 million in consumer contracts into a trust structure backed by three tranches of notes totaling $500 million). This disclosure confirms securitization and supports Plaintiff's beneficial interest and recharacterization claims under ASC 860-30 and the IRS' Revenue Ruling 2003-7.**

Most critically, the Portfolio Program **creates mandatory liability recognition requirements under ASC (Accounting Standards Codification) 860-30-25-3,** which requires *__cash collateral__* recipients to **"record as an asset…together with a __liability for the obligation to return it to the payor__ (obligor)".** Defendant's receipt of Plaintiff's **$41,115,96** stated redemption price at maturity as cash collateral in the securities borrowing structure creates automatic **liability recognition,** regardless of contractual labels. **ASC 860-30-25-4** specifically addresses **"securities lending transactions"** where cash collateral must be **"recognized by the secured party…as proceeds of either a sale or borrowing"** while **ASC 860-30-25-5** requires Plaintiff's installment contract to **"continue to be recognized on the transferor's balance sheet"** confirming Plaintiff's **beneficial ownership** retention.

The Portfolio Program thus operates as a sophisticated securities borrowing/lending arrangement that federal accounting standards mandate be reported accurately, creating irrefutable grounds for **recharacterization** and **balance sheet offsetting under ASC 210-20.**

## II.    DEFENDANT'S PORTFOLIO PROGRAM SUMMARY

This case presents a paradigmatic example of how modern securitization systemically mischaracterizes investment contracts as **consumer debt.** The Defendant's own SEC filings, balance sheet accounting, and regulatory reporting confirm that Plaintiff's February 29, 2024, transaction was a **securities borrowing/lending** arrangement where:

- **Plaintiff served as securities lender** issuing a debt instrument (security) at **$41,115.96** stated redemption price at maturity.

- **Defendant served as securities borrower** establishing a short position when selling Plaintiff's price at maturity.

- **The transaction failed ASC's sale accounting** requiring borrowing treatment under FFIEC standards.

- **Plaintiff's payments constitute capital contributions** to Defendant's Automobile Receivables Trust 2024-A (or 2024-1)

The Defendant's February 27, 2024, or March 28, 2024, SEC 8-K filing explicitly describes this as a **"secured financing"** rather than loan origination, confirming the securities borrowing structure that federal accounting standards mandate be reported accurately.

III.    **Was the transaction involving Plaintiff's Receivable a True Sale or Secured Borrowing?**

The Defendant asserts that they are the lender to Plaintiff and their balance sheet for this transaction may reflect a *true sale*. However, in applying a *substance over form* doctrine, and the equitable powers of the Bankruptcy Court under **11 U.S.C. § 105(a)**, and **541**, and **28 U.S.C. § 1331**, this Court has the power to **recharacterize** Plaintiff's transaction.

Professor Peter V. Pantaleo's comprehensive analysis in [9]**"Rethinking the Role of Recourse in the Sale of Financial Assets"** confirms that when transfers fail true sale treatment, they *must* be characterized as *secured borrowings*:

**"If the transfer of the future payment stream from the originator [seller] to the third party [purchaser] fails to constitute a true sale under § 541 of the Bankruptcy Code, the transfer would be deemed as advance of funds by the third party to the originator secured by the payment stream, i.e., a secured loan".**

Source: Peter V. Pantaleo et al., Rethinking the Role of Recourse in the Sale of Financial Assets, 52

BUS. ("11KETTERING REVISED - ResearchGate") LAW. 159, 161 (1996)


Defendant's own 10-K filing convicts them right here. **Item 2.03** of the said filing, titled: **"Creation**

**of a Direct Obligation or an Obligation under an Off-Balance sheet Arrangement of a Regis-**

**trant":** ("SEC.gov | Additional Form 8-K Disclosure Requirements and Acceleration ...")

*"On March 28, 2024, Credit Acceptance Corporation* (*the "Company"* ...) *entered into a* **$500.0** *mil-*

*lion asset-backed non-recourse secured financing* (*the "Financing"*). *Following this transaction, we*

*conveyed consumer loans having a value of approximately $625.2 million to a wholly owned spe-*

*cial purpose entity; Credit Acceptance Funding, LLC 2024-1 (Funding 2024-1),* which **transferred**

those **consumer loans** *to a trust, which issued three classes of notes:* ("cacc-20240328 - SEC.gov")

**Note Class: A     Amount: $298,175,000     Interest Rate: 5.68%**

---

[9] **Source: Peter V. Pantaleo et al, Rethinking of Recourse in the Sale of Financial Assets, 52**

**BUS. LAW. 159, 161 (1996)**


**Note Class B:     Amount: $64,412,000     Interest Rate: 6.03%**

**Note Class C:     Amount: $137,413,000     Interest Rate: 6.71%**


The Defendant's funding of **$500.0** million was secured by cash flows from consumer loans. Plain-

tiff's transaction took place on February 29, 2024. On March 28, 2024, Defendant entered into a **$500**

**million** dollar financing in which they conveyed consumer loans valued at **$625.2 million** to Defend-

ant's Special Purpose Vehicle. The Defendant's new release of such financing, issued in accordance

with Rule **135c** under the Securities Act of 1933, is direct evidence of a <u>**secured borrowing**</u> which,

under **ASC 860**, accounting for the transaction as a secured borrowing rather than a true sale is man-

dated. Furthermore, Schedule **RC** balance sheet, item **4.b "Held for investment"** would coincide

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 14

between the period of February 29 – March 28, 2024. Between these times, the liabilities of the defendant would have remained on their balance sheet until Plaintiff's contract was securitized and there was no other financing announced by the Defendant between February 29, 2024 (Plaintiff's transaction date), and March 28, 2024, financing news release.

The March 28, 2024, financing revolved for 24 months with the same-like classes of Notes (A, B, C) (Class A: **$298,175,00;** Class B: **$64,412,000;** Class C: **$137,413,000;**) and interest rates ranging from **5.68%-6.71%**. The March 28th financing, which more accurately coincides with Plaintiff's February 29, 2024, transaction, according to Defendant's website, stated that the financing will:

- Have an expected average annualized cost of approximately **6.4%** including the **initial purchasers' fees and other costs**.

- "Revolve for 24 months after which it will **amortize** based upon ***the cash flows*** on the conveyed loans; and" ("cacc-20240926 - SEC.gov") ("Credit Acceptance Announces Completion of $400.0 Million")

- "Be used by us to repay ***outstanding indebtedness and for general corporate purposes***." ("Credit Acceptance Announces Completion of $400.0 Million") ("Credit Acceptance Announces Completion of $400.0 Million")

The Defendant stated in their March 28th announcement that:

*"We will receive 4.0% of the cash flow related to the underlying consumer loans to cover servicing expenses. The remaining 96%, less amounts due to dealers for payments of dealer holdback, will be used to pay principal and interest on the notes as well as the ongoing costs of the Financing. ("Credit Acceptance Announces Completion of $400.0 Million") The Financing is structured so as not to affect our contractual relationships with dealers and to preserve the dealers' right to future payments of dealer holdback.*

It is upon information and belief that Plaintiff's monthly principal and interest payments are being used to pay the Defendant's Receivables Trust 2024-1 obligations created by the March 28th

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION - 15

financing. Per Defendant's **8-K** SEC filings, the said Trust is liable on the financing which is secured by all the assets of the Trust, consisting of consumer loans which Plaintiff believes, outside of any evidence to the contrary, includes his own contract.

**Item 2.03 Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant**, illustrates that Plaintiff's security (installment contract) transferred to Defendant's Receivables Trust 2024-1 demonstrates a *capital contribution* and the cash flow stemming from the said transferred security is indicative of a return on investment for the noteholders of the said trust rather than debt repayment from a traditional loan: That section states:

*"The Financing creates debt for which the Trust is liable, and which is secured by all the assets of the Trust. Such debt is non-recourse to the Company (other than customary, limited recourse to the Company in the form of repurchase obligations or indemnification obligations for any violations by the Company of its representations or obligations as seller, servicer, or custodian), even though the Trust, Funding, 2024-1 and the Company are <u>consolidated</u> for financial reporting purposes". ("cacc-20240926 - SEC.gov")*

This structure is the epitome of securitization. The Defendant admits that they only received 4% of the cash flows from the underlying consumer loans. The Defendant structured the financing specifically to ensure their relationship with dealers was not affected, indicating the furtherance of the Portfolio Program. Defendant also admits that "90%" of consumer cash flows "*will be used to pay principal and interest on the notes*" to investors, with Defendant retaining only "4%" of the cash flows related to the underlying consumer loans as a servicing fee.

This admission parallels with the dealer agreement mentioned earlier where Defendant would receive the right to *"service"* the conveyed consumer loans. In order for Defendant to survive this suit, they would have to submit to the Court that Plaintiff's transaction was the only loan that was not securitized. The Defendant's history of entering into these financings and the consistent

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 16

language and strategy used in their structure, Plaintiff prays to this Court to infer that his transaction was among the one securitized by Defendant.

## IV.    ASC 860's Standards for Secured Borrowings and True Sales (Sales Accounting)

Under **Accounting Standards Codification** (ASC) **860**, *Transfers and Servicing of Financial Assets*, the primary factor in deciding whether a transfer should be accounted for as a sale or secured borrowing is whether the transferor has relinquished effective control over the transferred assets. *See **ASC 860***. According to ***PricewaterhouseCoopers***-A global professional services firm and one of the Big Four accounting firms in the world, *a transfer of financial assets can fail to qualify for derecognition accounting for a variety of reasons. They range from one-off transactions that do not meet all of the sale accounting requirements (sometimes referred to as "failed sales") to **routine transfers of securities in the capital markets governed by <u>standardized contracts</u> having terms that, by design, <u>allow the transferor to maintain effective control over the securities.</u>*** *("5.1 Accounting for transfers reported as secured borrowings ... - Viewpoint") Three of the most common are:*

- **Repurchase Agreements**
- **Dollar Rolls**
- **Securities Lending transactions**

Based on the ASC 860 criteria and Defendant's own documentation, the Plaintiff argues that the Defendant's financing structure meets all three of the above terms that prevent derecognition accounting:

## 1.  REPURCHASE AGREEEMENTS

**Defendant has explicit repurchase obligations:**

From Defendant's Sales and Contributions Agreement, **Section 6.1**:

- **CAC shall have the obligation to make payment to Funding of the applicable Purchase Amount.** ("Document - SEC.gov")

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 17

- **"CAC hereby agrees to repurchase directly from the Trust such Ineligible Loans"** ("Ineligible Loans Definition | Law Insider") ("Ineligible Loans Definition | Law Insider")
- **Multiple repurchase triggers for representation breaches.**

This matches the **ASC 860** definition exactly: "***The transferor…simultaneously agrees to repurchase the security from the transferee at a future date***".

2. **DOLLAR ROLLS (Substantially Similar Assets)**

   **Defendant's structure involves transferring loans and receiving "substantially the same" financing:**

- **CAC transferred $625.2 million in loans.**
- **CAC received $500 million in financing backed by those same loans.**
- **The loans serve as collateral for the financing CAC received.**
- **This creates the "substantially the same" economic exposure described in dollar rolls.**

3. **SECURITIES LENDING TRANSACTIONS**

This part is the perfect match for analyzing the transaction from the ***substance over form*** doctrine:

**Plaintiff's analysis shows: (Viewing the transaction from the substance over form doctrine)**

- **The plaintiff is the owner of securities** (the loan contract)
- **Defendant is the third-party borrower of Plaintiff's security.**
- **Cash provided would be the collateral in the form of cash.**
- **Plaintiff's installment payments serve as the "fee" for lending Plaintiff's security.**
- **Open-ended agreement with ability to unwind through payoff.**

The **ASC 860** language states '***either party may unwind the agreement after first notifying the other, and shortly thereafter the parties re-exchange the borrowed securities and related collateral***'. ("5.1 Accounting for transfers reported as secured borrowings ... - Viewpoint") This language

applies to Plaintiff's case because either party can unwind (Plaintiff via payoff, Defendant via repossession), then re-exchange the security (loan) and collateral (remaining balance).

More importantly, Defendant's Sale and Contribution Agreement, **Section 2.1(g)** states:

**"If and to the extent the transfer…is characterized as a <u>financing transaction</u>, then this Agreement also shall be deemed to be, and hereby is, a security agreement**. The recognition of a potential **recharacterization** by Defendant further supports Plaintiff's claims as the above insert taken directly from the Defendant's own filings, they are admitting their transaction could be characterized as <u>*financing*</u> rather than a <u>*true sale*</u>.

The Defendant's financing structure fails to qualify for derecognition under ASC 860 because it contains:

- **Repurchase obligations.**

- **Substantially similar asset exchange**

- **Securities lending characteristics**

All three prevent *sale accounting* and require *secured borrowing treatment*. Defendant's own SEC filings confirm they keep the assets "on-balance sheet" and consolidate the entities – providing they are already accounting for these as secured borrowings and not <u>*sales*</u>. This creates a massive inconsistency: Defendant's representation to Plaintiff that the transaction was a *loan* while representing to the SEC it's secured borrowing, which could allude that the Defendant is actively committing potential securities fraud.

Plaintiff presents to the Court that Defendant represented that his transaction involving the *installment contract*

was evidence of a loan to him but really intended the instrument to function as a totally different security. For one, the ***non-recourse financing structure***. The Defendant's filing explicitly states this creates "***debt for which the Trust is liable***" that is "***non-recourse to the Company***." This directly supports Plaintiff's argument that:

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-TERIZATION - 19

- The defendant transferred the loans to obtain financing (secured borrowing).

- The Defendant's Automobile Receivables **Trust 2024-1**, not Credit Acceptance Corporation, is the primary obligor on the debt.

- The Plaintiff's monthly principal and interest payments (cash flow/clean up call) are indeed servicing the Trust's debt obligations.

The Defendant's financing also has ***limited recourse exceptions*** which are only for:

- Repurchase obligations.

- Indemnification obligations

- Violations of representation as seller, servicer, or custodian

This also supports Plaintiff's **ASC 860** argument that the Defendant retained effective control (continuing involvement) over the transferred assets, which undermines sale accounting treatment. Under **ASC 860-10-40-5**, the derecognition criteria require surrendering control. Defendant's **8-K** shows:

- Retained servicing responsibilities.

- Has repurchase obligations.

- Maintains indemnification duties.

- Bears risk for representation violations

The plaintiff further asserts that the substance of his transaction indicates that the financing was a secured borrowing where:

- The "collateral" (Plaintiff's loan) secures the Trust's debt.

- Defendant maintains substantial continuing involvement.

- The economic substance is financing, not a true sale.

The Defendant may assert that their financing has nothing to do with Plaintiff's financial obligations under the Consumer Loan contract but that argument fails because Plaintiff's monthly principal and interest payments flow though the Defendant (Credit Acceptance Corporation) to Defendant's

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION - 20

Automobile **Receivables Trust 2024-1** to service the Trust's debt obligations as mentioned in their 8-K filings, and not to Defendant Credit Acceptance Corporation as a true purchaser of the Consumer Loan contract as represented to Plaintiff. These acts support Plaintiff's securities lending characterization where:

- Plaintiff is actually the securities lender because it is the receivables stemming from the Consumer Loan contract that serves as capital for the Trust and the underlying cash flows (monthly payments from plaintiff) are being used to pay the Trust's debt obligations.

- Plaintiff's monthly payments represent the "return" of the borrowed security which are being redirected to Defendant's Trust noteholders according to the class of notes issued.

- Defendant received financing, not purchase proceeds.

The Defendant has numerous 8-K filings all reporting the same financing for dozens of Trusts set up to facilitate their financing. The language from their 8-K filings creates potential inconsistencies because Defendant continues to assert that they own Plaintiff's "loan" and have filed a lien with the Virginia Department of Motor Vehicles indicating that they are the lien holder while reporting on their 8-K that the actual lien holder is the Indenture Trustee, **Computershare Trust Company, N.A.** The defendant may have an uphill battle to prove that they own Plaintiff's loan outright since:

- True owners do not typically have non-recourse financing secured by assets they own.

- The continuing involvement described contradicts complete transfer of control.

- The economic substance appears to be financing rather than asset purchase.

Using Defendant's own words, and representations made to the SEC documents that the transaction was structured as financing rather than a true sale, which directly supports Plaintiff's **ASC 860** secured borrowing analysis and potential setoff claims.

**V.      Defendant's Sales and Contributions Agreement Support Plaintiff's Secured Borrowing Claims**

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION - 21

Upon research of Defendant's numerous 8-K/10-K/10-Q filings with the SEC, Plaintiff believes that Defendant has remained very consistent with their financing structures. Given Defendant's history and public records from the SEC, Plaintiff claims that *his* loan was among the assets transferred to Defendant's **Receivable Trust 2024-1** on March 28, 2024. If the Court accepts Plaintiff's claims on its face as *plausible*, not merely conceivable, then it can seem plausible that Plaintiff's loan is not so special that Defendant purposely chose not to securitize *his* out of the **billions** of dollars in asset transfers the Defendant has conducted throughout their history.

Defendant's Sales and Contributions Agreement, **Section 2.1(g),** from March 28, 2024, has all the hallmarks of 1) **Secured Borrowing Language:** *"However, notwithstanding the express intent of the parties, if and to the extent the transfer of any of the Loans or other Conveyed Property is for any purpose characterized as a collateral transfer for security or the transaction is characterized as a financing transaction, then this Agreement also shall be deemed to be, and hereby is, a security agreement within the meaning of the UCC";* 2) **Control Retention-Massive ASC Violation:** *Section 2.1(g) explicitly states: "CAC will continue to service the Conveyed Property; CAC retains the right to service the Loans and the related Contracts; CAC receives servicing fees and reimbursements";* 3) *Repurchase Obligations-Control Retention, Section 6.1(Mandatory Repurchase(s): "CAC has the obligation to make payment for breached representations; CAC must repurchase directly from the Trust";* This creates **continuing involvement** that defeats sale accounting; 4) *Financial Consolidation Admission:* The 8-K states: *"even though the Trust, Funding 2024-1 and the Company are consolidated for financial reporting purposes":* Plaintiff questions if the transactions were true sales, there would be no need to consolidate. Consolidation proves the lack of derecognition; 5) *Clean-Up Call Option:* Both documents (8-K/Sales and Contribution) mention Defendant's *limited right to exercise a 'clean-up' option to purchase the consumer loans* – this is textbook control retention under **ASC 860**; 6) *Servicing Retention, Section 2.1(i)* further steepens the hill for Defendant: *CAC will reflect this transaction on its consolidated financial statements as an 'on-*

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION - 22

*balance sheet' item in accordance with generally accepted accounting principles:* Defendant admits the transaction stays on-balance sheet per GAAP equally **ASC 860** secured borrowing; 7) *Non-Recourse=Securities Lending Structure:* The **8-K** confirms: *"Such debt is non-recourse to the Company"* except for limited recourse – exactly matching Plaintiff's securities lending analysis; 8) *Plaintiff's Payment Service Defendant's Debt: "We will receive 4% of the cash flows related to the underlying consumer loans as a servicing fee"* and *"The remaining 96%...will be used to pay principal and interest on the notes".* Once again, Plaintiff's monthly payments are servicing the Defendant's own borrowings.

Plaintiff believes the facts presented are more than speculation whereas Defendant has already admitted and they documented **control retention**; they admitted potential **secured borrowing characterization**; they **keep the assets on-balance sheet per GAAP;** they **consolidate the "buyer" entities;** Plaintiff's **payments service Defendant's debt, not repay his loan**.

Defendants have already documented their own **ASC 860** violations in their SEC filings. Their actions create massive liability for securities fraud as it appears they are misrepresenting the transaction's true nature to Plaintiff while correctly accounting for it internally as secured borrowings.

VI.    **Precedential Support: The Lehman Brothers Repo 105 Case Confirms Judicial Authority to Recharacterize Deceptive Securitization Structures**

The landmark case of **Lehman Brothers' Repo 105** transactions provides compelling precedential support for this Court's authority to recharacterize Defendant's Portfolio Program transactions under the *substance-over-form* doctrine. The Lehman Brothers bankruptcy proceedings, extensively documented in the 2,200-page examiner's report filed by *Anton R. Valukas*, demonstrate that federal courts possess broad equitable powers to pierce through sophisticated financial engineering schemes that mischaracterize the true nature of transactions.

i.    **Structural Similarities Between Lehman's Repo 105 and Defendant's Portfolio Program**

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-TERIZATION - 23

The Defendant's Portfolio Program operates with the same deceptive mechanics that **characterized Lehman's Repo 105** scheme:

**i.a Temporary Balance Sheet Manipulation:**

Just as Lehman used **Repo 105** to temporarily remove $50 billion in troubled assets before quarterly reporting periods, Defendant's Portfolio Program systematically removes consumer debt instruments from dealer's balance sheets while retaining effective control through the "automatic assignment" mechanism described in their 10-K filings.

**i.b Securities Borrowing/Lending Structure:**

Both transactions create an identical three-party arrangement: (i) **the consumer/accommodation party provides the debt instrument as collateral, (ii) the financial institution receives cash collateral securing obligations to investors, and (iii) the dealer serves as the conduit for the arrangement.** As confirmed in *Jeffers, A.E., "How Lehman Brothers Used Repo 105 to Manipulate Their Financial Statements" (2011),* Lehman's transactions *"should have been recorded as secured loans"* rather than sales due to the intent to repurchase.

**i.c Investor-Driven Cash Flows:**

Defendant admits in their March 28, 2024, SEC filing that *"96% of cash flows will be used to pay principal and interest on the"* to investors, identical to Lehman's structure where consumer payments flowed through to securitization trust investors rather than representing traditional loan repayment.

**VII.    Judicial Precedent for Recharacterization Under Substance-Over-Form Analysis**

The Lehman Brothers examiner's findings, accepted by the U.S. Bankruptcy Court for the Southern District of New York, established that courts *must* apply substance-over-form analysis when sophisticated financial structures obscure the true nature of transactions. As noted in the examiner's report,

transactions that *"failed true sale treatment"* must be *"characterized as secured borrowings"* **regardless** of **contractual labels**.

Professor Peter V. Pantaleo's analysis, cited in the Lehman proceedings, confirms the controlling legal principle: *"If the transfer of the future payment stream from the originator [seller] to the third-party [purchaser] fails to constitute a true sale under § 541 of the Bankruptcy Code, the transfer would be deemed as advance of funds by the third party to the originator secured by the payment stream, i.e., a secured loan"*.

The Plaintiff asks this Court to set aside the *form* of the transaction as represented by the Defendant pursuant to the *installment contract* and apply the *Lehman* principle directly to the Defendant's Portfolio Program, where Plaintiff's debt instrument (security) secured the dealer's advance, secured Defendant's Trust 2024-1 debt obligations to the noteholders, and funded Defendant's servicing capabilities, rather than representing direct consumer debt.

i.       **ASC 860 Standards Mandate Recharacterization**

The accounting standards applied in the *Lehman* case provide additional support for *recharacterization*. Under **ASC 860-30-25-3,** which governs securities lending transactions, cash collateral recipients must *"record as an asset…together with a liability for the obligation to return it to the payor (obligor)"*. Defendant's receipt of plaintiff's **$41,115.96** stated redemption price as *cash collateral* in the Portfolio Programs structure creates the same automatic liability recognition that was required in the *Lehman* proceedings.

The three-part test in SFAS (adopted post-Lehman to address these precise issues) confirms that Defendant's transaction fails true sale treatment because: (1) the assets were not isolated beyond Defendant's reach, (2) Defendant maintains effective control through the dealer servicing agreement, and (3) the structure ensures assets return to Defendant's securitization vehicles as intended.

According to the *Securitization Accounting Manual, 11ᵗʰ Edition,* published by **Deloitte,** one of the world's most renown law and accounting firms:

*"For a financial asset transfer (e.g., a securitization of a financial asset or participating interest in a financial asset) to be accounted for as a sale, the transferor must surrender control over the assets transferred. Control is considered to be surrendered in a securitization only if all three of the following conditions are met: ("7813 - Scott - Open Mobile Survey Graphics")*

- *The assets have been legally isolated;*

- *The transferee has the ability to pledge or exchange the transferred assets; and ("Which is NOT one of the conditions to be considered in deciding whether ...")*

- *"The transferor otherwise no longer maintains effective control over the assets."* **("Chapter II. – The Securitization Transaction (Overview) - FDIC.gov")**

For accounting purposes, the term "*transfer*" has an extremely specific meaning. It relates to non-cash financial assets only and involves a conveyance from one holder to another. Examples include *selling* a receivable, ***pledging it as collateral for a borrowing***, or ***putting it into a securitization vehicle.*** The definition excludes transactions with the issuer or maker of the financial instrument (i.e., originating a receivable, collecting it, or restructuring it, such as in a troubled debt restructuring). ("7813 - Scott - Open Mobile Survey Graphics - IAS Plus") (Source: Deloitte, Securitization Accounting Manual, 11th Edition)

The **ASC 860** definition of *transfer* undermines the Defendant's claim that they were the *assignee* of the Plaintiff's contract because the origination of the contract (receivable) does not create the financial asset. It is the *transfer* of it that does. According to the Defendant's own SEC regulatory filings, the Defendant did not *sell* the receivable [thus defeating the sale criteria under **ASC 860**], rather, they *pledged* it as collateral for their own borrowing (See 8-K filing of March 28, 2024) as a non-cash financial asset.

When evaluating whether Plaintiff's asset was legally isolated, the **ASC 860** standard mandates that the asset must be put beyond the reach of the transferor, or any consolidated affiliate of the transferor, and their creditors (either by a single transaction or a series of transactions taken as a whole). The

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION - 26

Plaintiff believes that the Bankruptcy Court's standard of review shall be applied in this case to determine whether the Defendant would have a debt claim against the Plaintiff or would the debt be converted into equity of the Plaintiff. However, if the Defendant were to enter into bankruptcy or receivership of the transferor or any consolidated affiliate, the facts and circumstances would control, which shall include:

(1) Judgments about the kind of bankruptcy or other receivership into which a transferor or affiliate might be placed, (2) whether a transfer would likely be deemed a true sale at law, and (3) whether the transferor is affiliated with the transferee.

Plaintiff asserts that any entity that relies on securitization for funding automatically bears the risk of having the alleged debt recharacterized under the bankruptcy court's equitable powers under § 105.

*Deloitte* recognized this potential risk in their said manual:

***In contrast to the "going concern" determination, the transferor must address the possibility of bankruptcy, regardless of how remote insolvency may appear given the transferor's credit standing at the time of securitization, and irrespective of an entity's credit rating. That said, it is not enough for the transferor merely to assert that it is unthinkable that a bankruptcy situation could develop during the relatively short term of the securitization. ("133218_FASB_Cover.indd - Bentley University")***

The Defendant's securitization structure, which calls for their consolidation, makes legal isolation of Plaintiff's asset impossible. Given that their own financing structure resulted in a pledge of Plaintiff's contract (receivable) as collateral to their **Receivables Trust 2024-1** [to back the issuance of their trust notes], the first transaction between Credit Acceptance Corporation and Credit Acceptance Funding, **LLC 2024-1** (or any other SPE involving Plaintiff's transaction), cannot be deemed a true sale at law outside any evidence that the Funding, LLC actually purchased the receivables. The second transfer, from Funding LLC to the Receivables Trust 2024-1, would be the focal point of the

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 27

analysis under the bankruptcy code. It is at *this* phase where the Defendant runs into serious economic risk, and it is at this phase where a bankruptcy trustee could reach the transfer of Plaintiff's assets. The Defendant's continuing involvement in the transferred assets preclude them from removing the said assets from its balance sheet. Defendant's own 8-K/10-K filings are all indicative of ***continuing involvement.*** The transferee does not have the right to pledge or exchange the assets because the Defendant's repurchase obligations restrict those rights. Page 23 of the *Deloitte* securitization accounting manual highlights this point:

***"The transferor, its consolidated affiliates, or its agents cannot effectively maintain control over the transferred assets or third-party beneficial interests related to those transferred assets through:" ("Account Receivables | SpringerLink")***

- *An agreement that requires the transferor to repurchase the transferred assets before their maturity (in other words, the agreement both entities and obligates the transferor to repurchase as would, for example, a **forward contract or a repo**). ("Account Receivables | SpringerLink")*

- *The ability to unilaterally cause the SPE to return specific assets, other than through a cleanup call, that conveys more than trivial benefit to the transferor. ("Account Receivables | SpringerLink")*

- *An agreement that permits the transferee to require the transferor to repurchase the transferred assets, which is priced so favorably that is probable that the transferee will, in fact, require the transferor to repurchase them. ("Account Receivables | SpringerLink")*

The three bullet points are all written in the Defendant's SEC filings thus failing the true sale test under **ASC 860**. Furthermore, the amount of **$41,115.96** return (overcollateralization), written *deep in the money* makes it likely that the transferee will exercise its right to have the transferor (the Defendant) to repurchase the asset.

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 28

Since the Defendant's securitization structure is set up in such a way that it fails the true sale test, the *Deloitte* manual makes a Plaintiff's point abundantly clear: On page 23, ***What if I fail to comply with the sale criteria?***

***If the securitization does not qualify as a sale, the proceeds (other than beneficial interests in the securitized assets) are accounted for as a liability-a secured borrowing. The asset(s) will remain on the balance sheet with no change in measurement, meaning that no gain or loss is recognized. The assets should be classified separately from other assets that are unencumbered.***

The Plaintiff's complaint and his demands can all be summed up with that last paragraph. It is the foundation of his lawsuit against the Defendant, which is the accurate accounting for his transaction.

### ii.     Possible Fraudulent Mischaracterization Parallels

Just as Lehman's failure to disclose Repo 105 transactions constituted securities fraud, Defendant's mischaracterization of the Portfolio Program violates federal disclosure requirements. The *Lehman* examiner found that "*failure to disclose the use of its accounting device to significantly and temporarily lower its leverage...created a misleading portrayal of Lehman's true financial health.*" ("*Lehman Bankruptcy Report: Top Officials Manipulated Balance Sheets ...*") Similarly, Defendant's characterization of securities borrowing arrangements as traditional consumer loans misled Plaintiff about their true legal position and rights.

### iii.    This Court's Equitable Authority

The *Lehman* proceedings confirm that federal courts possess broad equitable authority under **28 U.S.C. § 1331** and principles of federal common law to recharacterize transactions that violate the substance-over-form doctrine. As demonstrated in the *Lehman* case, when sophisticated financial institutions use complex structures to evade regulatory requirements and mislead participants, courts must look beyond contractual labels to determine the true economic substance of the arrangement.

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 29

Plaintiff respectfully requests this Court to follow the precedent established in the *Lehman Brothers* proceedings and apply substance-over-form analysis to recharacterize Defendant's Portfolio Program as the securities borrowing/lending arrangement it actually represents, thereby granting the relief requested herein.

## VIII.    DEFENDANT'S SHORT POSITION CREATES MANDATORY LIABILITY RECOGNITION UNDER FFIEC AND ASC 815 REPORTING STANDARDS

The Federal Financial Institutions Examination Council (FFIEC) establishes the controlling definition for short positions that Defendant, as a financial institution under **26 C.F.R. § 1.9002-1**, must follow in their Call Report filings. **FFIEC Glossary 031 and 031** unambiguously defines **"Short Position"** as:

*"When a bank sells an asset that it does not own, it has established a short position. If on the report date a bank is in a short position, it shall report its liability to purchase the asset in Schedule RC, item 15"*. This definition creates three irrefutable facts in Plaintiff's case:

1.  **The defendant sold Plaintiff's asset** (the debt instrument with $41,115.96 stated redemption price) to their securitization trust investors.

2.  **Defendant did not own the asset** when sold (as evidenced by their own admission that the transaction was "secured borrowing" rather than a true sale).

3.  **The defendant must report the liability** to purchase the asset under **Schedule RC, item 15**.

The Fourth Circuit has consistently recognized that federal courts possess broad authority to enforce compliance with federal regulatory reporting requirements. In *Kiviti v. Bhatt, 78 F.4th 168 (4th Cir. 2023)*, the Fourth Circuit held that bankruptcy courts derive exceptional power from Congress's Article I authority and are **"not bound by the justiciability requirement of Article III absent a statutory limitation"**.

*PWC* section 5.4 *Recognition of Collateral* states:

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 30

**"When a transfer of financial assets is accounted for as a secured borrowing, the transferor continues to report the transferred assets <u>on its balance sheet</u>.** *ASC 860-30* **prescribes how each party should report the transferred financial assets (the "noncash collateral")". ("5.4 Recognition of collateral - Viewpoint")**

The section goes on to state:

**"Because the characterization of the exchange between a transferor and transferee under the secured borrowing model in** *ASC 860-30 <u>sometimes differs from its legal form,</u>* **applying the collateral recognition provisions in** *ASC 860-30* **can be challenging. ("5.4 Recognition of collateral - Viewpoint") This is particularly true regarding** *<u>repurchase agreements</u>* **and** *<u>security lending agreements customarily used in the U.S.</u>***"**

The Defendant's March 28, 2024 (or February 27, 2024), 8-K SEC filings disclose the transfer of approximately **$625 million** in auto installment contract (which Plaintiff strongly suggests contained his contract) to a wholly owned special purpose entity (SPE-Credit Acceptance Funding, LLC 2024-1), which subsequently transferred these *<u>receivables</u>* to a trust (Credit Acceptance Automobile Receivables Trust 2024-1) that issued asset-backed notes. While this structure is ostensibly styled as a "true sale", the *economic substance* of the transaction, as detailed below, demonstrates that Defendant Credit Acceptance Corporation, retained effective control over the transferred financial assets in defiance of *ASC 860-10-40-5(c),* thus precluding derecognition and necessitating recharacterization under *ASC 860-30.*

Under ASC 860-10-40-5(c), a transferor retains effective control when (1) it has an obligation or right to repurchase the transferred assets before their maturity, or (2) the transferee is constrained from selling or pledging the assets. The securitization structure disclosed in Defendant's 8-K exhibits both hallmarks:

- **Servicing Rights and Residual Interests:**

Defendant Credit Acceptance retained the contractual right to service the transferred loans and re-ceive a 4% servicing fee, which gives rise to both substantive discretion and economic exposure to the underlying receivables. These retained interests directly undermine the notion that the transferee (trust) obtained unrestricted control.

- **Dealer Holdback and Revolving Structure:**

Defendant Credit Acceptance maintained significant exposure to credit losses via dealer holdbacks-a form of contingent interest tied to loan performance-and structured the deal as a 24-month revolving facility. These mechanisms sustain Defendant's ongoing involvement and economic interest in the assets.

- **Non-recourse Debt with Embedded Constraints:**

Although the transaction is described as "non-recourse," the transferred receivables serve as collateral for the notes issued by the trust. PWC's ASC 860-30 guidance (Section 5.4) explicitly analogizes such structures as secured borrowings, akin to repurchase or securities lending arrangements, where the underlying asset is never truly relinquished.

Under ASC 860-30 and PWC Section 5.4, transactions such as repurchase agreements and securities lending-where the transferor retains effective control – are treated as **secured borrowings** and the collateral remains on the **_transferor's_** balance sheet. The Defendant's securitization structure fits this description:

- The Company (Credit Acceptance) continues to recognize the underlying auto installment con-tracts on its balance sheet, consistent with secured financing.

- The trust-issued notes represent liabilities collateralized by Plaintiff's [consumer] loan, further reinforcing the analogy to a repurchase agreement.

- As such, the transferred contract(s) constitute **collateral,** not **_derecognized_** assets – thereby satis-fying the criteria for collateral recognition under ASC 860-30-25-5 and mirroring repurchase agreement accounting.

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-TERIZATION - 32

Since the Defendant and its entities (SPV, Trust 2024-1) are consolidated for accounting purposes, and by way of their securitization structure, it is impossible that the transferred assets meet the *derecognition* criteria under ASC 860-10-40-5. Therefore, by default, Plaintiff's *loan* must remain or should have been accounted for to reflect the said loan's retainment on Defendant's balance sheet. Defendant's SPE and Trust structure suggests **legal isolation** (i.e., bankruptcy remote), but the presence of ***servicing rights, retained interest (e.g., 4% servicing strip), and dealer holdback obligations*** may continue to indicate ***continuing involvement***. According to Defendant's own admissions and public regulatory filings, the Defendant retains effective control (e.g., via call options, servicing discretion, or residual interests). The FFIEC mandates that under the ASC, the transfer is treated as a <u>se-</u><u>cured borrowing</u>, not a sale.

Under ASC 860-30, and PWC's section 5.4, Defendant's securitization structure evidencing **Repurchase agreements** and **Securities lending agreements,** are treated as secured borrowings because, as said before, the Defendant retains control, and the transferred assets are expected to return. Additionally, since Defendant's securitization is structure in such a way that they retain control, and Plaintiff's auto installment contract serves as their trust's ***collateral***, then the proceeds from the trust notes [backed by Plaintiff's collateral] are to be recorded as ***liabilities*** – just like a repo.

Supporting indicators for this assertion is the fact that on March 28, 2024, the Defendant issued three tranches of notes backed by -$625 million in *loans*. The transaction was represented as **non-recourse** and revolving for 24 months, with Defendant receiving a servicing fee and retaining exposure to dealer holdback. These features suggest economic exposure and control, reinforcing secured borrowing treatment under ASC 860-30. Since the said transaction was structured in such a way that did not meet the *derecognition* criteria under ASC 860-10-40-5, the FFIEC mandates that the transaction shall be accounted for as secured borrowing, and the ***receivables*** would be treated as **<u>collateral</u>** – which is similar to how ***Repurchase Agreements*** and ***Securities Lending Agreements*** are treated

under ASC 860-30. If this Court looks beyond the contractual labels of Plaintiff's transaction with the Defendant, and enforce the accounting mandate under ASC 860-30, then:

1. The **cash received** from Plaintiff's collateral is recorded as a ***liability*** of the Defendant;

2. The **receivables remain on the balance sheet** of the Defendant, and the receivables are now classified as "pledged securities," or "transferred securities;" and

3. The Court would then apply the **collateral recognition guidance** of ASC 860-30-25-5.

The Court would not have took look far as to draw the substance of this transaction as the Defendant's own public SEC filings admits that the proper accounting treatment for the transferred assets could be enforced:

**Defendant's Sale and Contribution Agreement Section 2.1(g)** (March 28, 2024):

**"If and to the extent the transfer…is characterized as a financing transaction, then this Agreement *also shall be deemed to be*, and hereby is, a *security agreement*.**

Further evidence of Defendant's acknowledgment that Plaintiff's assertions have merit is their **granting clause** in the Indenture Agreement (March 24,2024), which states:

**"It is the *intention* of the issuer [Automobile Receivables Trust 2024-1] and the Indenture Trustee [Computershare Trust Company, N.A.] that this grant constitutes a grant or assignment of a valid, first priority security interest in the issuer's rights in the Collateral, free and clear of all Liens…" ("Document - SEC.gov")**

This admission clearly rebuts Defendant Credit Acceptance Corporation claim to have any legal ownership in Plaintiff's vehicle title. It further illustrates that the term "security interest" is being used rather than a bon fide "true sale." However, as of this lawsuit, Credit Acceptance Corporation is listed as the lienholder of Plaintiff's vehicle title.

And even more compelling:

**"The Indenture Trustee…acknowledges that in such capacity it is acting as a representative, within the meaning of Section 9-502(a)(2) of the UCC, for itself, the Trust Collateral Agent, the**

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-TERIZATION - 34

Noteholders, the issuer and Seller...*as secured parties with security interests in the collateral...*".

(Which such collateral consists of Plaintiff's installment contract-which such payments to the note holders deriving from Plaintiff's monthly principal and interest payments)

The language used in Defendant's Indenture Agreement/Sales and Contribution agreement gives more strength to Plaintiff's request for recharacterization. It shows that:

- The parties **contemplated and acknowledged** the transaction as secured **financing.**
- The agreement is structured to **function as a security agreement** under **UCC Article 9,** not a true sale.
- The **Indenture Trustee is acting as a representative of secured parties,** which is 0only relevant in a **secured loan context,** not a sale.

If the Court looks beyond the contractual labels of Plaintiff's transaction, the Court can conclude that the language pointed out from Defendant's agreements actually meant that even if the transaction is styled as a sale, the parties **contractually agreed** that if it's ever deemed a financing, the agreement will **operate as a security agreement** – satisfying the recharacterization standard under both **GAAP and UCC.**

Under ASC 860-30 and PWC section 5.4 governing **collateral recognition,** defines the *legal* and *accounting characteristics* of the said term [collateral recognition]. The Defendant's **Repurchase Agreement** (obligation)

legal characterization is defined as:

**"Legal purchase and sale. Transferee acquires legal ownership of each security but is <u>obligated to sell the security back to the transferor.</u>"**

The accounting characterization is defined as:

**"Noncash collateral pledged to secure transferor's obligation to repay "borrowed" cash."**

Based on Defendant's own SEC filings and admission in their 8-K/10-K forms, the transaction involving Plaintiff and their own financing of March 28,2024, closely mirrors the *accounting*

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 35

*characterization* under ASC 860-30-*collateral recognition* and PWC section 5.4. The Defendant received **cash proceeds from investors** (noteholders) in exchange for transferring auto installment contracts to a trust. This economically identical to a securities lender receiving cash collateral – the transferor keeps exposure, and the transaction is temporary or conditional. Plaintiff contends that the cash received was not true "sale consideration," but rather the **proceeds of a secured borrowing.**

The **indenture trustee** was granted a **security interest** in the auto loan receivables – just like a borrower pledging collateral in a repo or securities lending deal. The March 28, 2024, 8-K explicitly confirms that the trust (the "issuer") granted a valid security interest under **UCC § 9-502(a)(2).** Plaintiff argues that this arrangement is textbook secured financing – the trust did not own the receivables outright, it held them **as collateral**.

Plaintiff's argument for recharacterization of his transaction under ASC 860 is actually a request to apply the appropriate accounting mandate under FFIEC guidelines in which Defendant's own SEC filings and admission are already recognized.

The *proceeds from a borrowing. Noncash collateral transferred by the securities borrower continues to be reported on transferor's balance sheet.* In Plaintiff's case, the Defendant reports the securitized receivables **on its balance sheet** – even after the transfer – because **control was retained** (e.g., viz servicing rights, dealer holdbacks, etc.). This is consistent with the secured borrowing under ASC 860-30, not a true sale. Plaintiff's so-called *loan* should never have been derecognized – they remain **collateral on Credit Acceptance's books**, and the securitization is merely a financing arrangement. The ASC 860 accounting framework challenges the Defendant's assertion of "true sale" treatment and is consistent with the recharacterization provisions set forth in UCC Article 9, as acknowledged by the Defendant in their 8-K filing. Furthermore, this accounting treatment may invoke Virginia's usury statutes—should the Court determine that the transaction constitutes a secured loan rather than a true sale, the resulting effective interest rate could potentially exceed statutory thresholds.

i.    **Plaintiff's Claim to Proceeds: Recharacterization=Retained Ownership**

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION - 36

Under ASC 860-30, cash collateral must be recorded as a liability. ASC 860-10-40-5 indicates that Defendant   kept effective control of receivables via servicing rights, residual interests, and repurchase obligations, so the transfer did not meet derecognition criteria and is considered a secured borrowing. Plaintiff cites ASC 860-30-25-3 to 25-10 which mandates that **cash collateral** received in a **secured borrowing** arrangement be recorded as an asset with a corresponding liability to return it. Defendant's own financial statements, however, in order to continue their operations that will attract potential investors, may only reflect restricted cash – never a true sale gain – confirming a continuing liability to return collateral.

The Defendant utilizes **Computershare Trust Company N.A.**  as their **Collateral Agent** and **Indenture Trustee**

for the receivables transferred in their securitization structure. Per Defendant's *Indenture Agreement* filed with the SEC and their *Sales and Contribution* Agreement, the said trust company was granted a security interest in the underlying payment stream from Plaintiff's collateral under **UCC § 9-502(a)(2)**. Banking regulations (Reg Y, FFIEC Schedule RC-R) require institutions holding securitized collateral to back such exposure with risk-based capital, treating pledged assets as ***off-balance sheet*** and segregated in blocked accounts. The Defendant's regulatory filings confirm that the trust's collateral accounts are maintained in accordance with these rules.

Furthermore, U.S. Treasury Regulations confirm segregation and return of collateral under **26 C.F.R. § 9002-1** (dealer reserve method) requires amounts set aside to satisfy ***financing obligations*** to be held in dedicated reserve accounts and **excluded** *from income*, reinforcing that collateral accounts are not the Defendant's unrestricted assets. (See 26 C.F.R. § 1.9002-1)

**26 C.F.R. § 1.118-1** excludes voluntary contributions to corporate capital – such as collateral deposits – from gross income and requires their separate accounting, confirming any surplus belongs to the contributor (the pledgor). The Defendant cannot claim they have ownership of these funds because their SEC filings already confirm they do not obtain ownership of the Plaintiff's collateral proceeds

(less the 4% servicing fee) or any direct benefit from the cash flow stemming from Plaintiff's under-lying receivable.

The plaintiff believes case law supports his claim and entitlement to the cash collateral and any excess proceeds or interest rates charged beyond Virginia's statutory usury limits. Trust indentures and SEC rules governing asset-backed securities mandate strict segregation of collateral and prohibit appropri-ation of any excess without an accounting to the beneficial owner. **UCC § 9-607** and **§ 9-625** require that, upon enforcement or disposition of collateral, any surplus proceeds be returned to the debtor or pledgor.

Courts have enforced these principles by ordering disgorgement of surplus collateral when overcollat-eralization or misapplication occurs. See ***Quaker Construction Corp. v. American States Ins. Co.,*** *149 B.R. 987, 993 (Bankr. D. Mass. 1992) (surplus from collateral sale returned to debtor)*. In *Quaker*, the debtor had posted collateral under a surety bond arrangement that substantially exceeded its actual obligation. When the surety sold the collateral and realized proceeds in excess of the bond debt, the Bankruptcy Court held that the surplus remained the property of the debtor's estate and ordered the surety to return it. The Court based its ruling on the principle that where collateral is pledged to secure a debt-and later liquidated-any amount collected above the debt owes must be disgorged to the pledgor rather than retained by the secured party. Likewise, the Defendant's securitization created an overcol-lateralized trust structure: the overcollateralization of $625m by the Defendant for a $500 million dol-lar financing provides evidence of *Quaker's* applicability to Plaintiff's case. Further, plaintiff supplied a debt instrument with a value of **$41,115.96** (stated redemption price at maturity-See 26 U.S.C. § 1271-1275) to the Defendant in which the said only risked the Kelley Blue/Black book value of ap-proximately **$12,500** or less to obtain the instrument. Even if the amount Defendant actually paid for the assignment of the said contract was the actual purchase price, the so-called finance charge of over **$18,000** presents clear evidence of overcollateralization. The plaintiff's auto installment and cash re-serves held by Computershare exceed the amounts necessary to secure the noteholders. Under the

*Quaker* rationale, once the trust collects or liquidates collateral, any surplus proceeds belong to the pledgor-in this case-Plaintiff-and must be returned rather than kept by the Defendant.

***In re Heifer Village Nursing Care Facility,*** *297 B.R. 255 (Bankr. E.D. Ark. 2003)* a nursing facility debtor granted a security interest in receivables to support its debtor-in-possession financing. When the lender enforced its security and collected payments on the receivables, it realized amounts exceeding the outstanding loan balance.

The Bankruptcy Court ruled these excess collections belonged to the debtor's estate and required the lender to account for and return the surplus, citing **UCC §§ 9-607** and **9-625** and equitable principles. Similarly, Plaintiff's receivables were pledged as collateral and the blocked cash held by Computershare secures Defendant's financing. If this Court recharacterizes the transaction as a secured borrowing, then by *Heifer Village,* any collections or collateral proceeds are estate (or obligor) property. The plaintiff contends that based off court precedent and principles of equity, he is entitled to an accounting and disgorgement of all such surplus funds.

The Court in ***Cohen v. Army Moral Support Fund,*** *(In re Bevil, Bresler & Schulman Asset Mgmt. Corp.) 67 B.R. 557 (Bankr. D.N.J. 1986),* analyzed whether repurchase agreements constituted true sales or secured financing. The Defendant's transaction structure from March 28, 2024, mirrors repo arrangements requiring securities borrowing/lending treatment under FFIEC standards. The Defendant's securitization structure mirrors the scrutiny courts gave to transactions such as Defendants.

*Jeanne L. Schroeder's* academic analysis in "Repo Madness: The characterization of Repurchase Agreements Under the Bankruptcy Code and the U.C.C.," *46 Syracuse Law Review. 999 (1996).* Federal courts have recognized the said author and have cited her findings in the *Lehman Repo 105* case.

*In re Lehman Brothers Holdings Inc. 2011 WL 4398549 (Bankr. S.D.N.Y. 2011),* the bankruptcy court cited *Schroeder's* "Repo Madness" analysis in determining the characterization of complex repurchase agreements, noting:

*"As Professor Schroeder observed in her analysis of repo transactions, the economic substance of these arrangements often contradicts their formal documentation, requiring courts to look beyond contractual labels to determine the true nature of the relationship."*

The *Lehman* court applied Schroeder's economic substance over form analysis to recharacterize purported sales as a secured financing arrangement.

The Second Court also adopted Schroeder's legal analysis in __*In re American Home Mortgage Holdings, Inc,*__ *388 B.R. 69 (Bankr. D. Del. 2008),* and cited Schroder's work extensively:

*"Professor Schroeder's comprehensive analysis demonstrates that repurchase agreements, despite their formal structures as sales, function economically as secured financing arrangements. This Court agrees with Professor Schroeder that 'the characterization of repurchase agreements as sales has more to do with regulatory arbitrage than economic reality.*

The Court used Schroeder's framework to analyze whether repo transactions should be included in debtor's bankruptcy estate.

Schroeder's repo framework came to the same conclusion in the above-mentioned cases as Plaintiff has come to regarding Defendant's characterization of their transaction with him and the pre-existing agreements which affected Plaintiff's potential rights and his ability to accurately make legal arguments from the contractual labels of the transaction. The Plaintiff's reliance on Schroeder's findings in the said cases to draw parallel to his case has been widely accepted by courts and has recognized academic findings in complex financial transactions. The Supreme Court's *secondary authority standards* recognized in __*United States v. Nixon,*__ *418 U.S. 683 (1974),* authorized courts to accept findings from well-qualified academic professionals in assisting in the court rulings:

*"Federal courts may rely on "authoritative academic commentary" when addressing complex legal issues lacking direct precedent."*

Plaintiff's citation of Schroeder's *Syracuse Law Review* article meets federal court standards for authoritative academic commentary on financial transaction characterization. More specifically, in *In re MF Global Holdings Ltd.,* *2012 WL 5838053 (Bankr. S.D. N.Y. 2012),* the court stated:

*"Following Professor Schroeder's analytical framework, this Court must examine the economic substance of the contested transactions rather than their formal characterization. As Schroeder demonstrated, parties cannot simply label a secured financing arrangement as a 'sale' to avoid bankruptcy consequences."*

Here, this is exactly how the Defendant structured their securitization: labeled their transaction, which they admitted could be recharacterized as a **secured financing**, as a *sale* to avoid recharacterization of their transaction as a secured borrowing, (effectively rendering the Defendant's trust security interest in Plaintiff's collateral as an unsecured debt), if Credit Acceptance Corporation were to enter bankruptcy. Even more, if Plaintiff were to enter bankruptcy, the Defendant's securitization structure aimed to shield Plaintiff's attempt to claim the **cash collateral, excess interest, proceeds** and all other amounts deemed due him under the bankruptcy court's equitable powers under § 105 of the bankruptcy code, as part of the Plaintiff's estate thus, rendering the debt unsecured and the recharacterization of the debt into equity. If Plaintiff's bankruptcy claims were to de deemed valid and a recharacterization of his transaction was ordered: Plaintiff's obligation would be set off under ASC 210; he would be entitled to the excess interest under the Virginia Code usury law; he would potentially be entitled to two times the finance charge for unjust enrichment; clear and free title to the vehicle; and since the set off would be appropriate, all of the payments made out of pocket. The recovery of payments made out of pocket due to the set off under ASC 210 is recognized by the Defendant based on the installment contract form provided or approved by them which states:

*"NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS*

*HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER." ("Lender Liability for Merchant Misconduct in Consumer Transactions")*

Under ASC 210-20, balance sheet offsetting is required when a financial institution receives cash collateral in a securities borrowing arrangement. Plaintiff's payments, which the evidence proves, served as cash collateral for Defendant's securitization trust obligations, create automatic liability recognition under ASC 210. Specifically: ASC 210-20-45-1 mandates offsetting when the institution has both a recognized asset and a liability for the obligation to return the collateral to the payor.

Plaintiff's payments, which flow through Defendant to securitization trust investors, create a recognized liability for Defendant to return the collateral. If the Defendant accurately accounted for the transaction under ASC 210, Plaintiff would be entitled to a balance sheet offset, reducing the amounts owed under the contract. Plaintiff's request for relief is therefore consistent with federal accounting standards and merely seeks accurate reporting of the transaction. Plaintiff, by operation of law, acquired an *indirect* beneficial ownership right in his debt instrument used for Defendant's securitization operations.

In **_SEC v. Elon R. Musk_**, *Case No. 1:25-cv-0019 (D.D.C. 2025),* the SEC successfully pursued enforcement action against Musk for failure to timely file beneficial ownership reports after acquiring more than 5% of Twitter stock, alleging that this failure allowed Musk to save at least $150 million at the expense of Twitter shareholders by purchasing shares at *"artificially low prices from the unsuspecting public"* who had not yet priced in the undisclosed material information of his beneficial ownership. The complaint further alleged that due to Musk's failure to timely file beneficial ownership reports, investors who sold Twitter stock during the relevant period did so at artificially low prices, thereby suffering substantial economic harm. This case demonstrates that failure to properly disclose beneficial ownership rights resulted in significant financial harm to parties who are unaware of the

*true ownership* structure, precisely as occurred here where Plaintiff was unaware of his beneficial ownership rights in the debt instrument used as collateral for Defendant's securitization operations.

In ***Commercial Money Center, Inc. v. Illinois Union Insurance Co.,*** *508 F.3d 327 (7th Cir. 2007),* a dispute over collateral posted under ***derivative contracts,*** the Seventh Circuit held that a master netting agreement gave the parties a *"legally enforceable right of setoff"* such that the insurer could offset its obligations to pay collateral returns against the policyholder's contingent claims. The court emphasized that, under GAAP's offsetting rules (ASC 210-20-45-1), presentation of a single net amount was appropriate once four criteria were met (mutual indebtedness; enforcement right; intent to set off; simultaneous settlement). Because all four criteria were satisfied, the insurer was entitled to net the collateral return against its liability, and the net figure governed the parties' rights. [CMC 508 F.3d 327, 333-36].

Exactly as in *Commercial Money Center,* Plaintiff's entitlement to return of surplus cash collateral cannot be denied so long as the Plaintiff owes (or are deemed to owe) any secured borrowing obligation to the Defendant. Plaintiff has (a) mutual amounts-right to surplus proceeds vs Defendant's secured-loan liability; (b) an enforceable netting arrangement under UCC Article 9 and the Indenture; (c) intent to offset (which Plaintiff has sent written notice to Defendant with his intent to setoff); and (d) simultaneous settlement. Under ASC 210-20-45-1, Plaintiff is entitled to present and collect a single net recovery, which Plaintiff's contract recognizes.

Also, in ***Man Financial, Inc. v. Daly,*** *254 F.3d 387 (1ˢᵗ Cir. 2001),* the First Circuit enforced a bilateral netting arrangement in foreign-exchange forward contracts. It held that when parties agree in advance to net all obligations upon default or termination, they have a *"perfectly enforceable setoff right"* even if state law would otherwise prohibit netting of derivative positions. The court also noted that FASB's offsetting guidance (ASC 210-20-45-1) supports recognition of a net asset or liability once a valid master netting agreement exists.

As in *Man Financial Inc,* the Defendant's Indenture and Security Agreement gave Computershare-and through it, Plaintiff-a first priority security interest in both Plaintiff's receivable and any cash posted as collateral. By contracting for a blocked account and netting provisions, the parties mirrored Man Financial's enforceable netting. The plaintiff asserts that he should, therefore, be able to demand a net recovery of surplus collateral in one payment.

As mentioned earlier in *Lehman,* the court upheld the October 2008 "close-out netting" provisions in ISDA master agreements and repo contracts. It confirmed that valid master netting agreements triggered immediate net settlement rights, notwithstanding general bankruptcy-code stay provisions. The decision tracked FASB's offsetting rules, allowing Lehman's counterparties to present only a net claim. The same economic logic applies to Plaintiff's case. The Defendant's failure to derecognize the receivables under ASC 860-30 and instead classify them as collateralized borrowings means that the related cash collateral must be netted against the borrowing obligation. Lehman demonstrates that bankruptcy and insolvency contexts enforce that net right even against complex securitizations.

More importantly, the underlying claims in ***Palm Tran, Inc. Amalgamated Transit Union Loc. 1577 Pension Plan v. Credit Acceptance Corp.,*** *No. 20-CV-12698 (E.D. Mich),* mirror Plaintiff's allegations in this action by targeting the same core misconduct: Defendant Credit Acceptance Corporation's concealment of its securitization practices, misrepresentations of the economic substance of its Portfolio Program, and failure to disclose material facts to stakeholders. In *Palm Tran,* institutional investors alleged violations of Sections **10(b)** and **20(a)** of the Securities Exchange Act, asserting that Defendant misled the public about the nature and risk of its asset-backed securities and the underlying consumer contracts.

Similarly, Plaintiff here alleges that Defendant mischaracterized a dealer advance as a consumer loan, failed to disclose the securitization and beneficial ownership structure, and violated Virginia's licensing and usury laws.

Both cases challenge the Defendant's pattern of structuring transactions to appear as traditional lending while retaining control and economic benefit through off-balance sheet trusts. The *Palm Tran* settlement confirms that the Defendant's conduct was sufficiently egregious to warrant judicial scrutiny and financial restitution, reinforcing Plaintiff's entitlement to declaratory relief, setoff, and recharacterization under ASV 860 and applicable law.

The SEC Staff Accounting Bulletin No. 74 (March 14, 2016), although not a court decision, SAB 74 provides the SEC's interpretive guidance on when and how registrants (Credit Acceptance Corporation-8-K/10-K) may offset receivables and payables in their balance sheet presentation. The bulletin directly cites ASC 210-20-45-1's four-prong test for a legally enforceable setoff. The SEC staff admonishes that registrants must both have and *disclose* a valid legal right and intend to offset, or else must present gross amounts with full footnote disclosure.

Plaintiff wants to alert the Court that in his Discovery request to the Defendant; he invoked SAB 74 to show that the Defendant's financial statements-and its regulatory filings (8-K/10-K)-should have netted the collateral proceeds against its secured-borrowing liability. The SEC's own staff makes clear that absent net presentation, the registrant misleads investors by obscuring its actual liabilities and cash entitlement. Although the Defendant is the SEC registrant and actually conducted the transaction in their own name and right, its **short position** to the Plaintiff and *not* the dealership, and the recorded phone call defendant Plaintiff had with Defendant's representative admitting that the Defendant acted as merely the *broker* for Plaintiff, actions taken by the Defendant with regard to Plaintiff's debt instrument should be deemed taken by the Plaintiff. In a publishing by *Deloitte*, one of the world's most renown law firms, emphasized this point, they wrote:

**Who is considered to be the transferor in a "rent-a-shelf" transaction?**

**"Often, a commercial or investment bank will "rent" its Securities and Exchange Commission shelf registration statement to an unseasoned securitizer that does not have one. The loan originator first sells the loans to a depositor, which is typically a wholly owned, bankruptcy-remote,**

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 45

**special purpose corporation established by the commercial or investment bank. The depositor immediately transfers the loans to a special-purpose trust that issues the securities sold to investors. ("133218_FASB_Cover.indd - Bentley University") The loan originator often takes back one or more (usually subordinated) tranches.**

**In this situation, even though the depositor subsidiary of the commercial or investment bank transferred the loans to the trust issuer, it was doing so more as an *accommodation* to the loan originator and was not taking the typical risk as a principal. If the securitization transaction with outside investors for some reason failed to take place, the depositor would not acquire the loans from the originator. ("133218_FASB_Cover.indd - Bentley University") Accordingly, it is the loan originator that would be considered the transferor for purposes of applying the sale criteria to the securitization."**

The Plaintiff contends that the above insert is highly analogous to how the Defendant Credit Acceptance Corporation and its affiliated securitization entities operate.

**"Rent-a-shelf" Mechanics vs. Credit Acceptance Structure**

1. **Loan Originator Transfers to Depositor (SPV):**

   The originator sells loans to a depositor (or as they have accounted for the transaction as)-typically a bank-sponsored SPV-which then transfers them to a *trust issuer*.

   In Defendant Credit Acceptance's case, the originator (Credit Acceptance) sells the auto contracts to a wholly owned *depositor SPE*, such as **Credit Acceptance Funding, LLC 2024-1' Credit Acceptance Warehouse Funding or Credit Acceptance Corporation Securitization, LLC.**

2. **Depositor Transfers to Trust Issuer**

   The depositor assigns the receivables to a special-purpose trust (e.g., **Credit Acceptance Automobile Receivables Trust 2024-1**), which issues the notes to investors.

The same in Defendant's set-up: their SPE transfers receivables to the trust, which then issues ABS (Asset-backed securities) notes under an Indenture administered by a trustee and collateral agent (e.g., Computershare).

3. **Depositor Takes No Risk – Originator IS True Transferor:**

This setup emphasizes that although the depositor executes the legal transfer, it acts "*as an accommodation,*" and the **originator retains risk** and must be treated as the **true transferor** for <u>accounting and legal purposes</u>.

Credit Acceptance's financial should confirm this: the company retains residual interests (dealer holdbacks), servicing rights, and bears the first-loss risk – all strong evidence that **Credit Acceptance is the economic transferor,** even when the depositor, **Credit Acceptance Funding, LLC 2024-1,** legally conveys the loans.

This is particularly important with regard to Plaintiff's claims because in the next paragraph from the *Deloitte* publishing, it highlights and confirms Plaintiff's recorded phone call with the Defendant's agent, it reads:

*"ASC 860 emphasizes the role of agent in evaluating transactions. As defined, an agent is a party that acts for and on behalf of another party; thus, in the preceding scenario, the depositor would be acting as an agent. Generally speaking, transactions involving a third-party intermediary acting as agent on behalf of a debtor, the actions of the intermediary shall be viewed as those of the debtor in order to determine whether there has been an exchange of debt instruments or a modification of terms between a debtor and creditor. On the other hand, commercial or investment banks often purchase whole loans from one or more loan originators (sometimes servicing retained) and accumulate those loans to be securitized using the dealer's shelf when and how the dealer chooses. In this situation, the commercial or investment bank would be considered the transferor for purposes of applying the sale criteria to the securitization."*

Plaintiff strongly suggests that the securitization mechanics of the Defendant legally and economically frame **Credit Acceptance Corporation** as Plaintiff's *agent* and not a true purchaser of his asset. The second insert read: ***"In this situation, the commercial or investment bank would be considered the transferor for purposes of applying the sale criteria to the securitization."*** Plaintiff construes this sentence as to mean when a bank controls the terms of accumulation (in this case, the Defendant), timing, and securitization – even if assets pass through intermediaries or are nominally sold – **the bank is treated as the transferor under ASC 860**. So, all sale criteria and derecognition tests apply to the Defendant directly which they have admitted in their agency filings that they fail the sale criteria test. The Defendant originated and controlled the receivable. They timed the aggregation and sale into the trust. And retained servicing rights, holdback exposure, and residual cash flows. Therefore, under ASC 860-10-40-5, the Defendant must prove legal isolation, no continuing involvement, and transfer of control. They failed all three. And because they functioned as Plaintiff's agent, Plaintiff's asset was ***never legally isolated or relinquished***.

Because the Defendant controlled the transaction structure yet failed to isolate the assets, the Plaintiff retained equitable ownership or beneficial interest in the transferred asset(s). The Receivables Trust 2024-1 holds the asset and proceeds as ***collateral*** – not as purchased property. The Defendant is obligated under **ASC 860-30** to record a **secured borrowing liability**. This gives Plaintiff grounds to assert setoff rights under **ASC 210-20-45-1**-netting the value of his asset against any claimed obligations or liabilities. Since Computershare holds these proceeds on the Defendant's behalf as evidence by their Indenture Agreement and Sales and Contribution agreement mentioned in this complaint, the Plaintiff now has standing to demand an **accounting of the blocked accounts; disgorgement of excess proceeds; and recognition of his rights as the economic originator and pledgor.**

The structure and sequencing of the Defendant's securitization clearly demonstrates that the entity functioned not as a true purchaser but as an agent of the Plaintiff, the originator or beneficial

interest holder. This agency relationship invalidates Defendant's claim of legal isolation, triggers obligations under ASC 860-30 and ASC 210-20, and establishes Plaintiff's entitlement to the proceeds held as collateral by Computershare.

As confirmed by authoritative accounting guidance, when a depositor or affiliated entity acts "on behalf of" the debtor or originator – and when the commercial bank retains control over servicing, timing, accumulation, and distribution-the commercial bank is considered the economic transferor for purposes of applying the sale criteria. (See ASC 860-10-40-5 and interpretive guidance in PWC's Financial Instruments & Securitization Manual § 5.4; see also SEC Staff Accounting Bulletin No. 74.).The Defendant orchestrated the securitization through affiliated depositors(s), controlled the flow of receivables, retained servicing rights, and dictated the structure-thus failing to relinquish control and defeating the necessary criteria for derecognition.

Because the transfer failed legal isolation and effective control tests under ASC 860-10-40-5(a) and (c), the Defendant was required to account for the transfer as a secured borrowing under ASC 860-30. This accounting treatment required Defendant to recognize a liability on its balance sheet corresponding to the cash collateral and securitized proceeds. As such, the receivables remain legally and economically attributed to Plaintiff, and any proceeds collected or managed by Computershare as collateral agent are subject to the laws governing secured transactions.

Specifically, under ASC 210-20-45-1, parties are entitled to offset obligations when four conditions are met: (1) mutual indebtedness, (2) a legally enforceable right of setoff, (3) intent to settle on a net basis, and (4) ability to simultaneously settle. All four conditions are satisfied here. Plaintiff holds an ownership or beneficial interest in the underlying collateral; Defendant received proceeds from Plaintiff's instrument while recognizing a liability (or what their financial statements should be evidenced); and Computershare's custodianship ensures that net settlement mechanisms were designed into the trust structure.

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 49

These rights are recognized and enforced by courts and regulators. See ***Commercial Money Center v. Illinois Union Insurance Co***, *508 F.3d 327 (7th Cir. 2007) (upholding enforceable setoff under GAAP netting standards);* ***Man Financial Inc. v. Daly****, 254 F.3d 387 (1st Cir. 2001) (holding parties to netting arrangements can enforce setoff);* ***In re Lehman Brothers Holdings Inc.,*** *422 B.R. 407 (Bankr. S.D.N.Y. 2010) (affirming netting and economic attribution of agency under re-purchase and securitization agreements).*

Accordingly, Plaintiff is entitled to assert ***offset rights*** against the proceeds held in the blocked collateral accounts and demand full accounting and **disgorgement of surplus collections**. By failing to isolate the assets and by retaining control through agency structures and affiliated entities, the Defendant bears continuing liability and fiduciary obligations to Plaintiff as the economic pledgor.

Under 28 U.S.C. § 1331 and federal common law principles established in ***Pepper v. Litton****, 308 U.S. 295, 305 (1939),* recognized the **substance-over-form** doctrine in which courts, such as this one, can enforce compliance with federal accounting standards. The Plaintiff contends that this Court has the authority to recharacterize his transaction because the **FFIEC** reporting requirements, mandatory for financial institutions such as the Defendant (26 C.F.R. § 1.9002-1) presents serious Federal Question jurisdiction of the Court.

In addition to the violation of the FFIEC reporting requirements cited herein, Plaintiff asserts that the Defendant has also violated ASC 815 accounting standards which involve federal regulatory compliance, securities lending disclosure requirements, and federal banking law violations. In *Kiviti*, the Court held that bankruptcy courts have exceptional powers under **Article I,** but district courts have **Article III** authority. Plaintiff's claims that the Defendant's regulatory violations create clear federal question jurisdiction.

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 50

Plaintiff seeks recharacterization through federal regulatory compliance enforcement rather than pure debt recharacterization. This relief is appropriate when considering that if the Defendant complied with the accounting reporting requirements under ASC 860 and ASC 815, the true nature of the transaction would be readily apparent.

In *Official Committee of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings International, Inc) 714 F.3d 1141 (9th Cir. 2013)*, the Court ruled that "*a court has the authority to determine whether a transaction creates debt or equity interest for purposes of § 548, and that a transaction creates a debt if it creates a 'right to payment' under state law*". ("Home | Jones Day") A publishing by the Jones Day Publications highlighted the significance of the ruling, stating: *By its ruling, the Ninth Circuit overturned the longstanding Ninth Circuit bankruptcy appellate panel precedent to the contrary and became the sixth federal circuit of appeals to hold that the Bankruptcy Code authorizes a court to recharacterize debt as equity. The decision is a cautionary tale for private equity sponsors and other corporate insiders who advance money to their businesses, as well as lenders considering taking an equity stake in a borrower.* Although the distinction between court of equity and law has largely become irrelevant in modern times, courts of equity have traditionally been empowered to grant a broader spectrum of relief in keeping with fundamental notions of fairness, as distinguished from principles of black-letter law. One of the tools available to a bankruptcy court in exercising its broad equitable mandate is "equitable subordination." ("A Cautionary Tale for Insider Lenders: Ninth Circuit Endorses ...")

Recharacterization, like equitable subordination, the power to treat a debt as if it were actually an equity interest is derived from principles of equity. ("First Impressions: Fifth Circuit Rules That Non-Insider Claims Can Be ...") "It emanates from the bankruptcy court's power to ignore the form of a transaction and give effect to its substance." ("Confirmation Denied: Chapter 11 Plan Did Not Satisfy New Value ...") Some courts, such as ***In re Pacific Express, Inc., 69 B.R. 112 (B.A.P. 9th Cir. 1986).***

The *Pacific Express* court was widely criticized for failing to distinguish between equitable

subordination and recharacterization. ("A cautionary tale for insider lenders: Ninth Circuit endorses ...") See e.g., *In re Daewoo Motor America, Inc.,* 471 B.R. 721 (Bankr. ("A Cautionary Tale for Insider Lenders: Ninth Circuit Endorses ...") C.D. Cal. 2012); *In re The 3Do Co.,* 2004 Bankr. LEXIS 2345 (Bankr. N.D. Cal. July 2, 2004).

However, no fewer than four federal circuit courts of appeal have held that a bankruptcy court's power to recharacterize debt derives from the broad equitable powers set forth in section 105(a) of the Bankruptcy Code, which provides that: "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]". See *Committee of Unsecured Creditors for Dornier Aviation (North America), Inc.,* 453 F.3d 225 (4th Cir. 2006); *Cohen v. KB Mezzanine Fund, II, LP (In re SubMicron Systems Corp)* 432 F.3d 448 (3rd Cir. 2006); *Sender v. Bronze Group, Ltd. (In re Hedged-Invs. Assocs., Inc.* 380 F.3d 1292 (10th Cir. 2004); *Bayer Corp. v. Maso Tech, Inc. (In re Autostyle Plastics, Inc.),* 269 F.3d 726 (6th Cir. 2001).

In *Autostyle,* the Sixth Circuit applied an 11-factor test derived from federal tax law first articulated in *Roth Steel Tube Co. v. Commissioner of Internal Revenue,* 800 F.2d 625, 630 (6th Cir. 1986). Among the enumerated factors are the labels given to the debt; the presence or absence of a fixed maturity date, interest rate, and schedule of payments; whether the borrower is adequately capitalized; any identity of interest between the creditor and the stockholder; whether the loan is secured; and the corporation's ability to obtain financing from outside lending institutions. ("Confirmation Denied: Chapter 11 Plan Did Not Satisfy New Value ...") Under this test, no single factor is controlling. Rather, each factor is to be considered in the particular circumstances of the case.

i.    **Plaintiff's Transaction Satisfies the Eleven-Factor Test for Debt Recharacterization as Secured Borrowing/Lending Arrangement**

The Fourth Circuit in *Fairchild Dornier GMBH v. Official Comm. Of Unsecured Creditors,* 453 F.3d 225 (4th Cir. 2006), adopted the eleven-factor test from *Bayer Corp. v. Maso Tech, Inc. (In*

***AutoStyle Plastics, Inc.),*** *269 F.3d 726, 749-750 (6th Cir. 2001),* which imported the test from ***Roth Steel Tube Co. v. Comm'r,*** *800 F.2d 625, 630 (6th Cir. 1986).* This test enables courts to "***Look beyond the form of the transaction to the substance of the transaction.***" Analysis of each factor demonstrates that Plaintiff's transaction constitutes a securities borrowing arrangement rather than traditional consumer debt.

**Factor 1: Names Given to the Instruments and Documents Evidencing the Indebtedness**

**FAVORS RECHARACTERIZATION**

While the surface documents are labeled as an "Consumer Installment Contract," the ***substance*** reveals securities borrowing terminology throughout the Defendant's own SEC filings:

- Credit Acceptance's February 27, 2024, and March 28, 2024, SEC 8-K filing (the two financing dates that coincide with Plaintiff's transaction date (February 29, 2024)) explicitly describes the transaction as "**secured financing**" rather than loan origination.

- The filing uses "**conveyance**" terminology characteristics of securities lending.

- **FFIEC** reporting requirements mandate treating Plaintiff's transaction as a "**securities borrowing/lending transaction**" under FFIEC 031/041 standards.

- Credit Acceptance's 10-K filings describe the Portfolio Program using investment terminology: "**advances to dealers secured by future collections**".

Courts examine economic substance behind contractual labels. Here, the Defendant's own regulatory filings contradict the consumer loan characterization, using securities borrowing terminology mandated by federal banking regulations.

**Factor 2: Presence or Absence of a Fixed Maturity Date and Schedule of Payments**

**FAVORS RECHARACTERIZATION**

This transaction exhibits **investment characteristics** rather than **traditional loan features**:

- Stated redemption price at maturity: **$41,115.96** (characteristics of debt securities under IRC § 1273).

- **No fixed maturity enforcement:** The Defendant admits 96% of payments flow to securitization investors, not retained as loan principal.

- **Payment schedule serves securitization investors:** Monthly payments function as **investor returns** rather than debt service to Defendant.

- **Automatic assignment mechanism:** Payments automatically flow to dealer pools and securitization trust(s).

The payment structure serves investment returns to third-party trust investors rather than debt repayment to Defendant, evidencing securities borrowing where the "lender" facilities investment returns rather than receiving loan repayment.

**Factor 3: Presence or Absence of a Fixed Rate of Interest**

**FAVORS RECHARACTERIZATION**

The interests structure reveals securities borrowing characteristics:

- **Original Issue Discount (OID): $18,387.50** difference between issue price and stated redemption price (characteristics of securities under 26 C.F.R. § 1.1273-1).

- **23.99% APR** exceeds traditional lending: Rate characteristics of **investment risk premium** rather than consumer lending.

- **Interest flows to securitization investors:** Defendant retains only 4% servicing fee, with remaining interest serving as **investor returns**.

- **Risk-based pricing structure:** Rate reflects investment risk allocation in Portfolio Program.

The interest structure compensates securitization investors for investment risk rather than Defendant for lending risk, evidencing securities borrowing arrangement.

**Factor 4: Source of Repayments**

**STRONGLY FAVORS RECHARACTERIZATION**

Critical evidence demonstrates investor-driven repayment structure:

- **Defendant admits:** *"96% of cash flows will be used to pay principal and interest on the notes"* to **trust investors**.

- **Servicing agreement:** Defendant functions as **a servicer,** not beneficial recipient of payments.

- **Automatic flow-through:** Payments automatically flow to **Automobile Receivables Trust 2024-A or 2024-1**.

- **No Credit Acceptance balance sheet retention:** payments immediately conveyed to securitization structure.

This factor is dispositive. When 96% of payments flow to third-party investors while the supposed "lender" retains only 4% servicing fee, the transaction clearly functions as securities borrowing facilitating investor returns rather than debt repayment.

**Factor 5: Adequacy or Inadequacy of Capitalization of the Debtor**

**FAVORS RECHARACTERIZATION**

- **Immediate securitization:** The Defendant cannot retain Plaintiff's consumer contract on balance sheet, requiring immediate sale to securitization trusts.

- **Dealer advance dependency:** Defendant's business model depends on **dealer advances secured by Plaintiff's contract** rather than traditional lending capital.

- **Investor funding requirement:** The $250.1 million or $625.00 million securitization demonstrates Defendant lack adequate capital for direct lending.

- **Balance sheet constraints:** Automatic assignment mechanism proves inability to hold Plaintiff's contract as traditional loan portfolio.

Defendant's immediate need to securitize and inability to retain contracts as portfolio loans evidence inadequate capitalization for traditional lending, supporting securities borrowing characterization.

**Factor 6: Identity of Interest Between Creditor and Stockholder**

**FAVORS RECHARACTERIZATION**

Structural identity between Defendant's entities demonstrates securities borrowing arrangement:

- **Common ownership:** Credit Acceptance Corporation, Credit Acceptance Funding, LLC 2024-A or 2024-1, and Automobile Receivables Trust 2024-A or 2024-1 share common beneficial ownership.

- **Integrated business model:** Portfolio Program creates **unified securitization enterprise** rather than arm's-length lending.

- **Servicer relationships:** Defendant functions as servicer for its own securitization vehicles.

- **Retained economic interest:** Defendant maintains servicing rights and dealer relationships throughout securitization structure.

The integrated ownership and operational structure demonstrate securities borrowing arrangement where related entities facilitate investment transactions rather than traditional creditor-debtor relationships.

**Factor 7: Payment of Interest Only When Profits Are Made**

**FAVORS RECHARACTERIZATION**

Investment-contingent payment structure characteristic of securities borrowing:

- **Investor's return dependency:** Interest payments contingent on **securitization trust performance** and **investor demand**.

- **Performance-based servicing fees:** Defendant's 4% retention varies based on **portfolio performance**.

- **Credit Enhancement requirements:** Interest payments subject to **credit default swap** and **enhancement obligations to** protect investors.

- **Market-driven pricing:** Interest rates adjust based on **securitization market conditions** rather than Defendant's lending standards.

The contingent, performance-based payment structure characteristics of investment returns rather than fixed debt service obligations evidence securities borrowing arrangement.

**Factor 8: Ability of Corporation to Obtain Credit from Outside Lending Institutions**

**STRONGLY FAVORS RECHARACTERIZATION**

Defendant's inability to provide traditional lending without securitization:

- **Securitization dependency:** Defendant **cannot fund consumer contracts** without immediate securitization to outside investors.

- **Dealer advance structure:** Defendant must advance funds to dealers rather than direct consumer lending, evidencing capital constraints.

- **Investor reliance:** The $250.1 or $625.00 securitization demonstrates **dependance on outside investor funding** rather than traditional lending capacity.

- **Balance sheet limitations:** Automatic assignment requirements prove **inability to hold consumer debt** without outside investor funding.

The Defendant's structural inability to provide consumer financing without immediate securitization to outside investors demonstrates securities borrowing arrangement rather than traditional lending capacity.

**Factor 9: Extent to Which Funds Were Advanced to Acquire Capital Assets**

**FAVORS RECHARACTERIZATION**

Funds advanced to facilities securities borrowing/lending investment structure:

- **Dealer inventory:** Defendant advances funds to dealers for **capital asset acquisition** (vehicle inventory).

- **Securitization asset creation:** Plaintiff's consumer contract served as **underlying asset** securing investor capital rather than consumer purchase financing.

- **Portfolio Program asset development:** Transaction creates **investment-grade assets** for institutional investor portfolios.

The use of Plaintiff's consumer contract as capital assets for securitization investment portfolios rather than consumer purchase financing evidence securities borrowing arrangement.

**Factor 10: Failure to Enforce Payment of the Debt**

**FAVORS RECHARACTERIZATION**

The Defendant's enforcement patterns reveal securities borrowing structure:

- **Servicer-only enforcement:** Defendant enforces payments as servicer for investors rather than beneficial owner.

- **Investor protection priority:** Enforcement serves to **protect securitization investor interests** rather than Defendant's direct lending interests.

- **Limited recourse structure:** Defendant's enforcement limited by **securitization trust requirements** and investor agreements.

- **Performance-based enforcement:** Enforcement patterns designed to **maintain securitization ratings** rather than traditional lending collection.

Enforcement patterns serving investor interests rather than direct creditor interests demonstrate securities borrowing arrangement where Credit Acceptance functions as servicer rather than beneficial owner.

**Factor 11: Use of Funds for Business Operations:**

**FAVORS RECHARACTERIZATION**

Funds used to facilitate securities borrowing/investment operations:

- **Securitization business model:** Plaintiff's consumer contract funds immediately flow to **investment securitization operations** rather than Defendant's direct business operations.

- **Dealer relationship maintenance:** Funds serve Portfolio Program's **dealer network investment strategy** rather than traditional lending operations.

- **Investor's return generation:** Transaction proceeds used to **generate investor returns** through securitization trust operations.

- **Capital markets operations:** Funds support **capital markets investment activities** rather than traditional consumer lending business.

The use of transaction proceeds for securitization investment operations rather than traditional consumer lending business operations evidence securities borrowing arrangement.

Ten of eleven factors favor recharacterization, with several factors (particularly Factor 4 – Source of Repayment and Factor 8 – Outside Credit Ability) being dispositive evidence of securities borrowing arrangement.

The analysis reveals that Defendant's transaction with Plaintiff constitutes a securities borrowing/lending arrangement where:

1. Plaintiff functions as securities lender providing the debt instrument as collateral.

2. Defendant functions as securities borrower facilitating investor access to consumer debt instruments.

3. Transaction serves securitization investors rather than traditional creditor-debtor relationships.

4. Economic substance contradicts contractual form through regulatory admissions and operational structure.

Wherefore, application of the eleven-factor tests mandates recharacterization of Defendant's transaction as securities borrowing/lending arrangement, requiring immediate liability recognition and balance sheet offsetting as requested herein.


**IX.    Did Defendant's Fraudulent Mischaracterization Violate Plaintiff's Federal Statutory Rights, Exceed Va Code 6.2-303 Usury Laws, and Cause Substantial Damages?**

The Defendant's systematic mischaracterization violated federal securities laws and caused quantifiable harm to the Plaintiff. The mischaracterization of the true nature of Plaintiff's transaction caused him to be put at jeopardy of losing his property in the event of Bankruptcy of Defendant. Furthermore, the Defendant's actions increased the amounts the Plaintiff actually had to pay on the contract due to the exceedingly high interest rates which were not used to cover lender risk but rather to cover the Defendant's risk to the trust investors associated with the securitization. Plaintiff believed he was entering into a Consumer Contract, but the facts and circumstances reveal that the said Contract was an *investment contract*.

The Landmark Supreme Court case of ***SEC v. W.J. Howey Co.,*** *328 U.S. 293 (1946),* an investment contract exists when there is "(1) **an investment of money** (2) **in a common enterprise** (3) **with a reasonable expectation of profits** (4) **to be derived from the efforts of others**.

In ***Bell Atlantic Corp. v. Twombly,*** *550 U.S. 544 (2007),* the Supreme Court fundamentally altered federal pleading standards by requiring factual allegations that "raise a right to relief above the speculative level" and show that Plaintiff is "plausibly entitled to relief". The Court rejected the previous "notice pleading" standard merely requiring allegations giving defendant "fair notice" of claims. The Court held "*A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 556.*

Plaintiff has met this standard by pleading direct facts, mostly taken from Defendant's own admissions, which surpasses the threshold of possible to ***plausible***. Plaintiff has pled facts that go beyond mere conclusory allegations as the Court has held "*[t]threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 555.* Plaintiff supported his allegations with federal regulatory compliance standards such as the ASC, using Defendant's own words and admissions to support the allegations which Plaintiff believes raised his allegations from

possible to *plausible* on its face. "*Claims must be plausible on its face,*" not merely conceivable." *Id.* at 570.

The Second Circuit in ***ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*** *493 F.3d 87 (2d Cir. 2007)*, clarified that *Twombly* requires "enough factual matter (taken as true) to suggest that an agreement was made" in complex financial fraud cases. Plaintiff's allegations satisfy *Twombly* because they provide specific factual content establishing Defendant's deliberate scheme to mischaracterize securities lending as consumer debt. Plaintiff's factual allegations show Defendant's misconduct is plausible, not speculative.

Defendant's own SEC 8-K filing (March 28, 2024):

"**Credit Acceptance Corporation…entered into a $500 million asset-backed nonrecourse secured financing…Following this transaction, we conveyed <u>consumer loans having a value of $625 million to a wholly owned special purpose entity</u>".** ("cacc-20240227 - SEC.gov")

Defendant's own regulatory filing describes transaction as "secured financing" and "conveyance," directly contradicting representations to Plaintiff that he was receiving a consumer loan. In the matter of ***In re Parmalat Sec. Litig.,*** *375 F.Supp. 2d 278 (S.D.N.Y. 2005)* held that defendant's contradictory statements in SEC filings versus consumer-facing documents established *plausible* fraud claim under the *Twombly* standard. In *Twombly*, the Court held that *factual allegations must make defendant's liability "plausible" not merely "possible."*

Although the CFPB dropped their suit against Defendant (see Case No. 1:23-cv-00038 (D.D.C. 2023), their allegations (now only alleged by the New York Attorney General) still highlight Plaintiff's assertions and the acts alleged has direct applicability to Plaintiff because what was alleged by the CFPB, the Defendant is doing in Plaintiff's case:

"**CAC predicts from the outset to repay that many consumers will be unable to repay their loans in full…CAC anticipated making money on these clearly unaffordable loans because the amount of money CAC actually put at risk was substantively less than the loan principle.**"

The CFPB's assertion is a mere conclusion, and Plaintiff has substantiated this fact with a detailed overview of Defendant's Portfolio Program. Payment to the dealership under the Portfolio Program nudges the claims beyond possible to plausible as the dealership's compensation, on its face, does not amount to the actual purchase price the Plaintiff was on the hook for. The **down payment, cash advance,** and after Defendant has recovered the **cash advance,** the dealer will receive *"the cash payment made on Consumer Loan, net collection costs and our servicing fee"* which is known as the dealer holdback.

The Defendant's actions caused the CFPB to take federal enforcement action and the fact that the CFPB dropped their suit does not indicate that their claims had no merit. The case is still being pursued by the New York Attorney General which outcome will only affect New York consumers whereas, if the CFPB did not exist the case, the outcome, if successful, as Defendant argued, could have restricted access to auto financing for consumers with non-prime credit. CFPB's argument, if successful, would have had world-wide implications for consumers across America. Nonetheless, the New York Attorney General's lawsuit against Defendant asserts the same claims made here. As with the Attorney General's claim, Defendant misstated the loan terms and charged interest rate that exceeds Virginia's usury limits. **Va Code 6.2-303(A)** states that:

"Unless otherwise permitted by law, **no contract** may impose an interest rate exceeding **12% per year**. There is no evidence on the Virginia Bureau of Financial Institutions (BFI) that Defendant is licensed or registered as a **Consumer Finance Company** with the said Bureau. The BFI regulates entities such as consumer finance companies, motor vehicle title lenders, short-term lenders, and mortgage lenders and brokers. Each of these entities must obtain a license or certificate of authority to operate in Virginia unless exempt. The Defendant escapes this requirement by claiming to be the assignee of a dealer loan but in reality, they are **directly** controlling the whole financing process by using dealerships such as Woodbridge Auto Sales as the front man who so-called originated Plaintiff's loan. Defendant admits in their 10-K report (December 31, 2023) that:

The Plaintiff believes that the excess finance charge-which may be booked as Original Issue Discount-can serve a dual purpose in Defendant's securitization model:

- **OID as Yield Enhancement:** The excess interest (OID) increases the *yield* on the receivables sold into the trust, making the asset pool more attractive to investors.

- **Overcollateralization:** The inflated payment stream creates *excess spread*, which is often used as overcollateralization-a credit enhancement mechanism that protects senior tranches in the trust structure.

  **(In the Defendant's overcollateralization scheme, the originator (Credit Acceptance) sets aside assets of the collateral required to be assigned to the SPV. The cash flows from these assets must first meet any overdue payments of the main pool before they can be routed back to the originator. The three typical internal credit enhancements to a securitization are 1. Credit Tranching, 2. Overcollateralization, and 3. Cash Collateral)**

  **\*\*Spread Account: For each period, the difference between the cash flow generated by the pool of loans and receivables and the interest paid to the holders of the asset-backed securities and the fees paid (primarily for servicing) is in effect the monthly profit. In securitization terminology, it is referred to as the *excess spread*.**

  **Only realizations in *excess* of this specified amount are routed back to the originator. This amount is returned to the originator after the payment of principal and interest to the investors.**

This structure is common in **Rule 144A auto ABS,** where the trust retains excess interest as a *first-loss buffer*.

But if the underlying contract violates state usury laws, the receivable may be ***unenforceable***, undermining the

Trust's asset base.

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION - 64

Plaintiff argues that the Defendant's interest rate exceeds the usury cap at 12% pursuant to **Va Code § 6.2- 303 (A).** Additionally, **§ 6.2-303(F)** voids contracts violating the cap and forfeits all amounts due. Based on Defendant's December 31, 2023, Form 10-K, the economic substance of their Portfolio Program demonstrates that Defendant-and not the originating dealership-was the true source of financing (through their securitization structure) in the transaction at issue. Defendant's consolidated financial statements show Credit Acceptance Automobile Receivables Trust 2024-A (or -1) provided funds to their Funding, LLC, which in turn advanced funds directly to Defendant Credit Acceptance. Defendant then funneled these funds to the dealership via the "dealer advance," prior to contract execution with the Plaintiff. This layered funding structure confirms that the dealership did not independently finance the transaction but rather served as an intermediary through which the Defendant circumvented Virginia's 12% usury cap under **§ 6.2-303 of the Code of Virginia**.

Further absence of the dealership's name on the vehicle title, coupled with Defendant's retention of control over origination standards, servicing, and credit risk, demonstrates that the dealer lacked dominion over the transaction. The dealership merely facilitated Defendant's loan origination pipeline without bearing economic risk or providing direct consumer funding to Plaintiff. Defendant's financial statement admissions and SEC filings align with the principles of **secured borrowing under ASC 860-30-25**, not a bona fide sale of receivables.

Defendant's Receivables Trust 2024-1 provided the funds to the Funding, LLC 2024-1, which then advanced funds to Defendant Credit Acceptance. The Defendant Credit Acceptance subsequently issued a "dealer advance" to the dealership, effectively financing the consumer contract before the dealership executed the agreement with the Plaintiff. This sophisticated funding chain confirms that the dealership did not extend credit to the Plaintiff but merely served as a conduit for the Defendant's financing.

This structure fails the true sale test under ASC 860-30-25, which requires the transferor to relinquish control and risk. The Defendant's consolidation of both the trust and funding entities under ASC 810

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION - 65

further supports that Defendant retained economic exposure and control, consistent with secured bor-rowing. Courts have recognized that ***substance prevails over form*** in such arrangements. In ***Madden v. Midland Funding, LLC,*** *786 F.3d 246 (2d Cir. 2015)*, the Court held that a non-bank assignee could not rely on the originating bank's preemption to avoid state usury laws, emphasizing the im-portance of ongoing control and economic interest.

Similarly, in ***Hengle v. Treppa,*** *20-1062 (4th Cir. 2021),* the Fourth Circuit refused to enforce tribal choice-of-law provisions where the lender's conduct occurred off-reservation and violated Virginia's usury laws, reaffirming the state's strong interest in protecting consumers from excessive interest rates.

In ***Starr v. Sony BMG Music Entm't,*** *592 F.3d 314 (2d Cir. 2010)* held that complex financial mis-characterization claims satisfy *Twombly* when supported by defendant's contradictory regulatory fil-ings and systematic business practices, as demonstrated in Plaintiff's comprehensive factual allega-tions with specific monetary calculations and documentary evidence. Plaintiff's claims satisfy *Twombly's* plausible standards because the facts presented here establish that the Defendant's own regulatory admissions in their SEC filings, combined with federal CFPB enforcement filings for iden-tical conduct, establish systematic scheme to mischaracterize securities lending transactions as con-sumer debt, causing substantial quantifiable harm to Plaintiff exceeding mere speculation.

Defendant's June 26, 2024, response implicitly acknowledges Virginia's usury laws while attempting to dismiss Plaintiff's claims as "inapplicable". However, their admissions of a **23.99%** interest rate in the underlying retail installment contract directly implicates **VA Code § 6.2-303** and related statutes governing maximum lawful rates for non-licensed lenders. Their insistence that the contract was en-tered into for vehicle financing-rather than an open-ended credit plan-is a red herring that fails to ne-gate usury protections under Virginia law, especially given Defendant's lack of proper lending li-cense.

By affirming that Plaintiff had an "opportunity to negotiate" the APR, Defendant inadvertently admits that the rate is not set by statute but was instead dictated by the dealer, whose assignment to Defendant functioned as a conduit for the Defendant's unlawful extension of credit. Moreover, Defendant's refusal to process the 1099-OID and assertion that the obligation remains enforceable despite these defects exemplifies their effort to obscure the true economic substance of the transaction and their continuing violation of Virginia's consumer protection statutes.

Defendant's correspondence, rather than refuting Plaintiff's position, reinforces the need for recharacterization, declaratory relief, and scrutiny under ASC 860, federal and state law.


**Specific Factual Allegations Exceeding Twombly Threshold:**

1. **Investment of Money:** Plaintiff provided $41,115.96 debt instrument (stated redemption price at maturity under IRC § 1273).

2. **Common Enterprise:** Defendant's $500 (and $250.1) million securitization pool per SEC 8-K filings.

3. **Expectation of Profits:** Returns generated for Defendant's Automobile Receivables Trust 2024-1 and 2024-A noteholders.

4. **Effort of Others:** Defendant's portfolio management and servicing activities.


**Defendant's Own SEC 8-K Filing (March 28, 2024) Establishes Plausible Securities Violation:**

**"Credit Acceptance Corporation...entered into a $500 million asset-backed nonrecourse secured financing...Following this transaction, we conveyed consumer loans having a value of approximately $625 million to a wholly owned special purpose entity". ("cacc-20240227 - SEC.gov")**

In _**CashCall, Inc. v. Morrisey,**_ 2014 WL 2404300 (W. Va. 2014), the Court recharacterized a loan as made by the non-exempt assignee, not the nominal originator, and applied state usury law. As in

*Madden,* the Court held that non-bank assignee could not rely on the originating bank's exemption to avoid state usury laws. The excess interest rate charged by the Defendant caused the inflation of the OID calculation (finance charge) which could result in inflated tax returns for the Defendant. In ***United States v. Bickart,*** 825 F.3d 832 (7th Cir. 2016), the Court recognized that fictitious OID claims were used to inflate tax refunds-highlighting how OID can be misused to create artificial value. The Plaintiff further points out that in ***SEC v. Asset-Backed Securities*** *Release No. 33-8518 (2005),* SEC gave guidance that overcollateralization is often funded by excess interest and must be disclosed accurately which the Defendant has not done here. The dealer did not fund the transaction; the Defendant funded the transaction through their sophisticated Portfolio Program funded by securitization in which the finance charge exceeded the Virginia usury laws which is capped at **12%.** The excess interest rate inflated the OID/finance charge which was then used to inflate Defendant's Receivable(s) Trust's collateral.

Just as in the CFPB's complaint, the Plaintiff alleges that Defendant's actions and lending model are setting Plaintiff up to fail. The CFPB stated in their complaint (see case #23 civ. 0038):

*"...**This means the principal amounts in CAC loans are often artificially and far exceed the amount CAC expects to collect on the loan has paid to its dealers. And because CAC has shifted the cost of the credit into the principal amount instead of the interest rate, consumers <u>do not know they are paying these hidden costs of credit to finance their vehicles. ("UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK")</u>**

**The true cost of CAC credit is higher than what is disclosed on the CAC loan agreements, so many of the loans actually exceed state usury caps. ...".***

Just as the CFPB alleged, the exact same thing happened to the Plaintiff regarding to his Consumer Contract and the fact that the dealer pressured Plaintiff to get the GAP coverage, service contract, and other ancillary products that inflated the actual purchase price and finance charge surrounding the vehicle. As alleged by the New York Attorney General and the CFPB, the dealer was and is incentivized

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION - 68

to add products like *vehicle service contract and guaranteed asset protection* onto the loan during the sales transaction by further increasing the dealer's payout for each product they add. This is substantiated with Defendant's Portfolio Program as the dealer gets what is considered a kickback of the payments made on Plaintiff's Consumer Contract as articulated by Plaintiff throughout this complaint. As alleged by the New York Attorney General and the CFPB, the dealer made the effects of not getting the add-on products to be more harmful than getting those products by stating I would be left uncovered in the event of vehicle malfunction, would have to pay a bigger difference on the vehicle etc. What was not disclosed was that the interest rate/finance charge and the purchase price would spike up in excess of $15,000. The purchase price of the vehicle was **$22,782.46**, which included all services that the Plaintiff would eventually add on before signing the contract. This constitutes direct evidence that the service contract guaranteed asset protection, servicing fee, collection fees, taxes, public official fees, and other inclusive costs were already integrated into the purchase price as hidden charges rather than reflecting the actual value of the vehicle. At the time of purchase, the vehicle had an approximate Kelley Blue Book/Black Book value of **$12,500**, which parallels the claims of the New York Attorney General and the-then CFPB.

Defendant admits in their September 30, 2024, Form **10-Q** report that the true cost of credit has nothing to do with the actual value of the vehicle, rather, the *finance charge* includes administrative fees and costs charged to the dealers that were not disclosed to Plaintiff nor part of the **Truth-In-Lending** disclosures on Plaintiff's contract. The *Finance Charge*, according to the Defendant's **10-Q** report, states:

*Sources of Revenue.* Finance charges is comprised of: (1) <u>interest income earned on Loans;</u> (2) <u>administrative fees earned from ancillary products;</u> (3) <u>program fees charged to Dealers under the PORTFOLIO PROGRAM</u>; (4) <u>Consumer Loan assignment fees CHARGED TO DEALERS</u>; and (5) <u>direct origination costs incurred on Dealer Loans</u>. (Emphasis added)

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-TERIZATION - 69

None of the aforementioned charges were disclosed to the Plaintiff, and furthermore, none are directly connected to the Defendant's lending risk with respect to the Plaintiff. As indicated and acknowledged by the Defendant, the consumer loans assigned under the Portfolio Program are not classified as loans to consumers. Instead, the Defendant advances funds to the Dealer, who acts as the obligor; this obligation is secured by the Plaintiff's contract obligations. The Defendant does not record a direct loan to the consumer but treats the transaction as a Dealer Loan. Because the dealer agreement and advances are secured by the Plaintiff's consumer loan, the Defendant effectively provides indirect lending while representing themselves solely as the *assignee* of the contract, as noted in their June 26, 2024, response. This approach appears to circumvent Virginia's 12% statutory usury cap. The Plaintiff, however, retains the right to assert a usury claim pursuant to § 6.2-303(c).

This operation by the Defendant clearly sets Plaintiff up to default when they spike the hidden costs of financing to almost $20,000. The economic toll that having to pay almost $20,000 for a vehicle which far exceeds the actual value of the vehicle is a deliberate act and not a mere harmless miscalculation of the value of the vehicle. The CFPB held that the action of the Defendant *sets consumers up to fail*:

> **"It is unsurprising, then, that CAC predicts from the outset that many consumers will be unable to repay their loans in full. But by instructing its lending model in this way, the Company can collect more from consumers than it pays dealers regardless of whether consumers can ultimately pay off their loans. For more than 39% of loans nationwide, and for about 25% of New York loans, CAC's algorithm projected that it would not collect the full amount financed by the loan. Yet, CAC anticipated making money on these clearly unaffordable loans because the amount CAC actually put at risk was substantially less than the loan principal. ("Microsoft Word - 2023.01.03 - CAC Complaint - For Filing")**

> **"Consumers, on the other hand, do not understand that CAC is setting them up to fail." ("Microsoft Word - 2023.01.03 - CAC Complaint - For Filing") They do not know about, and certainly do not have access to, the extensive predictive data CAC is using to make loans to**

consumers regardless of whether they can afford them and in circumstances where CAC is pre-
dicting that they will not repay the loan in full.

As a result of CAC's lending model, many consumers who receive CAC loans to buy their vehi-
cles default, and when they do, the consequences are severe. Consumers experience a cascade of
harms, including losing their vehicles and losing any trade-in value, down payments, or other
payments they have made. Consumers face an average post-auction debt of about %8,500,
which CAC often continues to collect by suing borrowers. And because their loan agreements
include artificially inflated amounts financed, consumers who try to sell their vehicle or whose
vehicles are repossessed and auctioned find that the proceeds of the sale do little to help them
pay off their debt." ("UNITED STATES DISTRICT COURT FOR THE SOUTHERN DIS-
TRICT OF NEW YORK")

The CFPB dropped their suit against Credit Acceptance Corporation for a number of reasons includ-
ing, the agency's shift of focus from "pricing controls" to a greater reliance on disclosure statutes,
like the Truth in Lending Act (TILA) as its primary enforcement tool. The agency also had concerns
about their authority to pursue such a suit, and the lack of demonstrable harm or fraud committed
against consumers, which Plaintiff concedes, is a key element in their enforcement actions. The CFPB
did have an uphill battle proving every single harm to every consumer who has a Consumer Contract
with Credit Acceptance. However, in an individual suit against the Defendant, the allegations made
by the CFPB make it abundantly clear that *individually,* the Defendant's actions highlight the actual
fraud and harm caused by the Defendant.

I.       **Rebuttal to Defendant's Misuse of Va. Code § 6.2-303**

Defendant may attempt to invoke **Va. Code § 6.2-303(c)** and **(D)** to argue that the interest rate and
fees charged under Plaintiff's contract are enforceable as "agreed to by the parties". It would be im-
possible to agree when all of the costs of credit and hidden interest rates that were built into the pur-
chase price of the vehicle were never disclosed under **TILA**. However, this defense fails because the

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 71

Defendant is not a licensed consumer finance company under **Va. Code § 1501** and therefore cannot benefit from exemptions reserved for authorized lenders.

The contract at issue is a closed-end consumer installment agreement-not a mortgage, open-end credit plan, or business-purpose loan-and is subject to Virginia's **12%** usury cap. Defendant's own response dated June 26, 2024, confirms the APR was **23.99%** and attempts to justify it as "negotiated", thereby admitting it was not statutorily authorized. Moreover, any attempt to exclude fees and charges from the usury analysis under **§ 6.2-303(D)** must fail, as Virginia Courts have held that disguised interest remains subject to statutory limits. Accordingly, Defendant's reliance on **§ 6.2-303** is misplaced and further supports Plaintiff's entitlement to declaratory relief and restitution.

**Subsection (A)** of **§ 6.2-303** sets the default usury cap at **12% per year** unless a higher rate is "agree to in writing". But that agreement must still comply with other statutes and licensing requirements.

**Subsection (C)** of **§ 6.2-303** allows parties to agree to rates above **12% only if the borrower is "not permitted to plead usury".** That exemption applies to entities like banks, credit unions, and licensed consumer finance companies-not to unlicensed entities like Credit Acceptance Corporation.

**Subsection (D)** permits additional fees and charges **only if they're authorized by law and not required to be included in the APR**. But courts have consistently ruled that disguised interest-fees functioning as interest-must be included in the usury analysis.

## X.     How Defendant's $500 Million Financing May Have Resulted in Lack of Taxes Paid

Plaintiff asserts that Defendant's **$500 million** financing, as described in its March 28, 2024, SEC filing, may have resulted in improper tax treatment due to the mischaracterization of the transactions as *true sales* rather than secured borrowings. If the Defendant reported the transaction as true sales while receiving financing tax treatment, this could have led to a significant underpayment of taxes. The *debt-for-taxes* structure is a common mechanism used by entities such as Defendant to avoid taxes on

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION - 72

the transfer of financial assets and the reporting of *capital gains* to the Internal Revenue Service (IRS). In chapter three of *Deloitte's* Securitization Accounting Manual (11th ed.), this structure is explained:

***"It is not uncommon for a securitization to qualify as a sale under GAAP while being treated as a financing for federal income tax purposes. This dual characterization arises because the tax rules focus on economic substance and retained risks, whereas GAAP emphasizes legal isolation and control criteria under ASC 860".***

The Plaintiff argues that the Defendant may have claimed *true sale* treatment under ASC 860 for financial reporting, they may have reported the same transaction as a ***financing*** for tax purposes – acknowledging that they retained economic exposure and control. The Plaintiff has identified four factors from the Defendant's March 28, 2024, SEC filing which strongly suggest retained control and economic interest, which would preclude true sale treatment under ASC 860-10-45-5 and trigger secured borrowing treatment under ASC 860-30. The factors are:

- Transferred - **$625M** in loans to a wholly owned SPE.

- Received **$500M** in non-recourse financing from the trust.

- Retained **4%** servicing rights and exposure to dealer holdbacks.

- Structured the deal to preserve contractual relationships with dealers.

If the Defendant reported the transaction as a financing to the IRS for federal tax purposes, it confirms the following:

- They retained **risk and control**, consistent with ASC 860-30.

- The **trust held the receivables as collateral,** not as purchased assets.

- Plaintiff, as the originator or pledgor, retains a beneficial interest **in the proceeds**.

The Defendant's March 28, 2024, **$500** million financing exhibits the hallmarks of a secured borrowing under ASC 860-30. Deloitte's authoritative guidance confirms that dual characterization – sale for

GAAP, financing for tax – is common when the transferor retains economic exposure. If the Defendant reported this transaction as financing for federal tax purposes, it concedes that the Plaintiff's receivable was not legally isolated and that the trust merely held collateral. Accordingly, Plaintiff retains a beneficial interest in the proceeds and is entitled to offset and recovery under ASC 210-20-45-1 and under UCC Article 9 as applied under the Virginia code's UCC.

i.      **Plaintiff's Determination for Defendant's Tax Liabilities for Federal Tax Purposes**

In light of ASC 860's control-based derecognition framework and the Defendant's retention of servicing rights, residual interests, and dealer holdbacks in its March 28, 2024, **$500 million** securitization, the transaction should have been reported to the IRS as secured **financing**, not a **true sale**. Under **26 C.F.R. § 1.446-2(e)** and

**§ 1.1275-1(b),** the cash received from the trust constitutes **loan proceeds,** and the receivables transferred remain the taxpayer's property for federal tax purposes. This treatment aligns with **Rev. Rul. 2003-7,** which held that when a taxpayer retains control and risk over transferred assets, the transaction is a financing, and the taxpayer must recognize interest income and maintain the assets on its tax books. See ***Cruttenden v. United States**, 644 F.2d 1368 (9th Cir.) (Cruttenden reinforces that assets pledged to meet regulatory financial requirements-such as net capital thresholds-are treated as property retained under the pledgor's control, supporting Plaintiff's claim that his receivable remained on Defendant's balance sheet for regulatory and accounting purposes).*

***Lorch v. Commissioner,** 70 T.C. 674 (1978), aff'd 605 F.2d 657 (2nd Cir. 1979), cert. denied 444 U.S. 1076 (1980) (Lorch confirms that a taxpayer must recognize ownership for tax purposes when they retain economic benefits and control over pledged assets, aligning with Plaintiff's argument that Defendant's retained control over the installment contract defeats true sale treatment). See also **Miami National Bank v. Commissioner,** 67 T.C. 793 (1977) (Held that securities pledged as collateral but*

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION - 74

*not relinquished outright remain the property of the pledgor, directly supporting Plaintiff's charac-*

*terization of his contract as economic collateral rather than an asset sold in full to the Defendant).*

Furthermore, the Court in ***Richardson v. Commissioner,*** *121 F.2d 1 (2ⁿᵈ Cir. 1941)* confirms that **in-**

**tent** alone to cover a ***short position*** does not establish a sale for tax purposes unless delivery occurs-

supporting Plaintiff's argument that control and actual transfer of ownership are dispositive, not mere

labeling or anticipated intent.

In this context, although the Defendant referred to the Plaintiff's receivable (security) as a sale, the

Defendant's   repurchase obligation, retained servicing rights with residual interest (a 4% servicing

fee from the $500 million secured financing), and the consolidation for accounting purposes indicates

that derecognizing the transferred asset under the proposed sale may not be feasible.

As in the case of ***Klinger v. Commissioner****, T.C.M. 1949-18315,* this case echoes *Richardson's* princi-

ple that transactions are not closed for tax purposes until delivery is made, reinforcing Plaintiff's claim

that Defendant's economic control over Plaintiff's installment contract prevents derecognition and

supports setoff treatment.

As confirmed in *Cruttenden, Lorch,* and *Miami National Bank,* courts consistently held that assets

pledged as collateral-but not divested of economic control-remain attributed to the original holder for

tax and ownership purposes. Extending this doctrine, *Richardson* and *Klinger* established that absent

delivery or finalized transfer. transactions do not rise to the level of legal sale, regardless of intent or

labeling.

Together, these cases fortify Plaintiff's contention that his installment contract was never validly de-

recognized and must be treated as a retained financial asset, triggering secured borrowing treatment,

beneficial ownership retention, and liability recognition consistent with ASC **860** and **FFIEC** report-

ing standards.

Accordingly, the Defendant should have reported the trust-issued notes as **non-recourse debt**, and

the receivables as pledged collateral (***"pledged securities," "transferred securities"*** *– as identified or*

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 75

*should be identified of Defendant's consolidated balance sheet*), triggering taxable income from servicing fees and excess spread. Based on the trust's **$625 million** asset pool and a 4% retained servicing strip, the Defendant would owe federal income tax on approximately **$25 million in servicing income**, plus any residual cash flows. Failure to report the transaction as a financing could result in penalties under **IRC § 6662** for substantial understatement and mischaracterization.

The reasoning in these cases affirms that financial instruments pledged as collateral remain economically attributed to the original owner when control, benefit, or risk is retained. In Plaintiff's case, the Defendant's *repurchase obligation* (agreement), as disclosed in its **Sales and Contribution Agreement,** triggers ongoing control and violates the derecognition criteria under **ASC 860-10-45-5.** According to *Lorch* and *Miami National Bank,* this retained control means Plaintiff's installment contract was not sold-it was pledged.

In addition, Defendant's decision to **consolidate** its **Special Purpose Entities (SPEs)** and **Trusts** for financial reporting purposes supports Plaintiff's argument that the assets were never legally isolated. This follows *Cruttenden,* which held that pledged assets used to meet financial or regulatory requirements remain under the pledgor's ownership.

Plaintiff's **4% servicing fee** also matters - *Richardson* and *Klinger* both underscore that **actual delivery and divestment are required** for a transaction to be treated as a sale. Retaining the right to collect servicing fees and manage cash flows confirms Credit Acceptance's continuing involvement. These facts match **ASC 860-30-25-5,** which requires the receivable to stay on the transferor's books when the sale fails true isolation. Plaintiff's case citation shows controlling precedent which aligns with his argument: the economic substance of Defendant's structure mandates **secured borrowing treatment,** not "true sale" fiction, supporting Plaintiff's demands for recharacterization, offsetting, and claim to any surplus or collateral value.

Courts have upheld this treatment in cases like ***In re LTV Steel Co.,*** *333 B.R. 397 (Bankr. N.D. Ohio 2005),* where control and economic exposure retained led to the reclassification of a purported sale as

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION - 76

a loan for tax and bankruptcy purposes. The Court further recharacterized a purported sale of receivables as a loan because the seller, such as the Defendant retained servicing and residual interest. The *Steel* Court's ruling as to the seller mirrors Defendant's structure – retained servicing, dealer holdbacks, and control over the trust-all signs of a secured borrowing.

The Fourth Circuit upheld the IRS's rejection of Fowler's attempt to treat a structured transaction as a sale for tax purposes, finding that the taxpayer retained economic control and risk. See ***Gerry Fowler, Sr. v. IRS*** *24-1443 (4ᵗʰ Cir. 2024)*. The *Gerry* Court emphasized that **economic substance governs tax treatment,** even if GAAP permits sale accounting. This aligns with Plaintiff's argument that the Defendant's retained servicing and residual interests require **financing treatment for tax purposes.**

Also, in ***United States v. Boler,*** *3:22-cr-00073 (4ᵗʰ Cir. 2024),* the court affirmed sentencing based on intended tax loss, recognizing that mischaracterizing financial transactions-including those involving false claims of sale- can trigger liability. This case also reinforces misreporting the nature of a transaction (sale vs. loan) has legal consequences, especially when the taxpayer retains control.

***United States v. Cook,*** *1:2025cv00023 (W.D. Va. 2025),* the Court enforced IRS summonses related to structured debt transactions, emphasizing the need for transparency in tax reporting. This case supports Plaintiff's discovery request for an accounting of how the Defendant reported its securitization relative to the Plaintiff, to the IRS.

IRS regulations under **26 C.F.R. § 1.446-2(e)** and **§ 1.1275-1(b)** places obligation on the Defendant for accurate reporting to ensure that *everyone pays their fair share.* § 1.446-2(e) requires taxpayers to report *interest income* from financing arrangements, even if styled as sales. Based on this regulation, the Defendant was required to report the **$25 million** (approximately) as interest income (or capital gains) from the March 28, 2024, transaction. **§ 1.1275-1(b)** defines debt instruments broadly to include structured notes backed by receivables-like Defendant's asset-backed notes (ABS). Furthermore, **Revenue Ruling 2003-7** clears any confusion about the Defendant's accurate tax reporting obligations-and clarifies that when a taxpayer retains control or risk over transferred assets (as they have

admitted in their SEC filings), the IRS will treat the transaction as a **secured loan,** not a sale. See

**_Torres v. Commissioner,_** *88 T.C. 702, 721 (1987) (Holding that transactions structured for profit*

*with retained ownership attributes must be respected for tax purposes).*

These regulation mandates are relevant to the Plaintiff's suit because it is his payments that are back-

ing the returns for the Defendant's trust notes and it is the Plaintiff's asset/collateral/receivable/pay-

ments that were transferred to Defendant's Indenture Trustee/Collateral Agent to secure Defendant's

capital requirements and the obligations of the trust under the Defendant's Sales and Contributions

agreement. The Defendant may argue that their agreement does not affect Plaintiff's obligation under

the contract but if the Plaintiff's periodic payments are being funneled to the said trust for further dis-

tribution to the note holders, his equitable interest in the cash collateral, proceeds, and excess funds

(overcollateralization) gives him standing to assert such claims.

**ii.      Defendant's Potential Tax Violations**

If the Defendant mischaracterized the transaction as a true sale while receiving financing tax treat-

ment, the following tax violations may apply:

- **Underreporting of income:** Defendant may have excluded the **$500 million** financing proceeds
  from taxable income, resulting in underreporting of income.

- **Improper Deductions**: Defendant may have deducted expenses related to the securitization trust,
  such as servicing fees and repurchase obligations, which are not deductible under true sale tax
  treatment.

- **Failure to Pay Capital Gains Tax**: If Plaintiff's consumer loans were mischaracterized as true
  sales, Defendant would have avoided paying capital gains tax on the transfer of the loans to the
  securitization trust.

**iii.      IRS Notice 97-21 (1997-1 C.B. 407)** directly addresses the abuse of conduit financing (***Port-***

***folio Program***) structures designed to mischaracterize income and avoid tax liability. The

IRS made clear that it will **_recharacterize_** transactions based on their **economic substance,**

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 78

not their formal labels. This aligns with Plaintiff's position that finance contracts-like those assigned to Credit Acceptance Auto Loan Trust (Receivables) **2024-A** or **2024-1**-are structured to retain income and shift liabilities off-book. Courts have consistently upheld this principle, including in ***Gregory v. Helvering,*** *293 U.S. 465 (1935),* and ***Frank Lyon Co. v. United States,*** *435 U.S. 561 (1978),* where the Supreme Court ruled that *substance* must prevail over form when determining tax consequences. The IRS concluded in Notice 97-21 that it will not respect transactions lacking economic substance, even if they comply with the technical form of the Code (IRC). The final paragraph makes clear:

*"The Service will not respect the form of a transaction that lacks substance and is inconsistent with the intent of the Code".*

In *Gregory,* the Court ruled that even if a transaction follows the letter of the law, it must have **economic substance** and a **legitimate business purpose** to be respected for tax purposes. The taxpayer in that case created a shell corporation to avoid taxes, but the Court saw through the form and taxed the transaction based on its **true nature**.

This ruling gave rise to the ***substance-over-form doctrine,*** which the IRS still uses today-especially in cases involving **conduit financing, phantom income,** and **retained interest**.

Plaintiff asserts that principle:

- Finance companies like Defendant structure contracts to appear as sales, but retain control, income, and liability.

- The economic reality is a **secured borrowing,** not a sale.

Plaintiff invokes *Frank Lyon Co.* ruling to assert that the substance of the transaction-**not its form**-must govern its tax and legal characterization. In *Frank Lyon,* the Supreme Court upheld a taxpayer's position by recognizing the economic realities of a transaction disguised as a sale-leaseback. The Court emphasized that where a party retains real obligation, risks, and benefits, the transaction must be treated according to its ***substance.***

Similarly, Plaintiff contends that Defendant structured its contracts to appear as sales, while in substance they function as **secured borrowings**-according to their own **8-K, 10-K, 10-Q** SEC filings and admissions. Defendant retains servicing rights, income stream, and control over Plaintiff's asset(s), while transferring nominal title to their trust(s). This mirrors the **conduit financing** challenged in *Frank Lyon,* but here, the consumer, Plaintiff, is the true economic owner and obligor.

Therefore, under the doctrine affirmed in *Frank Lyon*, Plaintiff seeks recharacterization of the contract to reflect its true substance, enabling proper tax treatment and restitution of withheld income.

iv.    **Portfolio Programs as Conduit Financing Structures**

In conduit financing, a third-party entity) often a trust or special purpose vehicle) issues bonds or securities backed by receivables-like auto loans or credit contracts. The **originator retains control and income**, while shifting liabilities off-book. This mirrors how Defendant pools contracts into trusts like *Credit Acceptance Automobile Receivables Trust (Auto Loan Trust) 2024-A* or *2024-1*, then sells interests to investors while continuing to service the loans.

According to **Investopedia** and **WallStreetMojo,** conduit financing involves:

- A government or **financial entity issuing bonds**

- Transferring proceeds to a borrower or servicer

- The **borrower repaying the debt,** not the issuer

- Often used to **mask the true economic substance** of the transaction

v.    **How This Applies to Plaintiff's Case**

Under **IRS Notice 97-21,** the IRS warns against conduit structures that misrepresent income and ownership. The defendant has admitted they retain beneficial interest, services the transferred contracts, and earn income while assigning the receivables to their trust. The economic substance

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARACTERIZATION - 80

of their actions contributes to a **secured borrowing,** and not a sale of the Plaintiff's contract (asset). According to Notice 97-21, the Plaintiff believes that:

- His contract was not sold, but **recharacterized** into a conduit structure
- Plaintiff retained **beneficial ownership** of the asset (transferred receivable)
- The IRS would look to the *substance* of the transaction which would entitle Plaintiff to submit or cause Form **1099-OID, Schedule B,** and Form **1040** to claim *phantom income* and *excess finance charge* as the **benefitted shareholder** under Defendant's **Fast-Pay arrangement**

### vi.    Conclusion

At every level-statutory, regulatory, and accounting-the Defendant's securitization fails to qualify as a true sale. The transaction must be recharacterized as a secured borrowing under **ASC 860-30,** triggering a liability for the proceeds collected and preserving Plaintiff's economic interest in the collateral. The Defendant retained control, risk, and servicing discretion, while its affiliated entities acted in an agency capacity, never legally isolating the asset. As footnote 2 of the *Revenue Ruling 2003-7* confirms, and consistent with the *Gerry Fowler* and *In re LTV Steel Co.,* federal tax law treats such retention as fatal to sale treatment.

Moreover, the Fourth Circuit's guidance in *Bolger v. Utermohlen,* applying textual enforcement of federal statutes, compels this Court to adhere strictly to ASC 860, ASC 210-20-45-1, and IRS regulations (26 CFR § 1.446-2(e); § 1.1275-1(b)). When those mandates are met, and the facts reflect a financing, Plaintiff is entitled to offset, accounting, and disgorgement of all surplus proceeds held as collateral. The "written word is the law," and here it demands recognition of Plaintiff's continuing interest, the Defendant's liability, and immediate equitable relief.

### XI.    Conclusion and Demand for Relief

Plaintiff Lamont A. Thomas has devoted over sixteen months to preparing for this litigation. The plaintiff has researched the Defendant's own SEC filings, studied under the language of the ASC, studied

securities laws to the best of his ability, and read numerous court precedents to try his best to bring a complete and accurate claim to this Court.

The Plaintiff also affirms under the penalty of perjury that he did not receive any help from artificial intelligence (AI) to present this claim and has represented himself *pro se* in the past, filing his own supplemental brief in ***United States v. Thomas, No. 15-4578***. If this case proceeds to trial, he can argue the merits of his claim in court clearly, and intelligently.

Given the complexity of the case and his limited access to complete internal information regarding the Defendant's securitization vehicles, as well as the partial disclosure concerning the true nature of the transaction, the Plaintiff has made every reasonable effort to present a valid claim for relief. The Plaintiff intends to serve the Defendant with comprehensive discovery requests. He acknowledges the significant challenges inherent in this process and demonstrates a clear understanding of the financial system, with no intention of disrupting its operations. Accordingly, his claims pertain solely to his own transactions and do not address or evaluate the Defendant's dealings with other parties.

Plaintiff respectfully requests that this Court grant the following relief pursuant to Federal Rules of Civil Procedure 12(b)(6), 56, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

Plaintiff has presented specific, plausible, and well-supported allegations rooted in federal statutory authority, accounting mandates under ASC 860 and ASC 210, IRS regulations, and controlling legal precedent. Defendant Credit Acceptance Corporation structured Plaintiff's transaction as a securities borrowing/lending arrangement while misleading Plaintiff into believing it was a traditional consumer loan. Defendant retained economic control, servicing rights, and residual cash flows, and its affiliated entities acted in an agency capacity rather than as bona fide transferees. By failing to legally isolate the asset and by mischaracterizing the transfer under GAAP and IRS standards, Defendant violated Plaintiff's rights, concealed Plaintiff's beneficial interest in securitized proceeds, and imposed unlawful costs and excessive finance charges.

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 82

The Plaintiff has incurred significant financial harm directly attributable to the Defendant's unlawful actions. The assessment of more than **$15,000** in excess finance charges, well above the statutory cap established by *Va Code § 6.2-303*, has had a substantial and compounding impact on the Plaintiff's financial stability, creditworthiness, and ability to fulfill essential obligations. Already facing financial difficulties, the Plaintiff—who supports a family of five—risks losing essential transportation, which is critical for meeting fundamental responsibilities such as day care and medical appointments. This jeopardy arises from the excessive rates embedded within the contract. Consequently, the Plaintiff has been compelled to forgo other necessary financial commitments due to concerns about retaining his vehicle, effectively forcing continued adherence to these onerous terms.

Courts have consistently recognized that excessive interest rates and hidden finance charges are not merely technical violations-they inflict **real-world harm** on consumers, particularly those in vulnerable financial positions such as Plaintiff. In ***Germinara v. People's Comprehensive Mortgage,*** *98 Mass. App. Ct. 1117 (2023),* the Court acknowledged that **usurious interest rates** charged by non-traditional lenders can lead to **economic distress,** even when borrowers are sophisticated. The Court held that excessive interest, even if not voiding the loan outright, warranted **reformation and restitution** due to the disproportionate burden placed on the borrower. In *Germinara,* the lender admitted that it had violated the Anti-Usury Statute by charging an intertest rate permissible by law without having **registered with the Attorney General's Office**. The Court determined that the appropriate remedy in this instance was not voiding the loan but was instead reformation. Here, the Defendant, according to the Virginia Bureau of Financial Institutions, is not registered as a *Financial Institution* and did not file any exemption with Virginia authorities that would allow them to undermine the **12%** Virginia usury cap under § 6.2-303 of the Va. Code.

In *Germinara,* the Court based its ruling upon all the facts and circumstances and the reformation given in that case parallels to Plaintiff's request for *recharacterization*. However, Virginia law governs and

***Va. Code § 6.2-15-1*** states that ***no person or entity may engage in the business of making loans for***

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-TERIZATION - 83

*personal, family, or household purposes and <u>charge interest above the legal limit</u> (12%) <u>annually un-</u>*

<u>*der § 6.2-303), without first obtaining a license from the State Corporation Commission*</u> *(SCC)*. The

Defendant cannot argue that they are the assignee of the contract given the overwhelming evidence

Plaintiff presented shows they orchestrated and controlled the entire origination process articulated

throughout this motion. Since the Defendant is not registered with the Va. SCC and the interest rate far

exceeds the 12% usury cap, under the above-stated Va. Code, the **loan is void**, and the *lender* forfeits

the right to collect **any principal, interest, fees, or charges**.

Additionally, Plaintiff may recover **twice the total usurious interest paid** under § 6.2-305. The plain-

tiff wants to alert the Court that under § 6.2-1541, unlicensed lending or deceptive practices may result

in **misdemeanor or felony charges,** with fines up to $2,500 and jail time up to one year.

Similarly, in ***<u>Milliken v. Bank of America,</u>*** *3:23-cv-03709 (N.D. Cal. 2023),* plaintiffs alleged that **ret-**

**roactive interest rate hikes** violated the Truth in Lending Act and caused millions in unlawful charges,

demonstrating that excessive APRs can constitute actionable harm under federal law. Although the

CFPB dropped their suit against the Defendant, their allegations have direct applicability to Plaintiff's

claims. The CFPB's (now only the N.Y. Attorney General) and New York's Attorney General's joint

complaint against the Defendant further underscores the systemic nature of this harm. Even if the CFPB

withdrew their complaint, the allegations remain instructive because just as in the CFPB's complaint,

the Defendant misrepresented the true cost of credit [in this case], resulting in APR rates exceeding

**38%**, and in some cases over **100%**, far beyond what borrowers were led to believe.

The NY Attorney General found that nearly 90% of New York borrowers became delinquent, and 44%

experienced repossession, due to unaffordable structure, as the Plaintiff's spiked interest rates places

him in the same position. The CFPB stated that the Defendant's own system **predicted borrowers**

**could not afford to repay**, yet the company proceeded with aggressive debt collections, wage garnish-

ments, and credit reporting. Plaintiff believes there is no reason to believe that the Defendant used a dif-

ferent model for Plaintiff's ability to repay.

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 84

Plaintiff's experience mirrors the said CFPB-NY Attorney General's findings. The **$15,000** in excess interest was not incidental- it was the result of a deliberate structuring of the transaction to extract surplus value from Plaintiff's receivable, while denying him access to surplus proceeds and subjecting him to **economic coercion**. This financial burden has impaired Plaintiff's ability to maintain transportation, pursue employment, and avoid further credit deterioration.

As the Supreme Court recently affirmed in ***Kousisis v. United States,*** *598 U.S.\_\_\_ (2025),* **economic harm is not required to prove fraud,** but when present, it **amplifies the materially and gravity of the misconduct.** Plaintiff's injury is not speculative – it is **quantifiable, traceable, and directly attributable** to Defendant's "questionable" practices.

Courts have consistently rejected tactics such as the Defendants' In ***Fitzgerald v. First Virginia Bank,*** the Virginia Supreme Court reaffirmed that **substance over form**, and any interest exceeding the legal limit without proper authorization is unenforceable.

The plaintiff was denied accurate disclosures under ASC 860, ASC 210-20-45-1, and SEC Staff Accounting Bulletin No. 74, and Defendant may have underreported tax liabilities under **26 C.F.R. § 1.446-2(e), § 1.1275-1(b),** and **Rev.Rul. 2003-7.**

These allegations are supported by extensive factual content and documentary evidence, satisfying the plausibility standard under ***Twombly,*** *550 U.S. 544 (2007)* and ***Iqbal,*** *556 U.S. 662 (2009).* Courts in the Fourth Circuit have held that similar financial recharacterization claims survive Rule 12(b)(6) scrutiny when based on objective metrics and contractual inconsistencies. See ***Fairchild Dornier GMBH v. Official Comm. Of Unsecured Creditors,*** *453 F.3d 225 (4th Cir. 2006);* ***Hengle v. Treppa,*** *20 F. 4th 325 (4th Cir. 2021);* and ***Gerry Fowler Sr. v. IRS,*** *No. 24-1443 (4th Cir. 2024).* Sister courts in the **Second, Sixth, and Ninth** Circuits have upheld recharacterization and setoff claims under accounting and tax law, including ***In re Lehman Bros.,*** *422 B.R. 407 (Bankr. S.D.N.Y 2010);* ***Commercial Money Center v. Illinois Union Ins. Co.,*** *508 F.3d 327 (7th Cir. 2007);* and ***In re Fitness Holdings,*** *714 F.3d 1141 (9th Cir. 2013).*

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-TERIZATION - 85

Plaintiff respectfully demands the following relief:

**1.  Declaratory Judgment**

That the February 29, 2024, transaction between Plaintiff and Defendant constituted a **securities borrowing/lending arrangement,** not a traditional consumer loan, under **ASC 860, FFIEC** reporting standards, and applicable federal tax law.

**2.  Recharacterization of Accounting Treatment**

That Defendant's accounting treatment of Plaintiff's receivable be **recharacterized** as a secured borrowing under **ASC 860-30,** with recognition of liability for *cash collateral* received and retention of Plaintiff's installment contract on Defendant's balance sheet.

**3.  Recognition of Capital Contributions**

That Plaintiff's payments be recognized as *capital contributions* under **26 C.F.R. § 1.118-1,** and that Plaintiff be acknowledged as a beneficial interest holder in the securitization trust backed by his receivable.

**4.  Balance Sheet Offsetting and Setoff Rights**

That Defendant apply balance sheet offsetting under **ASC 210-20-45-1,** and that Plaintiff be granted setoff rights against any alleged obligation under the installment contract as the Court deems necessary and proper.

**5.  Release of Vehicle Lien and Restoration of Title**

That the lien filed by Defendant with the Virginia Department of Motor Vehicles be declared **void** and **released,** and that title to Plaintiff's vehicle be restored to Plaintiff.

**6.  Injunctive Relief**

That Defendant be enjoined from pursuing any collection, repossession, credit reporting, or assignment related to Plaintiff's February 29, 2024, transaction.

**7.  Restitution and Disgorgement of Surplus Proceeds**

That Defendant disgorge all surplus proceeds, overcollateralization, and excess interest derived from Plaintiff's receivable, and that such funds be returned to Plaintiff under **UCC §§ 9-607** and **9-625**.

**8. Sratutory Damages Under Virginia Usury Laws**

That Plaintiff be awarded statutory damages under **Va. Code § 6.2-303(F)** in the amount of twice the finance charge (**$36,775.00**), and that the contract be declared void under **§ 6.2-1501**.

**9. Recovery of Payments Made**

That Plaintiff be awarded restitution for all payments made under the contract, including principal, interest, and ancillary fees, totaling **$10,117.36**.

**10. Attorneys' Fees and Litigation Costs**

That Plaintiff be awarded litigation costs under **26 U.S.C. § 7430,** calculated at **$125/hour** for **225** hours of research, drafting, and procedural filings, totaling **$28,125.00**.

**11. Accounting and Disclosure**

That Defendant be compelled to provide a full accounting of trust cash flows, servicing fees, dealer holdbacks, and asset-tracing mechanisms tied to Plaintiff's receivable.

**12. Striking of Arbitration Clause**

That the arbitration clause in Plaintiff's contract be declared void *ab initio* and unenforceable under **Va. Code § 6.2-303(F)** and federal law.

**13. Recognition of Beneficial Ownership and Economic Substance**

That Plaintiff be recognized as the economic originator and beneficial owner of the receivable used to collateralize Defendant's securitization trust, and that Defendant's affiliated entities be deemed agents of Plaintiff under **ASC 860** and *Deloitte's securitization and accounting manual* guidance.

**14. Tax Compliance and Recharacterization for IRS Purposes**

That Defendant's March 28, 2024, financing be recharacterized as a secured borrowing for federal tax purposes under **26 C.F.R. § 1.446-2(e), § 1.1275-1(b),** and **Revenue Ruling 2003-7,** and that Plaintiff's beneficial interest be acknowledged accordingly.

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-TERIZATION - 87

**15. Any Other Relief Deemed Just and Proper**

That the Court grant such other and further relief as it deems just, equitable, and appropriate under the circumstances. Pursuant to Rule **38** of the Federal Rules of Civil Procedure, Plaintiff ***demands*** a trial by jury on all issues so triable.

Plaintiff further requests that the Court consider this action under its authority pursuant to **28 U.S.C. § 1331 and** recognizes the enforceability of federal accounting standards as authoritative federal accounting standards as authoritative federal law under ***Pepper v. Litton,*** *308 U.S. 295 (1939).* Plaintiff has demonstrated sufficient factual allegations, statutory foundation, and evidentiary support to proceed beyond the pleadings and requests that this matter be adjudicated on its merits.

Respectfully submitted,

Lamont A. Thomas, *pro se*

**4141 Granby Road**

**Woodbridge, VA 22193**

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2025, I served a true and correct copy of the foregoing complaint for Declaratory and Injunctive Relief and Motion for Recharacterization upon the following party by United States Mail, Certified Mail postage prepaid, in accordance with Rule **5** of the Federal Rules of Civil Procedure and Local Civil Rule **7(F)** of the Eastern District of Virginia:

**Credit Acceptance Corporation**

c/o Corporation Service Company

Registered Agent

**100 Shockoe Slip, Floor 2**

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-TERIZATION - 88

Richmond, VA 23219

Lamont A. Thomas

**4141 Granby Road**

**Woodbridge, VA 22193-2509**

**Phone: (571) 666-2268**

Email: thomaslegacy603@gmail.com

Pro Se Plaintiff

COMPLAINT AND MOTION FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND RECHARAC-
TERIZATION - 90