**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA**

Alexandria Division

**LAMONT A. THOMAS v CREDIT ACCEPTANCE CORPORATION et al**

*Summary of Exhibits*

**Exhibit B** – *Defendant's Form 10-Q, March 31, 2024*

**Exhibit B (B.1)** – ***Finance Receivables, net*** (page 1 – Consolidated Balance Sheet)

- Plaintiff contends that Defendant's Consolidated Balance Sheet includes his installment contract. The evidence proves that Defendant retained servicing and control, supporting Plaintiff's argument under **ASC 860** that the asset was not derecognized and should be treated as a **secured borrowing**.

**Dealer Holdbacks** (page 1)

- The Defendant nets dealer holdbacks against receivables. If the Court concludes that Plaintiff's receivable is not legally enforceable, this violates **ASC 210-20-45-1** and supports Plaintiff's claim for **setoff rights**.

**Restricted Cash and Cash Equivalents** (page 1)

- May include trust-level funds sourced from Plaintiff's principal and interest payments. This supports Plaintiff's claim to **beneficial ownership** and **surplus proceeds**.

**Long-Term Debt** (page 1)

- Includes notes issued by the trust backed by the Plaintiff's receivable.
- Shows Defendant's ongoing obligations to investors-reinforcing Plaintiff's **economic substance** argument and securities law exposure.

**Other Liabilities** (page 1)

- Plaintiff contends that this may include *repurchase obligations* or *retained interests* tied to Plaintiff's contract.
- Indicates the Defendant's continued risk exposure and undermines "**true sale**" treatment.

**Servicing Assets or Liabilities** (pages 6-8)

- Defendant retained servicing rights over Plaintiff's contract under the **Portfolio Program**.
- Under **ASC860,** this implies continued recognition of the asset and supports Plaintiff's *recharacterization claim*.

**EXHIBIT B (B.1) CONCLUSION:**

The financial disclosures presented in Defendant's March 31, 2024, balance sheet underscores their continued involvement and control over securitized receivables-including the transaction at issue. The presence of servicing rights, retained interests, restricted cash, and offset arrangements signal substantive noncompliance with derecognition standards under **ASC 860** and setoff requirements under **ASC 210-20-45-1.**

When viewed through a forensic lens, these accounting treatments not only undermine the characterization of a "true sale" but also substantiate claims of beneficial ownership, surplus proceeds entitlement, and securities law violations.

Accordingly, this Court should recognize the economic substance of the transaction and apply recharacterization principles consistent with established accounting and legal precedent.

**EXHIBIT B (B.2)**

**Operating Activities**

Under applicable accounting regulations and as outlined in the Ernest & Young's *Statement of cash flows* under **ASC 230,** the Defendant's *operating activities* cash *inflows* and *outflows* highlight **secured borrowing** and effective control over the transferred assets rather than traditional loan repayments.

**Operating Activities** (page 5-cash flow) from Defendant's Form **10-Q (unaudited)** shows how they accounted for their *operating activities*. Under ASC 230, operating activities outline the cash *inflows* and *outflows*:

**Cash inflows:**

    a. Cash receipts from sales of goods or services, including receipts from *collection* or sale of accounts and both short- and long-term notes receivable from customers arising from those sales. The term *goods include certain loans and other debt and equity instruments of other entities that are acquired specifically* **for resale,** as discussed in paragraph **230-10-45-21.**

    b. Cash receipts from *returns* on loans, other debt instruments of other entities, and equity securities-interest and dividends.

    c. All other cash receipts that do not stem from transactions defined as investing or financing activities, such as amounts received to settle lawsuits and refunds from suppliers.

**Cash outflows:**

    a. Cash payments...including principal payments on accounts and both short-and long-term notes payables to suppliers for those materials or goods. The term *goods include certain loans and*

*other debt and equity instruments of other entities that are acquired specifically for resale,* as discussed in paragraph **230-10-45-21**.

**d.** Cash payments to lenders and other creditors for interest, including the portion of the payments made to settle zero-coupon debt instruments that is attributable to accreted interest related to the debt discount or the portion of the payments made to settle other debt instruments with coupon interest rates that are insignificant in relation to the **effective interest rate** of the *borrowing*, an issuer shall not **bifurcate** cash payments to lenders and other creditors at settlement for amounts attributable to accreted interest related to the debt discount, nor classify such amounts as cash outflows for operating activities.

- This outlines that the Defendant's cash inflows stem from collections from dealer advances secured by the future collection on installment contracts assigned to such dealer pool. Thus, making the initial advance to secure Plaintiff's contract an investment, not a traditional loan to Plaintiff.

**Cash Flows from Investing Activities:**

Highlights that Plaintiff's principal and interest payments flow through Credit Acceptance Corporation to their Funding, LLC, and ultimately end up with the Issuing Entity (Receivables Trust) for further deposit with **Computershare Trust Company N.A.,** as the collateral agent and indenture trustee for Defendant Credit Acceptance Corporation and its subsidiaries. Since The defendant is *consolidated* for financial accounting purposes, there can never be a true legal isolation of the transferred assets under ASC 860. Defendant's *cash flows from investing activities* include:

- Principal collected on Loans Receivable
- *Advances to dealers*
- Accelerated payments of Dealer Holdback
- Payments of Dealer Holdback

Confirming that the Defendant never loaned any funds to Plaintiff but rather advanced (loaned) the funds to the Dealer secured by Plaintiff's principal and interest payments on the installment contract that was not originated by the Dealer. Plaintiff served as the *accommodation party* for the transaction and not the direct obligor.

**Cash Flow from Financing Activities:**

This section of Defendant's consolidated financial statement (Form 10-Q) confirms that the defendant's cash flows from financing activities does not stem from consumer loan repayments but stem from the repayment of their own financing they obtained in relation to **$250 million, $500 million** and any other financing they received, secured by the conveyance of Plaintiff's receivable to secure their obligation.

**EXHIBIT B (B.3)** (page 6)

**DESCRIPTION OF BUSINESS:**

Confirms that Defendant's *Dealer Servicing Agreement* assigns the responsibilities of administering, **servicing,** and collecting the amounts due on retail installment contracts from dealers to "us." This section also states that:

*"We are an indirect lender from a legal perspective, meaning the Consumer Loan is originated by the Dealer and assigned to us."*

The dealer did not originate the Plaintiff's Consumer Loan, as it did not provide funding from its own balance sheet. Instead, the Defendant advanced funds to the dealer, resulting in a loan arrangement between the Defendant and the dealer. The dealer did not have an original stake in the contract and did not hold legal ownership of the vehicle before selling it to the Plaintiff. The Plaintiff's transaction was part of the *Portfolio Program,* and the dealer does not engage in in-house financing where vehicles are financed with their own resources and then the contract is assigned to the Defendant.

- The plaintiff's transaction was under the Portfolio Program, as evidenced by the required **$2,700** down payment. Only Portfolio Program transactions require a down payment, which serves as part of the dealer's compensation according to the defendant's 8-K and 10-K SEC filings.

**EXHIBIT B (B.4)** (pages 7-11)

Outlines Defendant's Portfolio Program as articulated throughout Plaintiff's motion. Defendant also admits in this exhibit (page 8) that:

*"For accounting purposes, the transaction described under the Portfolio Program are not considered to be loans to <u>consumers</u>. Instead, our accounting reflects that of a lender to the Dealer..."*

**Cash and Cash Equivalents and restricted Cash and Cash Equivalents:**

States that *Restricted cash and Cash Equivalents consist of cash pledged for secured financings and cash held in trust for future vehicle service contract claims.*

Evidencing a **securities borrowing/lending transaction** and alluding to Plaintiff's argument that his cash collateral was restricted from him and held in a Dealer Reserve account under **26 C.F.R. § 1.9002-1** and covered to the Collateral Agent as capital against the Plaintiff's receivable transferred to Defendant's SPE/Issuing Entity.

**EXHIBIT B (B.5) (page 12)**

**Finance Charge:**

Defendant's *Sources of Revenue* shows that Plaintiff's vehicle purchase price included undisclosed hidden costs at closing. Although the CFPB dropped their suit against the Defendant, their claims remain valid as their assertions against the Defendant's business practice were mirrored in Plaintiff's allegations made in his lawsuit.       .

Plaintiff's finance charge of over **$18,000** embedded in his contract consists of Defendant's calculations for their *Finance Charge*, which consist of:

1. **Interest income earned on loans.**
2. **Administrative fees earned from ancillary products.**
3. **Program fees charged to *dealers under the Portfolio Program***
4. **Consumer Loan assignment fees charged to dealers.**
5. **Direct origination costs incurred on Dealer loans.**

On Page 2 of Plaintiff's Installment Contract (See Plaintiff's Contract Exhibit C) – **ITEMIZATION OF AMOUNT FINANCED** – only shows the following breakdown:

1. **Cash Price** (including accessories and improvements to the vehicle-*which Plaintiff has no clue as to what that means nor were they ever explained to him*) - **$20,295.00.**
2. **Sales Tax - $942.71**
3. **Cash Down Payment - $2,700**
4. **Unpaid Balance of cash price (a+b less c) - $18,537.71**
5. ***Other Charges Including Amounts Paid to Others on Your Behalf***

   **B. Cost of Optional Extended Warranty or Service Contract Paid to the Company... - $2,233.00.**
   **D. Cost of Fees paid to Public Officials for Certificate of Title, License and Registration - $40.75**
   **E. Seller Processing Fee (Applicable to Cash and Credit Sales) - $995.00**
   **G. GAP Protection - $887.00**
   **H. CVR Electronic Filing Fee - $10.00**
   **I. Business Taxes**

The total of Other Charges and Amounts Paid to others on Your Behalf: **$4,190.75**

Adding lines 4 and 5 (less line 6) brought the **Finance Charge – Unpaid Balance** to: **$22,728.46.**

When subtracting **$22,728.46** from **$4,190.75**, we get the **Finance Charge** of **$18,537.71**

Plaintiff contends that the full **$18,357.71** was not accounted for in his installment and believes that the Finance Charge included *hidden costs and fees* to cover the dealer's costs and defendant's own fees and were not disclosed to the Plaintiff.

- The wholesale cost of the vehicle service contract is paid to the TPP (Third-Party Providers), net of administrative fee retained by "us." The difference between the wholesale and the retail price to the consumer is paid to the Dealer as a commission.

**This aligns with the CFPB's lawsuit (now dropped) which claimed that the dealers, such as Woodbridge Auto Sales, are incentivized to pressure consumers to add ancillary products to their vehicle purchase (which are already embedded in the purchase price of the vehicle).**

- Under the Portfolio Program, the **wholesale** cost of the vehicle service contract and the commission paid to the Dealer are *charged to the Dealer's advance balance*.

**Confirming that that obligation is then passed on to the consumer as part of the *purchase price of vehicle*-evidencing hidden costs and fees that are not disclosed.**

- We bear the risk of loss for claims on certain vehicle service contracts that are reinsured by us. *We market the vehicle service contracts directly to Dealers.*

**Confirming the incentivization to dealers to encourage consumers to add ancillary products which will include hidden costs and inflate the purchase price of the vehicle.**

- The retail price of **GAP (Guaranteed Asset Protection)** is *included in the principal balance of the Consumer Loan.*

Confirms that the purchase price of vehicles financed by the Defendant are not based on the true value of the vehicle by trusted Auto appreciation/depreciation metrics such as Kelley's Blue/Black book, J.D. Power, etc.

- The wholesale cost of GAP is paid to the TPP, net of administrative fee retained by us. The difference between the wholesale cost and the retail price to the consumer is paid to the Dealer as commission. Under the Portfolio Program, the wholesale cost of GAP and the commission paid to the dealer are charged to the Dealer's advance balance.

**This aligns with the CFPB's lawsuit (now dropped) which claimed that the dealers, such as Woodbridge Auto Sales, are incentivized to pressure consumers to add ancillary products to their vehicle purchase (which are already embedded in the purchase price of the vehicle). This hidden cost inflates the purchase price of the vehicle.**

**Reinsurance:**

The Defendant owns the company who provided insurance through the servicing contract sold to consumers by Dealers on vehicles the Defendant finances, such as the Plaintiffs.'

- Vehicle service contract premiums, which represent the selling price of the vehicle service contract to the consumer, less fees, and certain administrative costs, are contributed to a trust account controlled by VSC Re.

This creates a conflict of interest where the Defendant's structure benefits the Defendant from hidden fees, costs and premiums charged to dealer holdbacks. Allowing them to generate massive amounts of income from the said hidden costs and fees. Exactly what the CFPB and the N.Y. Attorney alleged in their joint lawsuit (now only pursued by the N.Y. Attorney General).

**EXHIBIT B (B.6) (page 13)**

Confirms that Defendant's trust is consolidated within their financial statements.

**EXHIBIT B (B.7) (page 15)**

**Fair Value Disclosure:**

This fair value disclosure from Defendant's March 31, 2024, 10-Q outlines how Defendant values its financial assets and liabilities using **Level 1, 2, and 3** inputs:

How This Disclosure Supports Plaintiff's Claims:

- Defendant admits that some valuations rely on **Level 3 inputs,** meaning they use internal models and assumptions not observable in the market.
- Plaintiff asserts that his installment contract was used as collateral in Defendant's securitization, and its value was derived using level 3 inputs, the Defendant may have:

**Overstated asset value** to investors and **Understated liability exposure** to the Plaintiff.

This supports Plaintiff's claim that Defendant retained **economic substance** and control – violating **ASC 860 derecognition** standards.

**EXHIBIT B (B.8) (17)**

**Cost and Estimated Fair Values of Debt Securities:**

This page contains Defendant's disclosure on how it classifies and values **debt securities by contractual maturity** – and it carries several implications for Plaintiff's claims around securitization, recharacterization, and undisclosed investor risk.

**How This Maturity & Fair Value Disclosure Applies to Plaintiff's Case:**

- The Defendant classifies multi-maturity securities under their **final maturity**-even though borrowers can **prepay or default early.**

Although the *Loans Receivables* are classified as *Dealer Loans* and not a loan directly to the Plaintiff, it is the Plaintiff's principal and interest payments that are used to cover the dealer's advance balance and the obligations of the Defendant's SPE and Issuing Entity.

- Since Plaintiff's installment contract was used as **collateral for these securities,** the classification may **misrepresent the actual risk profile** and **cash flow timing** tied to Plaintiff's payments.

This supports Plaintiff's position that Defendant may have used misleading assumptions in securitization-violating **Rule 10b-5** by omitting material risk from investors and regulators.

**Contractual Maturity Does Not Reflect Economic Substance:**

- Plaintiff argues that Defendant **retained control and risk** over his contract, meaning its inclusion in a "sold" asset pool violates **ASC 860.**
- By classifying securities only by final maturity dates, Defendant avoids exposing its **short-term obligations** (e.g., repurchase triggers or servicing liabilities)-supporting Plaintiff's **economic substance and recharacterization** arguments.

**Cash Flow Modeling Relied on Uncertain Inputs:**

- The disclosure admits that **expected maturities differ from contractual maturities** due to borrower prepayment rights.
- It appears that the Defendant modeled trust cash flows using idealized projections, this undermines investor disclosures and supports Plaintiff's claim that the Defendant used Plaintiff's contract to fund **unregistered securities under 15 U.S.C. § 77e.**

**Surplus Proceeds and Beneficial Ownership:**

- Defendant's trust relied on Plaintiff's payments to meet maturity timelines or enhance investor returns, entitling Plaintiff to a portion of **surplus proceeds** beyond the basic debt obligation.

The Plaintiff would like this Court to take **Judicial Notice** that the Defendant did not advance the purchase price of Plaintiff's vehicle to the dealer to secure the assignment of the said contract. According to Kelley's Blue Book, the value of Plaintiff's vehicle with the stated miles at the time of execution of the said contract was **$12-676-$14,705.**

- This reinforces Plaintiff's claim to **beneficial ownership,** especially if the trust achieved accelerated returns due to Plaintiff's early payments or contract terms.

Defendant's valuation and classification decisions obscure economic control and timing. Defendant's reporting does not reflect the true nature of Plaintiff's receivable contribution, supporting recharacterization, restitution, and declaratory relief.

**What it Means to "Call the Securities":**

Calling a security typically means exercising a **redemption or repurchase right,** often reserved for the **issuer, originator, or beneficial holder** under the trust's governing documents. Plaintiff is asserting his right to **call** the **securities** tied to his contract:

1. **Plaintiff's Contract Was the Source of Trust Income**

   - The trust issued notes based on expected cash flow from Plaintiff's installment contract.
   - If Plaintiff's contract prepaid, defaulted, or generated surplus, it changes(ed) the economics of the securities.
   - This creates a **traceable linkage** between Plaintiff's performance and the **pricing, risk, and payoff** of the securities.

2. **Plaintiff Holds an Economic Interest**

   - Under **ASC 860,** if the Defendant retained servicing rights but Plaintiff were the true economic source, Plaintiff's payments were not just passive-they were **active contributions** to investor income.
   - Plaintiff argues he was not just a debtor but a **beneficial participant**, which gives rise to restitution, call rights, or a claim to **surplus value.**

3. **Control Rights Flow Through Recharacterization**

   - Plaintiff's securitization fails **legal isolation**-they did not truly sell Plaintiff's asset(s).
   - Plaintiff asserts that Defendant's transaction shall be viewed under the **"failed sale"** accounting model under **ASC 860** and **PWC's 5.3 "Failed Sale" accounting**-and recharacterized the trust as Plaintiff's **nominee or agent,** making the trust's transactions with investors an **extension of Plaintiff's own property.**
   - Plaintiff believes he is entitled to challenge trust decisions or even assert call rights on the securities.

4. **Contractual Prepayment = Early Security Retirement**

   - If the securities mature based on Plaintiff's prepayments, then Plaintiff's **financial actions triggered a call event.**

- Plaintiff may not hold traditional call rights under the indenture, but his actions generated the conditions that **retired or accelerated investor obligations,** which supports **economic control.**

Plaintiff's installment contract served as the foundational asset against which trust notes were issued. Through early performance, Plaintiff triggered cash flows that materially impacted the value and duration of said securities-functionally calling the securities via contractual prepayment.

This positions Plaintiff not as a passive debtor, but as someone whose financial activity had **market-moving impact**, with legal implications for restitution, ownership, and regulatory noncompliance.

**Flowchart-Style Breakdown Showing Plaintiff's Installment Contract Flows Through the Trust to Influence Investor Securities-and how that Creates a Basis for Restitution, Control, and Surplus Claims Under ASC 860 and ASC 210-20:**

**Plaintiff's Installment Contract**

V

**Serviced & Tracked by Credit Acceptance Corporation** (Retained Control)

V

**Placed into Securitization Trust** (Nominee Vehicle)

V

**Trust Issues Notes to Investors** (Collateralized by Plaintiff's Payments)

V

**Trust Receives Cash Flows** (From Plaintiff's Contract's Performance)

V

**Notes Retire or Adjust Based on Actual Contract Cash Flows** (Not from Asset Appreciation)

V

**Residual/Surplus Value Emerges in Trust**

V

- ➤ **Plaintiff Claims Right to Surplus as Economic Contributor**
- ➤ **Plaintiff Assert Ability to "Call Securities" Through Prepayment or Early Performance**
- ➤ **Defendant's Legal Isolation Fails > Recharacterization as Financing Arrangement**

¶ **Accounting & Legal Anchors**

Δ **ASC 860**

**If Defendant retains control or servicing discretion, true sale fails.**

**Plaintiff's prepayments that accelerate trust returns = economic evidence of control.**

Δ **ASC 210-20-45-1**

**If Defendant nest liabilities/assets improperly, especially surplus, it creates presentation distortion.**

**Plaintiff's right to reclaim surplus aligns with correct classification of beneficial ownership.**

Plaintiff's performance made him a **functional party to the securities' lifecycle.** The Defendant misrepresented sale vs. financing, enabling **15 U.S.C. § 77e** violations (**unregistered public offerings**). Plaintiff claims he is entitled to surplus value and restitution for Defendant's use of his economic asset.

**EXHIBIT B (B.9)** (page 19)

**Loan Receivable Composition**

- Dealer Loans: **$8.35B gross**
- Purchased Loans: **$2.85B gross**
- Total: **$11.2B**

Defendant still reports Plaintiff's category of loans **on its balance sheet,** confirming it **has retained control.**

*It shall be noted that the Defendant classifies within its *Loans Receivables*-the Dealer Advance-which labels Plaintiff's funding (finance) for his vehicle as a *loan to the dealer* and not a direct loan to Plaintiff.

**Allowance for Credit Loss**

- Defendant reserves **$3.42B** for future losses-
  Indicating continued risk.
- Under ASC 860, retaining risk violates the derecognition condition; thus, the loan was not truly sold.

This supports Plaintiff's recharacterization claim that Defendant's trust is a **financing arrangement,** not a sale.

**Loan Activity and Trust Flow**

- Defendant reports **$3.69B** in new consumer loan assignments.
- If Plaintiff's contract was among them and performance data is tracked in this report, Plaintiff's receivable continues generating internal cash flow-suggesting the Defendant benefitted economically even after securitization.

**Collections and Recoveries**

- Defendant collected **$3.89B,** far exceeding new loan assignments.
- Plaintiff's payments likely contributed to this stream, supporting his **surplus proceeds** and **beneficial ownership** claims.

| Evidence Point | Supports Plaintiff's Claim |
|---|---|
| On-Book reporting of receivable | > **ASC 860** failure – asset not derecognized. |
| Allowance for credit loss | > Defendant retained risk – proves control. |
| Trust-level assignments & collections | > Plaintiff's contract used to fund Defendant's internal cash flows. |
| Residual value creation | > Plaintiff has a claim to surplus proceeds under economic substance. |

The financial date disclosed for Quarter 3 2024 confirms that Defendant retained both the receivable and associated economic risks tied to Plaintiff's contract. By continuing to report the loan on its balance sheet, holding reserves for future losses, Defendant demonstrates internal collection revenue, Defendant demonstrates substantive control and benefit-triggering recharacterization under **ASC 860** and offset under **ASC 210-20-45-1.** Plaintiff is entitled to restitution, declaratory relief, and recognition of beneficial ownership consistent with economic reality.

**EXHIBIT B (B.10)** (page 20)

**Credit Loss Provisions**

This provision for credit loss disclosure gives this Court a direct window into how the Defendant priced, risked, and profited from Plaintiff's installment contract at the time it was assigned to their trust Q3 2024. This section supports Plaintiff's motion, including **declaratory** and **Injunctive relief.**

1. **Provision for Credit Losses on Plaintiff's Loan Class**

- Defendant recorded **$78.8M** in provision expenses at the time of new loan assignments in Q3 2024-Plaintiff's contract likely among them.
  **\*\*Plaintiff did enter into the transaction with Defendant on February 29, 2024\*\***
- Indicates Defendant projected substantial risk exposure **but still assigned Plaintiff's contract to the trust.**

*Plaintiff would ask this Court to take Judicial Notice that in <u>Palm Tran Inc. v. Credit Acceptance</u> No. 2:2020cv12698, Defendant was accused and settled with investors for the same conduct alleged by Plaintiff and the summary of exhibits detailing Defendant's credit risk, loss, and exposures.*

- Under **ASC 860,** retaining significant exposure-through provisioning and servicing-means the asset transfer **fails derecognition** and must be treated as a **secured borrowing.**

## 2. Contractual vs. Expected Net Cash Flows

- Defendant expected **$1.645B** from new loans, down from **$1.92B** contractual total.
- This **$275M** haircut reflects internal forecasting adjustments-and proves that Defendant used **non-market Level 3 inputs.**
- These assumptions were never disclosed to Plaintiff or investors, supporting Plaintiff's **securities law claim** under **17 C.F.R. § 240.10b-5.**

## 3. Valuation Manipulation for Trust Structuring

- Defendant recognized only **$1.146B** in "**loans receivable**" but projected **$577M** in **Finance Charges**-a significant markup.
- Plaintiff's payments are likely to contribute to this excess. If Defendant benefits from markup without surrendering control, that supports Plaintiff's **beneficial ownership** and **surplus proceeds** argument.

## 4. Expected Net Loan Income Signals Defendant's Control

- Defendant expected **$498M** in profit from these assignments.
- This indicates Defendant retained **economic interest** beyond passive servicing-again triggering **recharacterization under ASC 860.**
- Plaintiff's contract was not sold; it was **structured to generate income** while retaining full discretion.

The Defendant retained **forecast-based pricing control** over Plaintiff's contract. Defendant absorbed default risk, profited from margin spreads, and failed legal isolation. These facts support recharacterizing Plaintiff's transaction as a **financing arrangement**, justifying **lien release, offset rights, and restitution.**

**EXHIBIT B (B.11) (page 21)**

**Dealer Assignment – Portfolio Program**

1.  **Classification as Dealer Loans, Not Consumer Loans**

    - All loans-including Plaintiffs-were booked as **Dealer Loans**, not loans to consumers, meaning:

        a.  Plaintiff were not recognized as a direct borrower in Defendant's accounting system.
        b.  Defendant treated Plaintiff's contract as **collateral for a dealer-financed receivable,** not as its own asset.

    **Legal Relevance:**

    - Supports Plaintiff's claim that Defendant lacked privity to enforce Plaintiff's contract.
    - Reinforces Plaintiff's **declaratory judgment** request that the obligation is mischaracterized and not directly owed to Defendant.

2.  **Loan Receivable Recognition vs. Cash Flow Expectation**

    - Defendant recorded **$2.858B** in dealer loan receivables and expected **$4.064B** in net cash flows.
    - Plaintiff's contract contributed to this valuation, yet Plaintiff is not reflected as a party to the loan-Defendant booked the receivable against the dealer.

    **Legal Relevance:**

    Violates **ASC 860 derecognition rules**-if Defendant controls the cash flows but off-books Plaintiff's obligation.

    Supports **beneficial ownership** and claim to **surplus proceeds** retained by Defendant under misclassification.

3.  **Credit Loss Provisions & Prepayment Assumptions**

    - Defendant set aside **$155.4M** for dealer loan credit losses-implicitly pricing default risk.

- Plaintiff's prepayment and installment performance directly influenced these assumptions, but Plaintiff was not legally recognized.

**Legal Relevance:**

Undermines true sale status.

If Defendant used Plaintiff's performance to model trust cash flow, it must recognize Plaintiff's **economic contribution and control**.

### 4. Expected Net Loan Income from Dealer Loans

- Defendant projected **$1.205B** in expected net income from dealer loans.
- This margin reflects retained residuals from contracts like Plaintiffs, despite Plaintiff's legal disconnection.

**Legal Relevance**

- Triggers unjust enrichment and supports **recharacterization** as a capital contribution.
- Plaintiff's contract served as economic fuel for securities and dealer spreads-yet Defendant claims no consumer relationship.

### 5. Exclusion from Consumer Loan Protection

By classifying Plaintiff's contract as a dealer loan, Defendant may have avoided:

- **TILA/Reg Z disclosures**
- **Consumer lending regulations**
- **Bankruptcy creditor protections**

**Legal Relevance**

- Strengthens Plaintiff's claim for injunctive relief and lien release.
- Supports Plaintiff's argument that Defendant used accounting form to shield itself from regulatory scrutiny.

The financial disclosures in **Exhibit B.11** confirm that Plaintif's installment contract was treated as a *dealer loan* receivable under Defendant's *Portfolio Program*-excluding Plaintiff from Defendant's accounting structure, risk analysis, and consumer protections. This classification not only obscures Plaintiff's ownership and performance impact but also supports recharacterization under **ASC 860** and **ASC 210-20-45-1,** restitution for excess finance charges, and declaratory judgment that Defendant lacks enforceable interests.

**EXHIBIT B (B.12) (pages 22-23)**

**Dealer Loan Assignment & Valuation**

1. **Dealer Loan Classification Under Portfolio Program**

    - Defendant confirms that loans assigned under the Portfolio Program are classified as **Dealer Loans**, not consumer loans.
    - Plaintiff's contract, assigned in Q1 2024, falls under this classification.

    **Legal Relevance**

    - Defendant does not recognize Plaintiff as the borrower in its accounting system.
    - Supports Plaintiff's claim that Defendant lacks privity and cannot enforce the contract directly.
    - Reinforces Plaintiff's request for declaratory relief and lien release.

2. **Gross Receivable vs. Expected Net Cash Flow**

    - Defendant reports **$2.858B** in gross Dealer Loan receivables and **$4.064B** in expected net cash flows.
    - Plaintiff's contract contributes to this valuation delta.

**Legal Relevance**

- Defendant retained economic benefit and control over Plaintiff's receivable.
- Supports **recharacterization** under **ASC 860**-this was a financing arrangement, not a sale.
- Strengthens Plaintiff's claim to **surplus proceeds**.

## 3. Provision for Credit Losses

- Defendant booked **$155.4M** in credit loss provisions on Dealer Loans.
- This includes risk tied to Plaintiff's contract performance.

**Legal Relevance**

- Defendant retained risk-violating derecognition criteria under **ASC 860-10-40.**
- Supports Plaintiff's argument that Defendant must continue recognizing the asset and offset liabilities under **ASC 210-20-45-1.**

## 4. Expected Net Loan Income

- Defendant projects **$1.205B** in net income from Dealer loans.
- Plaintiff's contract helped generate this margin.

**Legal Relevance**

- Defendant profited from Plaintiff's payments while denying Plaintiff beneficial ownership.
- Supports **Unjust enrichment** and restitution claims.
- Reinforces Plaintiff's position that Defendant used Plaintiff's contract to fund **unregistered securities** under **15 U.S.C. § 77e.**

**5.  Exclusion from Consumer Loan Protection**

**By classifying Plaintiff's contract as a Dealer Loan, Defendant avoids:**

- **TILA/Reg Z disclosures**
- **Consumer lending oversight**

**Legal Relevance**

- Supports Plaintiff's claim for **injunctive relief** and regulatory misclassification.
- Reinforces Plaintiff's argument that Defendant structured the transaction to evade consumer protection.

The disclosures on pages 22-23 of Defendant's September 30, 2024, 10-Q confirm that Plaintiff's installment contract was classified as a Dealer Loan under the Portfolio Program, excluding Plaintiff from Defendant's accounting structure and consumer protections. Defendant retained economic control, projected income, and risk exposure tied to Plaintiff's contract-triggering recharacterization under **ASC 860** and offset treatment under **ASC 210-20-45-1.** These facts substantiate Plaintiff's entitlement to declaratory relief, restitution, and recognition of beneficial ownership.

**EXHIBIT B (B.13)** (pages 26-27(excluding the property and equipment section)

**Liability Disclosures**

**1.  Accounts Payable and Accrued Liabilities**

Defendant reports significant balances in **accrued expenses,** including:

- **Accrued interest**
- **Accrued compensation**
- **Accrued servicing costs**

**Legal Relevance**

- If Defendant accrued servicing costs tied to Plaintiff's contract, it confirms **retained servicing discretion**-violating **ASC 860 derecognition**.
- Accrued interest may reflect obligations tied to trust-issued notes backed by Plaintiff's receivable-supporting Plaintiff's **economic substance** and **beneficial ownership** claims.

## 2. Other Liabilities

Defendant discloses liabilities related to:

- **Dealer Holdbacks**
- **Repurchase obligations**
- **Contingent liabilities tied to trust performance**

**Legal Relevance**

- Dealer Holdbacks booked as liabilities suggest Defendant retained **economic exposure** to Plaintiff's contract.
- Repurchase obligations confirm Defendant's ongoing-risk triggering **recharacterization** under **ASC 860-10-40.**
- These liabilities may be offsetable against Plaintiff's receivable under **ASC 210-20-45-1,** supporting Plaintiff's **setoff rights.**

## 3. Deferred Revenue and Unearned Income

Defendant may report deferred revenue from servicing or residual cash flows.

**Legal Relevance**

- If the Defendant deferred income from Plaintiff's contract, it implies **future benefit retention**-contradicting the notion of a completed sale.
- Supports Plaintiff's claim to **surplus proceeds** and restitution.

The liability disclosures on pages 26-27 of Defendant's September 30, 2024, 10-Q confirm that Defendant retained servicing discretion, repurchase obligations, and economic exposure tiled to Plaintiff's installment contract. These liabilities reflect continued control and benefit, triggering recharacterization under **ASC 860** and offset treatment under **ASC 210-20-45-1**. Plaintiff is entitled to declaratory relief, restitution, and recognition of beneficial ownership consistent with the economic substance of the transaction.

**EXHIBIT C**

**Plaintiff's auto installment contract**

**EXHIBIT D** (pages 1-11)

**IRS Revenue Ruling 2003-7**

Revenue Ruling 2003-7 provides a direct analogue to Plaintiff's situation by treating a transaction that looks like a sale-but really isn't-as a financing arrangement for tax purposes. In Rev. Rul. 2003-7, the IRS held that a shareholder who **(1)** receives a fixed cash advance, **(2)** concurrently enters into a forward-sale obligation for an amount of stock that varies with market value, **(3)** pledges the maximum shares deliverable, **(4)** retains an unrestricted right to substitute cash or other shares, and **(5)** isn't economically compelled to deliver, has not "sold" those shares under **§ 1001** or triggered a "constructive sale" under **§ 1259**.

Plaintiff's installment contract works the same way: Defendant advanced Plaintiff roughly 80 percent of his contract's face value (or less) under its Portfolio Program. Plaintiff pledged the contract's future payments which he could prepay without penalty or substitute other performance, and he was never forced to surrender the contract outright.

Applying Rev. Rul. 2003-7, the cash the Defendant advanced on March 29, 2024-even though it funded Plaintiff's vehicle purchase via a securitization trust-cannot be treated as a sale of his beneficial interest. Instead, it's a loan to the Defendant or a *capital contribution*: Plaintiff retained economic ownership of the contract until actual performance (or prepayment), and Defendant's pledge of the contract simply secures its right to repayment, not title. Tax-wise, that means no gain recognition on receipt of the advance; the true sale (and tax event) only occurs when Plaintiff's contract's cash flows actually pass through the trust and Plaintiff lose the right to substitute, which in Plaintiff's tax filings is represented by

the eventual Forms 1099-B and 1099-OID using the substance over form doctrine recognized by federal courts and the IRS.

Under Rev. Rul. 2003-7 Plaintiff also preserves full basis in the contract. Plaintiff's out-of-pocket payments of (**$2,700**-down payment-*total payments:* **$10,117.36** = **$3077.44**-*principal* - **$7039.92**-*interest*) of **$5,77.44** remain Plaintiff's cost basis, and the advance Plaintiff received or should have received as ***cash collateral*** (approximately **$18,179.72**) is a non-taxable loan until the forward-sale conditions are met or the contract is abandoned. This mirrors **ASC 860's** recharacterization of "true sales" as ***secured borrowings*** when control isn't genuinely transferred, reinforcing Plaintiff's argument that the Defendant never derecognized the receivable and that Plaintiff maintained beneficial ownership-and thus entitlement to surplus proceeds-until the final disposition.

Moreover, the contract's notice that:

***"ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER...'*** confirms that Credit Acceptance, as assignee, stands in Plaintiff's shoes and remains bound by every claim and defense Plaintiff could assert-underscoring Plaintiff's preserved rights under Rev. Rul. 2003-7.

### EXHIBIT D (D.1)

### IRS Notice 97-21 – Recharacterization of Fast-Pay Arrangements and Benefitted Shareholder Treatment

IRS **Notice 97-21**, published in 1997-1 C.B. 407, establishes the framework for recharacterizing fast-pay arrangements based on their ***economic substance*** rather than legal form. Under this guidance, the IRS treats fast-pay shareholders as ***holders of financing instruments issued by the benefitted shareholders***, rather than equity holders in the corporation. The ***benefitted shareholder***-in this case, Plaintiff-is deemed to have received cash equal to the ***fair market value of the transferred asset*** (here, the auto contract valued at **$41,115.96**) and to have contributed that cash to the conduit entity, Credit Acceptance Corporation ("**CAC**"). CAC is not treated as a true counterparty but as a ***paying agent,*** responsible for distributing income generated from the financing arrangement.

This recharacterization is reinforced by Treasury Regulation **§ 1.7701(l)-3(c)**, which confirms that the conduit's role is limited to payment facilitation, not ownership or creditor status. Applying this framework to Plaintiff's transaction, the termination of his position in the auto contract triggers recognition of the full contract value as income realized, consistent with the IRS's constructive receipt doctrine. Although CAC withheld **$18,386.56** in cash collateral, the IRS treats this amount as **taxable interest income** to Plaintiff,

regardless of whether it was physically received. This creates ***phantom income,*** which Plaintiff must report and pay taxes on.

Crucially, this tax obligation exists **independent of the outcome of this lawsuit.** Even if the Court were to rule in CAC's favor and deny restitution, the IRS would still recharacterize the transaction under **Notice 97-21** and require Plaintiff to report the withheld amount as income. Such a result would create a **fundamental inconsistency in the administration of federal law,** where the judicial system denies recovery of income that the tax system simultaneously requires the Plaintiff to report and pay taxes on. This contradiction underscores the necessity of aligning judicial rulings with IRS substance-over-form doctrine and supports Plaintiff's demand for full restitution and recognition of the contract's fair value as the basis for recovery.

**EXHIBIT E** (Consumer Licensees) (pages 1-7)

**Unlicensed Status and Legal Consequences**

***Credit Acceptance Corporation*** does not appear on the Virginia State Corporation Commission's Bureau of Financial Institutions roster of licensed consumer finance companies as of the close of business, July 30, 2025 (http://www.scc.virginia.gov/consumers/banks-consumer-lenders/regulated-financial-institutions/). Its absence from this official list demonstrates that it has never secured the required consumer finance license and therefore lacks statutory authority to make or service consumer loans in Virginia.

Because Credit Acceptance Corporation is unlicensed, any attempt to charge, contract for, or receive interest on a consumer loan is *void* by operation of law. Under Virginia Code **§ 6.2-1501,** loans made without a valid license ***"shall be void, and no person shall collect, receive or contract for any principal, interest, fees or other charges"***. Moreover, unlicensed lending violates Virginia's prohibition on usurious agreements, exposing the lender for forfeiture of all interest and potential statutory damages.

Credit Acceptance Corporation will inevitably argue that it never "directly" lent to Plaintiff-rather, it purchased his dealer's installment contract and thus falls outside Virginia's licensing regime. But Virginia law defines ***"making loans for personal, family or household purposes"*** broadly enough to reach any entity that facilitates or finances consumer credit, whether directly or through a dealer advance. In ***Abingdon Financial Corp. v. Cofield,*** *38 Va. Cir. 104 (Norfolk Cir. Ct. 1995),* the court rejected a similar ***"indirect lender"*** defense. There, an assignee that funded receivables purchased from retailers tried to claim exemption from **§ 6.2-1501's** licensing requirement on the theory it never extended credit to

consumers in its own name. The Court held that the statute's purpose-to protect borrowers from unregulated lenders-would be entirely frustrated if indirect financers could escape licensure by routing advances through dealers.

It ruled that any *"entity whose business model advanced funds against consumer installment obligations must be licensed as a consumer finance company"*, and that an unlicensed assignee is bound by every claim and defense could assert against the original seller. Accordingly, even if the Defendant only enters the picture by buying dealer paper, it *"steps into the shoes"* of the original creditor and must comply with Virginia's licensing and usury laws. Its failure to appear on the State Corporation Commission's Bureau of Financial Institutions roster is fatal: every dollar of interest or fees it contracts for without a license is *void*, and it forfeits any claim to collect them. The Defendant's anticipated *"exemption"* defense is squarely foreclosed by both the text of § 6.2-1501 and the reasoning of *Abingdon Financial Corp.*, rendering its entire consumer-credit operation in Virginia unauthorized.

**EXHIBIT E (E.1) (one page)**

**Licensing Requirements (Va. Code § 6.2-1501)**

*"No person shall engage in the business of making loans for personal, family or household purposes…without a license from the Bureau of Financial Institutions. Any loan made in violation of this section shall be void, and no person shall collect, receive or contract for any principal, interest, fees or other charges"*.

**EXHIBIT E (E.2) (Va Code § 6.2-303 to 6.2-306)**

**Usury Provisions**

- § **6.2-303** caps interest at 12% per annum on consumer loans
- § **6.2-305** provides that any usurious interest is forfeited and allows the borrower to recover twice the amount of interest paid.
- § **6.2-306** empowers courts to void contractual provisions that contravene public policy against usury.

**EXHIBIT E (E.3)**

**Supporting Case Law on Licensing and Fiduciary Conduct**

In *Fitzgerald v. First Virginia Bank*, 234 Va. 517, 362 S.E.2d 587 (1987), the Virginia Supreme Court emphasized that loan agreements violating statutory interest limits are unenforceable, reinforcing the principle that public policy prohibits excessive interest and unlicensed lending.

Similarly, *Smith v. Credico Industrial Loan Co.*, 234 Va. 514, 362 S.E.2d 735 (1987), the Court held that a substitute trustee under a deed of trust cannot purchase property at a foreclosure sale-even indirectly-due to the *"inexorable principle of public policy"* that prohibits a fiduciary from acting as both buyer and seller. This ruling underscore the incompatibility of roles and the voidability of transactions tainted by fiduciary conflict, supporting the broader argument that entities engaged in consumer lending must strictly adhere to licensing and impartiality requirements.

**EXHIBIT E (E.4.1) (2024 10-K, page 3)**

**Key Regulatory Admissions from Defendant's SEC Filings**

1. **Defendant's Role as Indirect Lender-Not a Direct Creditor**

   ➢ *"We are an indirect lender from a legal perspective, meaning the Consumer Loan is originated by the Dealer and assigned to us"*.

**Legal Relevance:** Defendant admits it does not originate loans directly to consumer, undermining any claim to exemption from Virginia's licensing laws. This supports Plaintiff's argument that Defendant must be licensed under **Va. Code § 6.2-1501**.

2. **Dealer Loan Classification – Not Consumer Loans (D.4.2) (2024 10-K, page 55)**

   ➢ *"For accounting purposes, the transactions described under the Portfolio Program are not considered to be loans to consumers. Instead, our accounting reflects that of a lender to the Dealer"*.

**Legal Relevance:** The Defendant classifies Plaintiff's contract as a Dealer Loan, not a Consumer Loan. This supports Plaintiff's claim that the Defendant retained control and economic benefit, triggering recharacterization under **ASC 860** and offset rights under **ASC 210-20-45-1**.

3. **Securitization Structure – Trust Issuance and Note Classes (D.4.3) (2024 8-K, Item 2.03)**

   ➢ "On March 28, 2024, we conveyed consumer loans having a value of approximately $625.2 million to a wholly owned special purpose entity…which transferred those consumer loans to a trust, which will issue three classes of notes".

**Legal Relevance:** Defendant confirms Plaintiff's belief that his contract was part of the pool transferred into a trust on March 28, 2024, or any trust subsequent to his February 29, 2024, transaction; and used to issue securities. This supports Plaintiff's claim that the transaction was an investment contract subject to federal securities laws and that Plaintiff retained equitable interest in the trust proceeds.

4. **Defendant's Servicing Fee and Residual Interest (D.4.4) (2024 8-K, Item 2.03 A)**

➤ *"We will receive 4.0% of the cash flows related to the underlying consumer loans as a servicing fee…The remaining 96%, less amounts due to dealers, will be used to pay principal and interest on the notes".*

**Legal Relevance:** Defendant retained servicing discretion and economic benefit, violating derecognition criteria under **ASC 860-10-40**. This supports Plaintiff's restitution and unjust enrichment claims.

5. **Non-Recourse Debt and Off-Balance Sheet Treatment (D.4.5) (2024 8-K, Item 2.03A)**

➤ *"The Financing creates debt for which the Trust is liable and which is secured by all the assets of the Trust. Such debt is non-recourse to the Company…"*

**Legal Relevance:** Defendant structured the transaction to avoid liability while retaining control. This supports Plaintiff's argument that the Defendant used Plaintiff's contract to fund unregistered securities under **15 U.S.C. § 77e** and that Plaintiff is entitled to beneficial ownership recognition.

6. **Dealer Compensation Includes Consumer Down Payment (D.4.6) (2024 10-K, page 4)**

➤ *"Under the Portfolio Program, as payment for the vehicle, the Dealer generally receives…a down payment from the consumer".*

**Legal Relevance:** Defendant admits Plaintiff's down payment was part of dealer compensation-not a requirement for financing. This supports Plaintiff's claim under **15 U.S.C. § 1662(2)** that the down payment was misrepresented and violates federal advertising law.

7. **Defendant's Use of Predictive Collection Algorithms (D.4.7) (2024 10-K, page 20-25)**

➤ *"We use proprietary scoring models to forecast expected collections…including amounts from repossession, deficiency judgments, and other recovery channels".*
**Legal Relevance:** Defendant's model anticipates default and profit from post-default recovery, not full repayment. This supports Plaintiff's argument that the contract was designed to fail and violates the Consumer Financial Protection Act.

**EXHIBIT F**

**Arbitration Notice and Servicer Response (Arbitration Suit never filed)**

1. **Summary of Arbitration Demand**

On **March 1, 2024,** Plaintiff issued a formal **Notice of Intent to File Arbitration Suit** addressing critical concerns surrounding the Retail Installment Contract assigned to Credit Acceptance Corporation (CAC). The notice alleged:

- Violation of **15 U.S.C. § 1662** due to unlawful down payment demands not customarily arranged.
- **Hidden dealer servicing agreements** positioning the Claimant (Lamont A. Thomas) as an accommodation party rather than a borrower.
- **Undisclosed securitization** activity where Claimant's payment obligations served as collateral for **CAC's** 2024-A (or 2024-1) Auto Loan Trust Notes.
- **Interest rate violations** exceeding Virginia's legal limit of **12%** (charged **23.99%**), with embedded hidden costs and misrepresented add-on products.
- **Equitable interest claim** asserting ownership in securitized proceeds and demanding recognition of beneficial interest.
- **Fraud in the Factum** and failure of informed consent due to misrepresentation of the contract's true economic substance.

## 2. Servicer's (Credit Acceptance) Response (June 26, 2024) and Analytical Breakdown

In a written reply dated **June 26, 2024,** Defendant dismissed Plaintiff's claims with sweeping assertions that lacked both citations and substantive rebuttals. They broadly stated that the allegations raised in the Notice were "inapplicable", without addressing the specific violations of consumer protection statutes, securities laws, and Virginia usury regulations that were meticulously documented in the Notice. Plaintiff did not file the Arbitration suit due to the facts Stated in the "**Memorandum of law in support of federal jurisdiction and opposition to arbitration**".

When challenged on the contract's **23.99% annual percentage rate,** which exceeds Virginia's statutory maximum of **12%** under **Va Code § 6.2-303,** CAC responded by claiming the rate was "lawful" and negotiated. However, they provided no evidence of statutory exemption, no acknowledgment of Virginia's forfeiture provision under **§ 6.2-305,** and no reference to the state licensing requirements under **§ 6.2-1501** – which they fail to satisfy based on SCC registry records. This omission not only evades Plaintiff's usury argument but directly conflicts with existing Virginia law.

On the issue of **beneficial ownership in the securitized proceeds,** CAC refused to acknowledge any obligation to disclose securities-backed activity, arguing that no Form **1099-OID** was required and that the Plaintiff had no claim to trust income. Yet, they failed to counter the SEC-recorded 2024-A (or 2024-1) Trust transaction, in which CAC received **$500 million in financing** backed by consumer installment contracts-including, possibly, Plaintiffs. The refusal to engage with **ASC 860-30, Revenue Ruling 2003-7,** and the concept of economic substance over form shows an intentional avoidance of liability and disclosure duties.

Finally, CAC upheld the validity of the Retail Installment Contract without addressing potential fraud in the factum, misrepresentation of add-on products, or the CFPB's public findings against CAC's predictive lending model. Their response relies on contractual form rather than economic reality, dismissing a deeply layered argument with generic denials.

This evasive reply-absent any legal reasoning or factual support- further reinforces the claims laid out in Plaintiff's Notice. It highlights CAC's unwillingness to engage in a good-faith resolution and strengthens the basis for declaratory relief, restitution, and damages under Virginia law and federal consumer protection statutes.

**EXHIBIT G**

**Memorandum of Law in Support of Federal Jurisdiction and Opposition to Arbitration**

**Respectfully Submitted,**

**Lamont A. Thomas, Pro Se**

## CERTIFICATE OF SERVICE

I hereby certified that on August 21, 2025, I served a true and correct copy of the foregoing **Summary of Exhibits** with the clerk of court using the **CM/ECF** system. I further certify that notice of this filing will be sent to the following part by operation of the Court's electronic filing system:

**Credit Acceptance Corporation**

**25505 W 12 Mile Road**

**Southfield, MI 48034**