Exhibit D (pages 1-11)

Part I

Section 1001.--Determination of Amount of and Recognition of Gain or Loss

26 CFR 1.1001-1:  Determination and recognition of gain or loss. (Also § 1259.)

Rev. Rul.  2003-7

ISSUES

    Has a shareholder either sold stock currently or caused a constructive sale of stock under § 1259 of the Internal Revenue Code if the shareholder (1) receives a fixed amount of cash, (2) simultaneously enters into an agreement to deliver on a future date a number of shares of common stock that varies significantly depending on the value of the shares on the delivery date, (3) pledges the maximum number of shares for which delivery could be required under the agreement, (4) has the unrestricted legal right to deliver the pledged shares or to substitute cash or other shares for the pledged shares on the delivery date, and (5) is not economically compelled to deliver the pledged shares?

FACTS

    An individual ("Shareholder") held shares of common stock in Y corporation, which is publicly traded.  Shareholder's basis in the shares of Y corporation is less than $20 per share.  On

September 15, 2002 (the "Execution Date"), Shareholder entered

into an arm's length agreement (the "Agreement") with Investment

Bank, at which time a share of common stock in $\underline{Y}$ corporation had

a fair market value of $20. Shareholder received $$\underline{z}$ of cash

upon execution of the Agreement. In return, Shareholder became

obligated to deliver to Investment Bank on September 15, 2005

(the "Exchange Date"), a number of shares of common stock of $\underline{Y}$

corporation to be determined by a formula. Under the formula,

if the market price of a share of $\underline{Y}$ corporation common stock is

less than $20 on the Exchange Date, Investment Bank will receive

100 shares of common stock. If the market price of a share is

at least $20 and no more than $25 on the Exchange Date,

Investment Bank will receive a number of shares having a total

market value equal to $2000. If the market price of a share

exceeds $25 on the Exchange Date, Investment Bank will receive

80 shares of common stock. In addition, Shareholder has the

right to deliver to Investment Bank on the Exchange Date cash

equal to the value of the common stock that Shareholder would

otherwise be required to deliver under the formula.

In order to secure Shareholder's obligations under the

Agreement, Shareholder pledged to Investment Bank on the

Execution Date 100 shares (that is, the maximum number of shares

that Shareholder could be required to deliver under the

Agreement). Shareholder effected this pledge by transferring

the shares in trust to a third-party trustee, unrelated to

Investment Bank.  Under the declaration of trust, Shareholder retained the right to vote the pledged shares and to receive dividends.

Under the Agreement, Shareholder had the unrestricted legal right to deliver the pledged shares, cash, or shares other than the pledged shares to satisfy its obligation under the Agreement.  Shareholder is not otherwise economically compelled to deliver the pledged shares.  At the time Shareholder and Investment Bank entered into the Agreement, however, Shareholder intended to deliver the pledged shares to Investment Bank on the Exchange Date in order to satisfy Shareholder's obligations under the Agreement.

LAW AND ANALYSIS

Section 1001(c) provides that, except as otherwise provided in subtitle A of the Code, the entire amount of gain or loss, determined under § 1001, on the sale or exchange of property shall be recognized.  The Code does not define a "sale or exchange."  The courts have considered many factors significant in determining whether a sale or other disposition of property has occurred.  The factors that are relevant, and the weight to be accorded to each factor, must be determined in light of the nature of the property involved.  See Torres v. Commissioner, 88 T.C. 702, 721 (1987).

Several cases have addressed the transfer of securities to a brokerage firm under a subordination agreement intended to

allow the brokerage firm to use the securities to meet its net capital requirements under stock exchange rules. See, e.g., Cruttenden v. U.S., 644 F.2d 1368 (9th Cir. 1981); Lorch v. Commissioner, 70 T.C. 674 (1978), aff'd, 605 F.2d 657 (2d Cir. 1979), cert. denied, 444 U.S. 1076 (1980); Miami National Bank v. Commissioner, 67 T.C. 793 (1977). In these cases, an owner of marketable securities transferred legal title and actual possession of the securities to the brokerage firm, which held the securities in a subordination account under an agreement that permitted the brokerage firm to sell the securities if necessary to meet claims of general creditors of the brokerage firm. The transferor, however, retained the right to receive dividends and the right to vote any stock. In addition, the transferor could reacquire the securities in the subordination account by substituting either cash or other securities of equivalent value.

In Miami National Bank, the court held that despite the right of the brokerage firm to sell stock in a subordination account to satisfy its creditors, the transferor remained the owner of the stock. As a result, the court held that the transferor's subsequent sale of the stock in the subordination account was effective to permit the purchaser to be treated as the direct owner of the stock for purposes of the consolidated return ownership test. At all times, the transferor had the right to reacquire the stock in the subordination account by

substituting cash or other readily marketable securities of equivalent value.  The court gave significant weight to this right in holding that the creation of the subordination account did not cause the brokerage firm to become the owner of the stock in the subordination account.  The court noted that the transferor's right of substitution was not "merely an idle one" because, at all times, the transferor possessed sufficient resources to exercise the right.  In fact, after the brokerage firm became insolvent, the transferor substituted cash for the stock.  Thus, Miami National Bank and other similar cases indicate that a transfer of actual possession of stock or securities and legal title may not itself be sufficient to constitute a transfer of beneficial ownership when the transferor retains the unrestricted right and ability to reacquire the securities.

In cases addressing short sales of stock or securities, the courts have refused to recognize covering purchases as triggering a sale because, until actual delivery, the taxpayer retains the unrestricted right to dispose of the covering shares.  See, e.g., Richardson v. Commissioner, 121 F.2d 1 (2d Cir.), cert. denied, 314 U.S. 684 (1941).  In a typical short sale, the taxpayer borrows stock or securities to effect a short sale and is under an obligation to return identical stock or securities to the lender.  In Richardson, the taxpayer entered into numerous sales, which were generally short sales effected

with borrowed stock.  In one case, the taxpayer purchased 7,100 shares of stock that were intended to be used to close out a short sale but were in fact delivered to close out a different sale.  Despite the taxpayer's intent to use the purchased stock to close his earliest open short sale, and despite a showing that he followed a consistent practice of applying purchases to close out his earliest open short sale, the taxpayer was held not to have closed a short sale because the stock was not actually delivered to the stock lender.  Noting that the taxpayer had not entered into any agreement or understanding with the lender of the 7,100 shares and had not otherwise placed himself in a position in which he was not entitled to treat the purchased shares as long stock and sell them for his own account, the court stated:

> [The covering shares] remained under control of the taxpayer and up to the time of actual delivery could have been sold and replaced by other purchases in the absence of prior agreement with the lender to use them to make restitution.  Such a shifting intent to cover a short sale ought not to be the critical event which would determine gain or loss under a tax statute.  It would leave the whole matter of fixing the event to the taxpayer's own will.  We hold that the time of delivery was the time at which the covering transactions must be regarded as closed.

Richardson at 4.  Accord Klinger v. Commissioner, No. 18315 (T.C.M. 1949).  Thus, Richardson supports the conclusion that even if the shareholder intends to complete a sale by delivering identified stock, that intent alone does not cause a transaction

to be deemed a sale, as long as the taxpayer retains the right to determine whether the identified stock will in fact be delivered.

By contrast, in Hope v. Commissioner, 55 T.C. 1020 (1971), aff'd, 471 F.2d 738 (3d Cir.), cert. denied, 414 U.S. 824 (1973), the Tax Court, in determining that a sale had occurred, relied on the seller's receipt of sales proceeds and the purchaser's receipt of title and possession of shares without restriction in use.  In that case, the taxpayer was the owner of approximately 57% of the common stock of a company that had recently become a publicly traded company, and was having difficulty in disposing of his remaining large block of stock. The taxpayer made an arrangement with an investment bank for a sale at a price that was approximately one half of the price at which the stock was currently trading.  Under the arrangement, the investment bank earned its fee by reselling 25% of the block of stock to the general public.  The investment bank held the remainder of the stock subject to options to purchase the stock at the investment bank's cost and subject to proxy agreements that transferred to the optionees the right to vote the shares for the election of directors.  Half of the options and proxy rights were held by the taxpayer's brother; the other half were held by two individuals who were employees of the company. Subsequent to the closing of the transaction, the taxpayer became dissatisfied with the sale price and brought a suit for

rescission. The litigation was not concluded in the year of the transaction. On advice of counsel, the taxpayer held the sales proceeds in cash and marketable securities pending settlement of the litigation. On his tax return for the year of the transfer, the taxpayer disclosed the transfer but did not include in income his gain on the sale on the ground that the transfer was not a completed sale on which gain was recognized.

The court concluded that the transaction constituted a sale of the entire block:

> The facts of this case conclusively establish that on July 27, 1960, the petitioner sold 206,400 shares of . . . stock to [an investment bank] as agent for several purchasers as well as for its own account. The sale was completed on that date when title and possession of the certificates were transferred by the petitioner to [the investment bank], and the petitioner received $4,000,032 as payment in full. . . . The petitioner received the money from the sale without any restrictions on his use or disposition of those funds.

55 T.C. at 1029.

In the present case, on the Execution Date, Shareholder received a fixed payment without any restriction on its use and also transferred in trust the maximum number of shares that might be required to be delivered under the Agreement. Like the taxpayers in Miami National Bank and Richardson, but unlike the taxpayer in Hope, Shareholder retained the right to receive dividends and exercise voting rights with respect to the pledged shares. Also unlike Hope, the legal title to, and actual possession of, the shares were transferred to an unrelated

trustee rather than to Investment Bank.  Moreover, Shareholder was not required by the terms of the Agreement to surrender the shares to Investment Bank on the Exchange Date.  Rather, Shareholder had a right, unrestricted by agreement or economic circumstances, to reacquire the shares on the Exchange Date by delivering cash or other shares.  See Miami National Bank and Richardson.  Accordingly, the execution of the Agreement did not cause a sale or other disposition of the shares.

A different outcome may be warranted if a shareholder is under any legal restraint or requirement or under any economic compulsion to deliver pledged shares rather than to exercise a right to deliver cash or other shares.  For example, restrictions placed upon a shareholder's right to own pledged common stock after the Exchange Date, or an expectation that a shareholder will lack sufficient resources to exercise the right to deliver cash or shares other than pledged shares, would be significant factors to be weighed in determining whether a sale has occurred.

Section 1259(a)(1) provides that, if there is a constructive sale of an appreciated financial position, the taxpayer shall recognize gain as if such position were sold, assigned, or otherwise terminated at its fair market value on the date of such constructive sale.  Under § 1259(b), the term "appreciated financial position" means any position with respect to any stock, debt instrument, or partnership interest if there

would be gain were such position sold, assigned, or otherwise terminated at its fair market value.  Furthermore, for purposes of § 1259, the term "position" means an interest, including a futures or forward contract, short sale, or option.    Under § 1259(c)(1)(C), a taxpayer is treated as having made a constructive sale of an appreciated financial position if the taxpayer (or a related person) enters into a futures or forward contract to deliver the same or substantially identical property.  The term "forward contract" is defined under § 1259(d)(1) as a contract to deliver a substantially fixed amount of property (including cash) for a substantially fixed price. The legislative history indicates that a forward contract that provides for the delivery of an amount of stock that is subject to "significant variation" under the terms of the contract is not within the statutory definition of a forward contract.  S. Rep. No. 33, 105th Cong., 1st Sess. 125-26 (1997), 1997-4 (Vol. 2) C.B. 1067, 1205-06.

Under these facts, the Agreement does not cause a constructive sale of the shares under § 1259(c)(1)(C). According to the Agreement, delivery of a number of shares, which may vary between 80 and 100 shares, depends on the fair market value of the stock on the Exchange Date.  Because this variation in the number of shares that may be delivered under the Agreement is a significant variation, the Agreement is not a contract to deliver a substantially fixed amount of property for

purposes of § 1259(d)(1).  As a result, the Agreement does not meet the definition of a forward contract under § 1259(d)(1) and does not cause a constructive sale under § 1259(c)(1)(C).

HOLDING

Shareholder has neither sold stock currently nor caused a constructive sale of stock if Shareholder receives a fixed amount of cash, simultaneously enters into an agreement to deliver on a future date a number of shares of common stock that varies significantly depending on the value of the shares on the delivery date, pledges the maximum number of shares for which delivery could be required under the agreement, retains an unrestricted legal right to substitute cash or other shares for the pledged shares, and is not economically compelled to deliver the pledged shares.

DRAFTING INFORMATION

The principal authors of this revenue ruling are Christina Morrison and Mary Truchly of the Office of Associate Chief Counsel (Financial Institutions and Products). For further information regarding this revenue ruling contact Ms. Morrison at (202)622-3950 or Ms.Truchly at (202)622-3960 (nottoll-free calls).

EXHIBIT D.1

[4830-01-u]

DEPARTMENT OF THE TREASURY

Internal Revenue Service

26 CFR Part 1

[REG-104072-97]

RIN  1545-AV07

Recharacterizing financing arrangements involving fast-pay stock.

AGENCY:  Internal Revenue Service (IRS), Treasury.

ACTION:  Notice of proposed rulemaking and notice of public hearing.

SUMMARY:  This document contains proposed regulations that recharacterize, for tax purposes, financing arrangements involving fast-pay stock.  The regulations are necessary to prevent taxpayers from using fast-pay stock to achieve inappropriate tax avoidance.  The regulations affect corporations that issue fast-pay stock, holders of fast-pay stock, and other shareholders that may claim tax benefits purported to result from arrangements involving fast-pay stock.  This document also provides notice of a public hearing on the proposed regulations.

DATES:  Written comments must be received by April 6, 1999.  Outlines of topics to be discussed at the public hearing scheduled for April 8, 1999, at 10 a.m. must be received by March 18, 1999.

ADDRESSES:  Send submissions: to CC:DOM:CORP:R (REG-104072-97), room 5226, Internal Revenue Service, POB 7604, Ben Franklin Station, Washington, DC 20044.  Submissions may be hand delivered Monday through Friday between the hours of 8 a.m. and 5 p.m. to:

-2-

CC:DOM:CORP:R (REG-104072-97), Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue, NW, Washington, DC. Alternatively, taxpayers may submit comments via the Internet by selecting the "Tax Regs" option of the IRS Home Page or by submitting them directly to the IRS Internet site at http://www.irs.ustreas.gov/prod/tax_regs/comments.html.  The public hearing will be held in room 2615, 1111 Constitution Avenue, NW, Washington, DC.

FOR FURTHER INFORMATION CONTACT:  Concerning the proposed regulations, Jonathan Zelnik at (202) 622-3940; concerning submissions of comments, the hearing, and/or to be placed on the building access list to attend the hearing, LaNita VanDyke at (202) 622-7190 (not toll-free numbers).

SUPPLEMENTARY INFORMATION:

**Paperwork Reduction Act**

The collection of information contained in this notice of proposed rulemaking has been submitted to the Office of Management and Budget for review in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)).  Comments on the collection of information should be sent to the **Office of Management and Budget,** Attn:  Desk Officer for the Department of the Treasury, Office of Information and Regulatory Affairs, Washington, DC 20503, with copies to the **Internal Revenue Service,** Attn:  IRS Reports Clearance Officer, OP:FS:FP, Washington, DC 20224.  Comments on the collection of information

-3-

should be received by March 8, 1999. Comments are specifically requested concerning:

Whether the proposed collection of information is necessary for the proper performance of the functions of the Internal Revenue Service, including whether the collection will have a practical utility;

The accuracy of the estimated burden associated with the proposed collection of information (see below);

How the quality, utility, and clarity of the information to be collected may be enhanced;

How the burden of complying with the proposed collection of information may be minimized, including through the application of automated collection techniques or other forms of information technology; and

Estimates of capital or start-up costs and costs of operation, maintenance, and purchase of services to provide information.

The collection of information is in §1.7701(l)-3(f) and §1.7701(l)-3(g). The collection of information is mandatory. The likely respondents are individuals, businesses, and other organizations.

Estimated total annual burden: 50 hours

Estimated average annual burden per respondent: 1 hour

Estimated number of respondents: 50

Estimated annual frequency of responses: Annually

-4-

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid control number assigned by the Office of Management and Budget.

Books or records relating to a collection of information must be retained as long as their contents may become material in the administration of any internal revenue law.  Generally, tax returns and tax information are confidential, as required by 26 U.S.C. 6103.

**Background**

On February 27, 1997, the IRS issued Notice 97-21, 1997-1 C.B. 407, which relates to financing arrangements involving fast-pay stock.  Among other things, the notice informs the public that the IRS and Treasury Department expect to issue regulations recharacterizing these arrangements to prevent tax avoidance. Notice 97-21 requested comments, but none have been received.

**Explanation of Provisions**

A.  <u>TAX-AVOIDANCE ARRANGEMENTS USING FAST-PAY STOCK</u>

Notice 97-21 addresses two-party financing arrangements that are structured as multi-party arrangements to let one or more of the parties avoid tax.  Instead of one party directly providing financing to the other, they both acquire stock (with different characteristics) in a conduit entity.  The arrangement is structured so that the party providing the financing has a decreasing claim on the conduit entity (and its assets) while the party receiving the financing has an increasing claim on the

-5-

conduit entity (and its assets).  Economically, both parties benefit from the conduit entity's income.  For tax purposes, however, the entity's income is allocated almost entirely to the party providing the financing, allowing the other party to claim unwarranted tax benefits.

Notice 97-21 describes in detail a typical fast-pay stock financing arrangement.  The parties to the arrangement include: (1) a person seeking financing (the sponsor), (2) investors who are willing to provide financing and typically are not subject to federal income tax (the investors), and (3) a corporation that is generally subject to tax only at the shareholder level (a conduit entity).  The conduit entity issues a class of self-amortizing stock (the fast-pay stock) to the investors and a class of other stock (the benefited stock) to the sponsor.  The fast-pay stock is structured so that during an initial period, the dividends made with respect to the stock are substantial and relatively certain while the dividends made with respect to the benefited stock are insignificant.  After the initial period, the dividend rate of the fast-pay stock, the stock's effective redemption value, or both, decline.

Economically, the fast-pay stock is self-amortizing because the distributions made with respect to the fast-pay stock are in part a return on the investors' investment and in part a return of their investment.  For tax purposes, however, the parties characterize the fast-pay stock distributions entirely as dividends (that is, entirely as a return on the investment).

-6-

Consequently, the investors' reported taxable income -- overstated dividend income followed by an overstated capital loss on disposition of the fast-pay stock -- fails to clearly reflect their economic income.  (Investors that are tax-exempt suffer no disadvantage from this arrangement.)

Characterizing the distributions made with respect to the fast-pay stock solely as dividends has the corresponding effect of understating the taxable income on the benefited stock (the stock held by the sponsor) during the initial period.  Instead of receiving dividends attributable to its share of the conduit entity's income, the sponsor's economic income takes the form of an increasing ownership interest in the conduit entity.  Because the fast-pay stock is economically self-amortizing, each distribution reduces the investors' claim on the conduit entity (and its assets) and increases the sponsor's claim.  By treating a fast-pay arrangement according to its form, the sponsor reports taxable income that fails to clearly reflect its economic income.  An individual sponsor, for example, reports little or no dividend income.  Instead, the individual reports gain on disposing of its benefited stock; thus, deferring tax on its economic income and converting that income from ordinary to capital.  A corporate sponsor not only reports little or no dividend income, but can avoid reporting gain on the disposition of its benefited stock, thereby entirely eliminating tax on its economic income.  (If a corporate sponsor has a sufficient interest in the conduit entity, the sponsor may succeed to the conduit entity's assets

-7-

tax-free by liquidating or reorganizing the conduit entity; thus, avoiding a taxable disposition of the benefited stock).

In substance, the investors (the fast-pay shareholders) are financing the sponsor's investment in the conduit entity. Although nominally shareholders in the conduit entity, the investors have a limited, diminishing claim to the entity (and its assets). The sponsor's claim, by contrast, is residual and long-term. Thus, a fast-pay arrangement is effectively a leveraged arrangement in which the sponsor uses untaxed income from the conduit entity to repay the investors.

B.   THE PROPOSED REGULATIONS

1.   In General

To prevent the avoidance of tax, the Secretary may issue regulations under section 7701(l) recharacterizing any multiple-party financing transaction as a transaction directly among any two or more of the parties. The proposed regulations exercise this authority by recharacterizing certain fast-pay arrangements. A fast-pay arrangement is any financing arrangement in which a corporation has outstanding two or more classes of stock, one of which is fast-pay stock. The regulations identify fast-pay arrangements and recharacterize certain of them as arrangements directly between the holders of the fast-pay stock and the other shareholders (the benefited shareholders) in the corporation. The regulations also impose reporting requirements on certain corporations with outstanding fast-pay stock and on certain shareholders that participate in fast-pay arrangements. These

-8-

reporting requirements apply to all fast-pay arrangements, whether or not they are subject to recharacterization.

Notice 97-21 describes specific models for recharacterizing fast-pay arrangements. For purposes of determining the income of the shareholders of a corporation with outstanding fast-pay stock, these models ignore the separate existence of the corporation and treat the fast-pay shareholders and benefited shareholders as owning the corporation's underlying assets. Although this approach prevents tax avoidance, the IRS and Treasury Department have concluded that it may not best reflect the financing relationship between the fast-pay shareholders and the benefited shareholders. In addition, the approach of the notice may be difficult for taxpayers to apply if the corporation has a complex capital structure, multiple assets (including active businesses), or both.

To address these concerns, the proposed regulations treat the fast-pay shareholders as acquiring instruments issued by the benefited shareholders instead of acquiring interests in the assets of the corporation. This approach better reflects the financing relationship between the fast-pay shareholders and the benefited shareholders. It also removes the burden of determining each party's ownership interest in the assets of the corporation. Thus, the regulations provide an approach that is easier to apply and more narrowly tailored than the models described in Notice 97-21.

-9-

## 2.  <u>Fast-Pay Stock and Benefited Stock</u>

Under the proposed regulations, stock is fast-pay stock if it is structured to provide for dividends that economically represent a return (in whole or in part) of the holder's investment rather than only a return on the holder's investment. Stock is presumed to be fast-pay stock if it has, by design, a dividend rate that is reasonably expected to decline, or an issue price that exceeds the amount at which the holder can be compelled to dispose of the stock.  A taxpayer may rebut these presumptions only by clearly showing that no dividend represents an economic return (in whole or in part) of the holder's investment.

Generally, whether stock is fast-pay stock must be determined based on all the facts and circumstances, including any related agreements such as options or forward contracts.  A related agreement is any direct or indirect, oral or written, agreement between the holder of the stock and the issuing corporation, or between the holder of the stock and one or more other shareholders in the corporation.  The determination that stock is fast-pay stock is made when the stock is issued, and whenever there is a significant modification in the terms of the stock or the related agreements, or a significant change in the relevant facts and circumstances.

The proposed regulations define benefited stock by reference to fast-pay stock.  With respect to a class of fast-pay stock, all other stock in the corporation (including any other class of

-10-

fast-pay stock) is benefited stock.  For fast-pay arrangements in which there is more than one class of benefited stock, the parties must apply the general recharacterization rules among the different classes as appropriate to match the arrangement's economic substance.

3.    <u>Fast-Pay Arrangements Subject to Recharacterization</u>

Under the proposed regulations, if the corporation with outstanding fast-pay stock is either a regulated investment company (RIC) or a real estate investment trust (REIT), the fast-pay arrangement is automatically recharacterized.  If the corporation is neither a RIC nor a REIT, the Commissioner may (at the Commissioner's discretion) recharacterize the fast-pay arrangement in cases where the Commissioner determines that a principal purpose for the structure of the fast-pay arrangement is the avoidance of tax.  This rule applies to all parties to a fast-pay arrangement, without regard to whether such parties acquired their interests as part of an initial offering or later (by purchase or other transfer).

By not automatically recharacterizing all fast-pay arrangements, the regulations prevent taxpayers from using the recharacterization rules for other tax avoidance purposes.  For example, shareholders of a controlled foreign corporation cannot circumvent the purposes of United States tax law (including treaties) by using the recharacterization rules to exploit inconsistencies between the treatment of a fast-pay arrangement by the United States and foreign jurisdictions.  It is expected

-11-

that the Commissioner will closely scrutinize fast-pay arrangements in which the corporation with outstanding fast-pay stock is a foreign corporation.

4.  Model for Recharacterizing Fast-Pay Arrangements

a.  In General

The proposed regulations treat the fast-pay shareholders as holding financing instruments issued by the benefited shareholders rather than as holding fast-pay stock in the corporation.  The corporation is the paying agent on the financing instruments but has no other relationship to the fast-pay shareholders.

Under the proposed regulations, the financing instruments have the same payment terms as the fast-pay stock.  The timing and amount of payments made with respect to the financing instruments, therefore, match the timing and amount of distributions made with respect to the fast-pay stock.  Nothing in the regulations characterizes the financing instruments.  The character of the financing instruments (for example, stock or debt) must be determined under general tax principles and depends on all the facts and circumstances.

The benefited shareholders are treated as first issuing the financing instruments in exchange for cash equal to the fair market value of the fast-pay stock (taking into account any related agreements), and then as contributing the cash to the corporation (thereby increasing their basis in the benefited stock).  Distributions made with respect to the fast-pay stock

-12-

are treated as first made with respect to the benefited stock, and then as used by the benefited shareholders to make payments on the financing instruments.

b.  Rule for Multiple Classes of Benefited Stock

The proposed regulations do not describe detailed rules for fast-pay arrangements in which there is more than one class of benefited shareholders.  Instead, as mentioned before, the regulations provide a general rule that requires recharacterization among the different classes as appropriate to match the economic substance of the fast-pay arrangement.

c.  Rules for Disposition of Benefited Stock

The proposed regulations provide special rules for dispositions of benefited stock.  On the sale of benefited stock, in addition to any consideration actually received, the seller is treated as receiving the amount necessary to terminate its position with respect to the financing instruments at fair market value.  Similarly, the buyer is treated as paying that amount and as issuing new financing instruments to the fast-pay shareholders.

d.  Rule Preserving Pre-effective Date Gain

The proposed regulations provide a special basis adjustment rule to ensure that unrealized gain on benefited stock is not inappropriately eliminated.  Because the regulations do not apply to amounts accrued or paid in taxable years ending before February 27, 1997 (pre-effective years), a benefited shareholder will have economic income, but not taxable income, attributable

-15-

5.  Withholding

A corporation that issues fast-pay stock is a withholding agent for payments made (or deemed made) under a fast-pay arrangement.  Generally, if a fast-pay arrangement is recharacterized under the automatic recharacterization rules, a withholding agent must withhold in accordance with the transaction as recharacterized.  A different rule applies, however, if the withholding agent knows or has reason to know that any taxpayer entered into the fast-pay arrangement with a principal purpose of using the recharacterization rules to avoid tax under section 871(a) or section 881.  In that case, for each payment made (or deemed made) to such taxpayer under the arrangement, the withholding agent must withhold under section 1441 or section 1442 the higher of (1) the amount of withholding that applies to such payment determined under the form of the arrangement, or (2) the amount of withholding that applies to such payment determined under the automatic recharacterization rules.  Also, when the withholding agent knows or has reason to know that the Commissioner has exercised the discretion to depart from the automatic recharacterization rules for a taxpayer, the withholding agent must withhold on payments made (or deemed made) to that taxpayer in accordance with the characterization of the fast-pay arrangement imposed by the Commissioner.

The withholding agent's liability to withhold on payments to foreign individuals is described in new proposed §1.1441-7(g).

-34-

1298(f) and the regulations under those sections (including §1.1295-1T(f)(2)) apply to any statement required by this paragraph (f)(1)(iv).

(2) <u>Statement</u>.  The statement required under this paragraph (f) must say, "This fast-pay stock disclosure statement is required by §1.7701(l)-3(f) of the income tax regulations."  The statement must also identify the corporation that has outstanding fast-pay stock and must contain the date on which the fast-pay stock was issued, the terms of the fast-pay stock, and (to the extent the filing person knows or has reason to know such information) the names and taxpayer identification numbers of the shareholders of any class of stock that is not traded on an established securities market (as described in §1.7704-1(b)).

(g) <u>Effective date</u>--(1) <u>In general</u>.  Except as provided in paragraph (g)(4) of this section (relating to reporting requirements), this section applies to taxable years ending after February 26, 1997.  Thus, all amounts accrued or paid during the first taxable year ending after February 26, 1997, are subject to this section.

(2) <u>Election to limit taxable income attributable to a recharacterized fast-pay arrangement for taxable years ending after February 26, 1997, and before the date these regulations are published as final regulations in the Federal Register</u>--(i) <u>Limit and adjustment</u>.  For taxable years ending after February 26, 1997, and before the date these regulations are published as final regulations in the Federal Register, a shareholder may

-35-

limit its taxable income attributable to a fast-pay arrangement recharacterized under paragraph (c) of this section, to the taxable income that would result if the fast-pay arrangement were recharacterized under Notice 97-21, 1997-1 C.B. 407, see §601.601(d)(2) of this chapter. Any amount a shareholder excludes from taxable income under this paragraph (g)(2)(i) must be included as an adjustment to taxable income in the shareholder's first taxable year that includes the date these regulations are published as final regulations in the Federal Register. A shareholder that has elected to limit its taxable income under this paragraph (g)(2)(i) must include a statement in its books and records identifying each fast-pay arrangement to which the limit was applied and providing the amount excluded from taxable income for each such fast-pay arrangement.

(ii) The following examples illustrate the rules of this paragraph (g)(2). For purposes of these examples, assume that the last year a shareholder may limit its taxable income under this paragraph (g)(2) is 1998.

Example 1. Fast-pay arrangement recharacterized under Notice 97-21; REIT holds third-party debt. (i) Facts.

(A) REIT Y is formed on January 1, 1998, at which time it issues 1,000 shares of fast-pay stock and 1,000 shares of benefited stock for $100 per share. Y and all of its shareholders have calendar taxable years. All shareholders of Y have elected to accrue market discount based on a constant interest rate, to include the market discount in income as it accrues, and to amortize bond premium.

(B) For years 1 through 5, the fast-pay stock has an annual dividend rate of $17 per share ($17,000 for the class); in later years, the fast-pay stock has an annual dividend rate of $1 per share ($1,000 for the class). At the end of year 5, and

-36-

thereafter, a share of fast-pay stock can be acquired by Y in exchange for $50 ($50,000 for the class).

(C) On the day Y is formed, it acquires a five-year mortgage note (the note) issued by an unrelated third party for $200,000. The note provides for annual interest payments on December 31 of $18,000 (a coupon interest rate of 9.0 percent, compounded annually), and one payment of principal at the end of 5 years. The note can be prepaid, in whole or in part, at any time.

(ii) <u>Recharacterization under Notice 97-21</u>.  (A) <u>In general</u>.  One way to recharacterize the fast-pay arrangement under Notice 97-21 is to treat the fast-pay shareholders and the benefited shareholders as if they jointly purchased the note from the issuer with the understanding that over the five-year term of the note the benefited shareholders would use their share of the interest to buy (on a dollar-for-dollar basis) the fast-pay shareholders' portion of the note.  The benefited shareholders' and the fast-pay shareholders' yearly taxable income under Notice 97-21 can then be calculated after determining their initial portions of the note and whether those initial portions are purchased at a discount or premium.

(B) <u>Determining initial portions of the debt instrument</u>. The fast-pay shareholders' and the benefited shareholders' initial portions of the note can be determined by comparing the present values of their expected cash flows.  As a class, the fast-pay shareholders expect to receive cash flows of $135,000 (five annual payments of $17,000, plus a final payment of $50,000).  As a class, the benefited shareholders expect to receive cash flows of $155,000 (five annual payments of $1,000, plus a final payment of $150,000).  Using a discount rate equal to the yield to maturity (as determined under §1.1272-1(b)(1)(i)) of the mortgage note (9.0 percent, compounded annually), the present value of the fast-pay shareholders' cash flows is $98,620, and the present value of the benefited shareholders' cash flows is $101,380.  Thus, the fast-pay shareholders initially acquire 49 percent of the note at a $1,380 premium (that is, they paid $100,000 for $98,620 of principal in the note).  The benefited shareholders initially acquire 51 percent of the note at a $1,380 discount (that is, they paid $100,000 for $101,380 of principal in the note).  Under section 171, the fast-pay shareholders' premium is amortizable based on their yield in their initial portion of the note (8.57 percent, compounded annually).  The benefited shareholders' discount accrues based on the yield in their initial portion of the note (9.35 percent, compounded annually).

(C) <u>Taxable income under Notice 97-21</u>.  Under Notice 97-21, the fast-pay shareholders' 1998 taxable income attributable to the fast-pay arrangement is $8,574 ($8.57 per $100 invested), computed by subtracting the amortizable premium ($302) from the

-37-

interest income from their portion of the note ($8,876). The benefited shareholders' 1998 taxable income attributable to the fast-pay arrangement is $9,353 ($9.35 per $100 invested), computed by adding the accrued discount ($229) to the interest income from their portion of the note ($9,124).

(iii) <u>Taxable income under the recharacterization of this section</u>. Assume the financing instruments are debt instruments. Under the recharacterization rules of paragraph (c) of this section, the fast-pay shareholders' 1998 taxable income attributable to the fast-pay arrangement is $8,574 ($8.57 per $100 invested), which is the interest income from the financing instruments. The benefited shareholders' 1998 taxable income attributable to the fast-pay arrangement is $9,426 ($9.43 per share of benefited stock), computed by subtracting the interest income accrued on the financing instruments ($8,574) from the dividend income actually and deemed paid on the benefited stock ($18,000).

(iv) <u>Limit on taxable income under this paragraph (g)(2)</u>. (A) <u>Fast-pay shareholders</u>. For 1998, the fast-pay shareholders have the same taxable income under the recharacterization of Notice 97-21 ($8,574) as they have under the recharacterization of paragraph (c) of this section ($8,574). Thus, the limit under paragraph (g)(2)(i) of this section is unavailable to the fast-pay shareholders.

(B) <u>Benefited shareholders</u>. For 1998, the benefited shareholders have taxable income attributable to the fast-pay arrangement of $9,353 ($9.35 per $100 invested) under the recharacterization of Notice 97-21, and taxable income of $9,426 ($9.43 per share of benefited stock) under the recharacterization of paragraph (c) of this section. Thus, under paragraph (g)(2)(i) of this section, a benefited shareholder may elect to limit its taxable income attributable to the fast-pay arrangement to $9.35 for each share of benefited stock. Any amount an electing shareholder excludes from taxable income($0.08 per share of benefited stock) must later be included as an adjustment. (If all benefited shareholders elect the limit, then as a class the later adjustment to taxable income is $73.)

<u>Example 2</u>. <u>REIT holds debt issued by a benefited shareholder</u>. (i) <u>Facts</u>. The facts are the same as in <u>Example 1</u> of this paragraph (g)(2) except that corporation Z holds 800 shares (80 percent) of the benefited stock, and Z, instead of a third party, issues the mortgage note acquired by Y.

(ii) <u>Recharacterization under Notice 97-21</u>. Because Y holds a debt instrument issued by Z, the fast-pay arrangement is recharacterized under Notice 97-21 as an arrangement in which Z issued one or more instruments directly to the fast-pay shareholders and the other benefited shareholders. Consistent

-38-

with this recharacterization, Z is treated as issuing a debt instrument to the fast-pay shareholders for $100,000. The debt instrument provides for five annual payments of $17,000 and an additional payment of $50,000 in year five. Thus, the debt instrument's yield to maturity is 8.57 percent per annum, compounded annually. Z is also treated as issuing a debt instrument to the other benefited shareholders for $20,000 (200 shares multiplied by $100, or 20 percent of the $100,000 paid to Y by the benefited shareholders as a class). This debt instrument provides for five annual payments of $200 and an additional payment of $30,000 in year five. The debt instrument's yield to maturity is 9.30 percent per annum, compounded annually. For 1998, Z's interest expense is $10,435 ($8,574 attributable to the debt instruments held by the fast-pay shareholders, and $1,861 attributable to the debt instruments held by the other benefited shareholders).

(iii) <u>Recharacterization under this section</u>. Assume the financing instruments are debt instruments. Under the recharacterization rules of paragraph (c) of this section, for 1998, Z has dividend income of $14,400 (800 shares multiplied by $18, or 80 percent of $18,000), and total interest expense of $24,859 ($18,000 of interest accrued on the note held by Y, and $6,859 of interest accrued on the financing instruments).

(iv) <u>Limit on taxable income under this paragraph (g)(2)</u>. For 1998, Z has a taxable loss attributable to the fast-pay arrangement of $10,435 under the recharacterization of Notice 97-21, and a taxable loss of $10,459 ($14,400 of dividends, minus $24,859 of total interest expense) under the recharacterization of paragraph (c) of this section. Thus, for 1998, Z's taxable loss attributable to the fast-pay arrangement is $10,459 (the amount determined under paragraph (c) of this section), and the limit of paragraph (g)(2)(i) of this section is unavailable to Z.

-39-

(3) <u>Rule to comply with this section</u>.  To comply with this section for each taxable year in which it failed to do so, a taxpayer should file an amended return.  For taxable years ending before the date these regulations are published as final regulations, a taxpayer that has complied with Notice 97-21, 1997-1 C.B. 407, (see §601.601(d)(2) of this chapter) is considered to have complied with this section.

(4) <u>Reporting requirements</u>.  The reporting requirements of paragraph (f) of this section apply to taxable years (of the person required to file the statement) ending after the date these regulations are published as final regulations in the Federal Register.

Deputy Commissioner of Internal Revenue

/s/ John Dalrymple