**Credit Acceptance**
*We change lives!*

25300 Telegraph Road
Southfield, MI 48033
Customer Service Phone (800) 634-1506
Operations Support Fax (866) 808-6559
Email Operationssupport@creditacceptance.com
www.creditacceptance.com

Date: June 26, 2024   Via: Mail

Exhibit F

To:   LAMONT A THOMAS
      4141 Granby Rd
      WOODBRIDGE, VA 22193-2509

Re: Credit Acceptance Account Number: 113531566

Dear LAMONT A THOMAS,

We have investigated your questions, and I am happy to share our findings.

We have reviewed the allegations in your letter relating to the various statutes you referenced and determined they are inapplicable. We also reviewed the details of your account and found no concerns with the retail installment contract you entered into with SNG, LLC that was assigned to Credit Acceptance.

To be clear, you signed the contract to finance the purchase of a vehicle, not to obtain a credit card, and your account does not involve an open-end credit plan.

As you'll see in the Section entitled "Truth in Lending Disclosures," you financed $22,728.46 at 23.99% interest. This interest rate is lawful in your state, and by signing the attached Credit Acceptance Corporation Disclosure Form, you confirmed that you had an opportunity to negotiate the APR with the dealership before signing the contract.

In your letter, you asked us to complete and return a 1099-OID. Please rest assured that we do not need to complete this form in order for you to meet your obligations under the contract.

I also see that you have enclosed documents that you believe entitle you to be released from your Contract. For the avoidance of any doubt, your account remains open and your contractual obligation to make payments is not discharged. If you would like to discuss payment arrangements, please call 1-800-634-1506.

Respectfully Yours,

Credit Acceptance



Credit Acceptance Corporation
25505 West Twelve Mile Road
Southfield, MI 48034-8339
Attn: Douglas Busk, Chief Treasury Officer

Credit Acceptance Corporation
P.O. Box 513
Southfield, MI 48037
In Capacity as "Servicer"

Accrual Accounting Collection Agency
14497 Potomac Mills, Road #1119
Woodbridge, VA 22192
In Care Of: Lamont A Thomas

**RE: <u>Securitization of Contract; Violations of CFPB laws.</u>**

<u>**NOTICE OF INTENT TO FILE ARBRITRATION SUIT**</u>

March 1, 2024

Greetings Credit Acceptance Corporation,

We are writing you on behalf of Lamont Andre Thomas Private Bank Estate & Trust, the *bailee* of all *equitable* rights, interest, and all proceeds derived from the use or transfer of the property of LAMONT ANDRE THOMAS (bailor) to any third-party who benefits from such usage. We have been instructed by the bailee to write to you (under a Power of Appointment) regarding the *Retail Installment Contract* involving the bailor and Credit Acceptance Corporation.

Our research revealed that Credit Acceptance Corporation engages in the *securitization* of retail installment contracts. The main goal is securing *the right of payment* from the obligor. Our thorough review of the 8K filing with the SEC as of February 27, 2024, alerted us to some potential issues that we would like to address to ensure LAMONT A THOMAS' *equitable* rights are not violated and full disclosure of any other agreements that LAMONT A THOMAS (Hereinafter "obligor") will be obligated under. It is our duty to discover any violations of the obligor's protected rights under law and equity and work with the parties to correct any fault. However, we will enforce the obligor's rights and remedy in any action available to us at law or in equity.

We have itemized our concerns below in order of discovery.

1. **<u>DOWN PAYMENT; EXISTING DEALER/ASSIGNEE AGREEMENT</u>**

Title 15 of the United States Code ("U.S.C.), chapter 41, part **1662** outlays strict requirements for the advertising and demands for a down payment. Section **(2)** states that:

*No advertisement to aid, promote, or assist directly or indirectly any extension of consumer credit may state:*

*(2) That a specific downpayment is required in connection with any extension of consumer credit unless the creditor usually and customarily arranges downpayments in that amount.*

The obligor was required to make a down payment on the vehicle of **$2,700**. Credit Acceptance ("creditor/Servicer") did not present any information that it customarily requires a down payment in such amount. The creditor *does not* customarily arrange for down payments to be in the amount of **$2,700** for all customers. Evidence of this fact is its own website titled: "*CAN I BUY A CAR WITH NO DOWN PAYMENT?*". The creditor has the option for well qualified buyers to finance a vehicle with no money down. That option alone violates the said statute governing down payments. This fact can withstand any defense because it is the policy of the creditor to arrange for down payments depending on the buyer's credit history, price of vehicle financed, and other factors. Before the obligor settled on the purchased vehicle, he sought a different one. However, the down payment for that vehicle was **$3,600**. This number was different from the actual down payment made. This means that the creditor does not *usually and customarily arrange downpayments* for **$2,700**.

The dealer (Woodbridge Auto Sales) has an *existing dealer agreement* with the servicer as mentioned on page four of the *Retail Installment Contract* under the paragraph titled **"ASSIGNMENT"**. The dealer did not **disclose** the true nature of the existing Agreement between the *seller* (Dealer) and the *assignee* (Credit Acceptance Corporation). Had the dealer disclosed this vital information to the obligor, the obligor would have been informed of the true nature of the said existing Agreement between the seller and assignee. The disclosure of this information would have been critical to the decision-making process of the obligor, since, according to the dealer-assignee Agreement per the **10k** filing by the servicer, the obligor's role in the *retail Installment Contract* was that of the **accommodation party**. The obligor never had any obligation to the servicer. Yet, the seller induced the obligor to sign the contract in belief that he was the recipient of a loan (finance) from the servicer. This inducement was *fraudulent* because the true obligation was that of the dealer to the servicer.

Ina **10-K** filing by Credit Acceptance Corporation as of December 31, 2023, the servicer explains in detail that the *existing dealer agreement* between the seller and assignee, is a *Dealer Servicing Agreement*. In addition to defining the legal relationship between "*Credit Acceptance and the Dealer*, the *Dealer Servicing Agreement assigns the responsibilities for administering, servicing, and collecting the amounts due on Consumer loans from the Dealer to us*".

Per the *Retail Installment Contract,* the dealer *assigned* the contract to the servicer. This assignment was due to the *existing dealer agreement*, which says in relevant part:

*"A Consumer Loan is originated by the dealer when a consumer enters into a contract with the Dealer that sets forth the terms of the agreement between the consumer and the Dealer for payment of the purchase price of the vehicle. The amount of the Consumer loan consists of the total principal and interest that the consumer is required to pay over the term of the Consumer Loan. Consumer Loans are written on a **contract form provided or approved by us**. Although the Dealer is named in the Consumer Loan contract, the Dealer generally does not have legal ownership of the Consumer Loan for more than a moment, and we, not the Dealer, are listed as the lien holder on the vehicle title. Consumers are obligated to make payments on the Consumer Loan directly to us, and any failure to make such payments will result in our pursuing payment through collection efforts*".

Also, the dealer did not show that the servicer had already advanced sums of money to the dealer in exchange for future contract receivables (Consumer loans). This reiterates the position of the obligor as the **accommodation party**, and **not** the *borrower*. In the **10-K** filing, the servicer said:

*"We record the amount advanced to the dealer Loan, which is classified within Loans receivable in our consolidated balance sheets. Cash advanced to the Dealer is automatically assigned to the Dealer's OPEN POOL OF ADVANCES. Dealers make an election as to how many Consumer Loans (either 50 or 100) will be assigned to an open pool before it is closed....All advances within a Dealer's pool are secured by the future collections on the related Consumer Loans assigned to the pool....We perfect our security interest with respect to the Dealer Loans by obtaining control or taking possession of the Consumer Loans, which list us as the lien holder on the vehicle title".*

This evidence that the servicer *never* loaned the obligor any money. The dealer misrepresented that a down payment was needed for the obligor to close the transaction. This was another false statement and requirement while, according to the **10-k** filing by the servicer, the dealer's receipt of the down payment was the dealers to keep as, under the **portfolio program**, the dealer generally receives as part of its payment: *"a down payment from the consumer".*


## 1 (A). CREDIT ACCEPTANCE DID NOT ADVANCE FUNDS TO OBLIGOR


The servicer and dealer did not disclose to the obligor that the contract entered into between the obligor and the dealer stemmed from the pre-existing obligation between the dealer and servicer. Before the obligor ever stepped into the dealership, the financing and obligations secured were already stipulated, which did not include any obligation of the obligor. On the **Record of Condition (RC)** balance sheet filed by the servicer, **RC-C 4 (a)** states:

**Loans and lease financing receivables.** Report on the proper subitem loans and leases held for sale and loans and leases that the reporting bank has the intent and ability to hold for the foreseeable future or until maturity or payoff, i.e., *__held for investment.__* The sum of Schedule RC, items 4.a and 4.b, must equal Schedule RC-C, part 1, item 12, (column A on the FFIEC 031).

This accounting method is confirmed by the servicer in their own words from their form **10-K** filing, page **4**, states:

**"We record the amount advanced to the Dealer as a Dealer Loan, which is classified within Loans receivable in our consolidated balance sheets".**

The dealer is an active participant in the servicer's **portfolio Program**. According to the servicer's **10-K** sec filing as of December 31, 2023, the Portfolio program is explained as:

*"Under the Portfolio Program, we advance money to Dealers (referred to as a "Dealer Loan") in exchange for the right to service the underlying Consumer Loans.*

The dealer informed the obligor that a ***down payment*** was required by the servicer (Credit Acceptance) to complete the transaction. At no point did the dealer inform the obligor that the down payment was not in fact required by the servicer, but the down payment of **$2,700** would serve part of the dealer's compensation under the *Portfolio Program.*

Under the Portfolio Program, as payment for the vehicle, the Dealer generally receives the following:

- A ***down payment*** *from the consumer.*
- A ***cash advance*** *from us; and'*
- *After the advance balance (cash advance and related Dealer Loan fees and costs) has been recovered by us,* ***the cash payments made on Consumer Loan****, net collection costs and our servicing fee ("Dealer Holdback").*

As mentioned earlier, the dealer had already been bound to the servicer before the obligor stepped into the dealership. This pre-existing Agreement was a *forward sale or Security Futures Contract.* This arrangement changes the relationship between the dealer, obligor, and servicer. This information was not disclosed to the obligor as mandated by the Truth-In-Lending Act and the Consumer Financial Protection Act of 2010.

We conclude that the down payment of **$2,700** was misrepresented to our client to trick him into covering the obligation the dealer has to the servicer per their existing ***Dealer Servicing Agreement.***

CONCLUSION: **VIOLATION OF 15 U.S.C. SECTION 1662 (1) (2).**

## 2.  EXCESSIVE HIGH INTEREST RATES

Given the creditor's historic background of charging unreasonably high interest rates, hidden add-on fees, and its complex hard-to-understand algorithm used in predicting how much it will collect from consumers over the life of a loan---not just from consumers' monthly payments, but also from potential collection efforts, repossessions, auctions, deficiency judgments if the consumer defaults, and the fact that the extremely high interest rates often don't reflect how much consumers are really paying for a Credit Acceptance Corporation loan, we thoroughly reviewed the interest rate charged on the contract against the maximum interest rate allowed in Virginia.

## 2 (a). INTEREST RATE EXCEEDS MAXIMUM ALLOWED IN VIRGINIA

After thoroughly reviewing the *Annual Percentage Rate* (APR) on the *Retail Installment Contract* (the "Contract") and comparing it to the **maximum interest rate allowed** in the Commonwealth of Virginia, we have concluded that the **23.99%** charged exceeds the **12%** annual interest rate allowed in the Commonwealth. This difference in interest rates will severely affect our client as he will be paying **$15,661.76** more in interest, thus exceeding the maximum amount allowed in Virginia. In the Commonwealth of Virginia (**Va Code 6.2-303**), the creditor may not charge more than **12%**. The creditor does not meet any other requirements that would exempt it from the restraints of **Va Code 6.2-303**. The lawful amount of interest the creditor may charge the obligor in Virginia is **$2,725.14**. It is our belief that the excess **$15,661.76** will be used to the benefit of the creditor, including insuring itself against any potential default of the obligor.

Our research further concludes that the creditor's lending model is *wholly indifferent as to a customers' ability to repay loans in full*. We concluded that the creditor uses this score to *predict* how much money it expects to collect on the loan. The projected collections allow the creditor to decide how much to pay its dealers. Since the creditor pays less for riskier loans and borrowers with lower scores, and the fact that the interest rate for the loan does not change based on borrower risk, the creditor's model incentivizes dealers to sell cars at inflated prices, which increases the amount the creditor pays the dealer (Source of information: Consumer Financial Protection Bureau).

In a lawsuit filed against the creditor by the *Consumer Financial Protection Bureau*, case# 23 civ.0038, January 4, 2023, the Bureau concluded which the instant transaction confirms:

*"…This means the principal amounts in CAC loans are often artificially inflated and far exceed the amount CAC expects to collect on the loan or has paid to its dealers. And because CAC has shifted the cost of the credit into the principal amount instead of the interest rate, consumers do not know they are paying these hidden costs of credit to finance their vehicles.*

*The true cost of CAC credit is higher than what is disclosed on the CAC loan agreements, so many of the loans actually exceed state usury caps. In New York alone, more than 84% of CAC loans exceed the 25% penal usury cap".*

Even ore disturbing is that the creditor *incentivizes dealers to add products like vehicle service contracts and guaranteed asset protection onto the loan during the sales transaction by further increasing the dealer's payout on the loan for each product they add.* The creditor usually

instructs the dealer to make it appear mandatory these products are added for the sales transaction to complete. Putting consumers who have poor credit and in desperate need of a vehicle, who don't understand the true nature of the service contracts, to agree to the terms out of fear the sale may not be approved unless the products are added into the loan.

Our research of the *service contract* part of the transaction has led us to believe that incentivizing the add-on *service contract* and other products to the loan generates, as the Bureau stated in its January 4, 2024, lawsuit, *Hundreds of millions of dollars*. Even in instances where dealers hide the add-on products or falsely make it appear that the add-on products are mandatory or fail to disclose to borrowers that the add-on products are included in their loan agreement which will cost them even more money, the *turning of a blind eye*, by the creditor, is understandable when *hundreds of millions of dollars* are generated from this practice.

## 2 (b) SETTING THE OBLIGOR UP TO FAIL

Our thorough inspection of the agreement has led us to believe, along with the researching of the creditor's customary practice, that *this* Retail Installment Contract is setting the obligor up to default before the loan can be fully paid off, and we believe the creditor knows this. To illustrate our point, we point to an insert of the Bureau's lawsuit (January 4, 2023) against the creditor:

**"It is unsurprising, then, that CAC predicts from the outset that many consumers will be unable to repay their loans in full. But by instructing its lending model in this way, the Company can collect more from consumers than it pays dealers regardless of whether consumers can ultimately pay off their loans. For more than 39% of loans nationwide, and for about 25% of New York loans, CAC's algorithm projected that it would not collect the full amount financed by the loan. Yet, CAC anticipated making money on these clearly unaffordable loans because the amount of money CAC actually put at risk was substantially less than the loan principal.**

**Consumers, on the other hand, do not understand that CAC is setting them up to fail. They do not know about, and certainly do not have access to, the extensive predictive data CAC is using to make loans to consumers regardless of whether they can afford them and in circumstances where CAC is predicting that they will not repay the loan in full.**

**As a result of CAC's lending model, many consumers who receive CAC loans to buy their vehicles default, and when they do, the consequences are severe. Consumers experience a cascade of harms, including losing their vehicles and losing any trade-in value, down payments, or other payments they have made. Consumers face an average post-auction debt of about $8,500, which CAC often continues to collect by suing borrowers. And because their loan agreements include artificially inflated amount financed, consumers who try to sell their vehicle or whose vehicles are repossessed and auctioned find that the proceeds of the sale do little to help them pay off their debt".**

Our thorough research of the interest rate charged in the obligor's contract (**23.99%**) has led us to believe that this amount exceeds the **12%** maximum amount allowed in the Commonwealth of Virginia. We further conclude that this was a deliberate act, and this act has put our client at a serious potential risk of defaulting because the creditor through the dealer misrepresented the nature of the add-on product. The creditor has added hidden a **$15,661.76** interest rate into the contract which is an exorbitant amount.

The servicer may want to point to the contract or instruct us to talk to the dealership about any discrepancies regarding the contract, but it is the servicer, Credit Acceptance Corporation, that makes *very expensive used-car loans to low-income consumers and those with limited credit options without regard for whether they can reasonably afford to repay the loans according to their terms*. (Quoting the CFPB, January 4, 2023-case# 1:23-cv-00038, page 7 of 59). The servicer did not use the obligor's personal data to assess whether he can repay the loan, rather, it gathered the personal and financial data to predict the net expected collections on the loan. This method of assessment gives us the factual impression that even the servicer does not expect the obligor fully paying off the loan. One can expect a default if it knows it has added hidden finance charges and fees into the loan contract upwards of over **$15,000.00**.

We do not have access to how much our client scored on the net expected collections for this loan. The servicer gives a *net expected collections* score to its borrowers which ranges from 0-100. The "score" not only factors in payments the servicer expects from its borrowers under the loan agreement, but also other amounts it expects to collect in case of a default or *if a loan goes bad* (CFPB, page 7, para 26). This score takes into consideration everything from payments of late fees, insurance proceeds due from insurances companies via ***credit default swaps***, repossession and auctions of a *defaulted borrower's vehicle*.

This is the best estimate score, at the time of origination, *of the percentage of total amounts owed* that the servicer *expects to collect*. In its lawsuit against the servicer filed on January 4, 2024 (hereinafter "the lawsuit filed by CFPB"), the CFPB alleges that the servicer:

> *"Claims that it requires proof of income for every borrower and will not approve a loan if the monthly payment exceeds 25% of the applicant's gross monthly income. But CAC does not engage in any meaningful analysis for the purpose of developing loan terms that are likely to result in repayment in full by the borrower.*
>
> *CAC does not consider-or even require dealers to ask about-the borrower's recurring debt obligations, rent or mortgage payment, or any of the other necessary expenses an individual incurs each month, including the cost of food, healthcare, or children. Nor does CAC calculate the borrower's monthly debt-to-income ratio or residual income, and its payment-to-income guidelines does not adjust according to an applicant's number of dependents. Additional information, the gross income figure provides little guidance in terms of an applicant's ability to repay in full the potential loan that is being offered".*

This system allows the servicer to inflate the principal price of the vehicle for high-risk borrowers.

On a recorded phone call on Monday, March 3, 2024, the obligor placed a call to the servicer to inquire why the servicer included a finance charge (23.99%) that exceeded the largest amount allowed in the Commonwealth of Virginia (12%). He was told that pretty much he signed the contract, to say "well, you signed it, too bad". He was then instructed to take his concern up with the dealership. We believe this was an attempt to deflect responsibility for the issue and to place blame on the dealership. However, the servicer requires its affiliated dealers to use the company's proprietary software to produce the loan agreement that will ultimately be executed by the borrower.

Our research has revealed that the servicer does not disclose the true nature of the auto loan and the *existing dealer agreement between Seller* (Woodbridge Auto Sales) *and Assignee* (Credit Acceptance Corporation) *in effect on the date hereof.*

The servicer claims that it has restricted dealers from increasing the price beyond 115% of the highest Black Book or Blue Book value (i.e., best condition) for the make and model in question. The CFPB asserted in its January 4, 2023, lawsuit against the servicer that 115% cap is to high to provide *meaningful protection to CAC borrowers; CAC does not check on the condition of the vehicle, and many CAC borrowers are in fat financing vehicles worth much less than the highest Black Book or Blue Book value.* The CFPB asserts the same as us that as a result of the inflated sales prices, the servicer's loan agreements are egregiously too high and expensive for the obligor. The average selling price for the servicer's consumers nationwide is well over 80% greater than the Black Book or Blue Book wholesale value of the vehicle sold. The dealer, in an assumption based on the customary practice, almost always accept less in total Dealer Compensation from the servicer deals than the total cost of the deal (minus interest) as disclosed to a borrower, which, as the CFPB pointed out in its lawsuit, *suggests that the dealers would accept a similarly lower amount from an all-cash purchaser.*

The difference between the total disclosed cost of the servicer-financed transaction (minus interest) and the dealer compensation (as proxy for the true amount dealers would have accepted in an all-cash purchase for a vehicle and add-on products, if applicable) ***constitutes a finance charge that is HIDDEN from the borrower as part of the AMOUNT FINANCED on a CAC loan agreement-it is an amount that a cash consumer would not have been charged.*** (Emphasis added. Quoting CFPB's "Lawsuit" January 4, 2023, S. CT).

The dealership did ***NOT*** disclose that the 23.99% charged to the obligor was **11.7601%** more than the maximum (cap) amount allowed by the Commonwealth of Virginia under **Va Code 6.2-303**, causing the obligor to pay over the life of the loan, **$15,661.76** more than he would have to when the Black and/or Blue book value of the vehicle is worth roughly **$12, 255.** (based on the Black and Blue book value used by the servicer). In essence, the servicer is requiring the obligor to pay more in hidden finance charges than the total true cost of the vehicle, which the dealership did not disclose. Rather, the dealer took only 4 minutes,30 seconds to explain the contract and its terms. This vague, rush-through explanation of the terms of the agreement did not give obligor all the necessary facts and disclosures to make an informed decision about the transaction.

The down payment our client put down on the vehicle (**$2,700**) did not go towards the **$22,728.46** principal balance. Furthermore, on **page 2** of the *Retail Installment Contract, line 5,*

*Total of Other Charges and Amounts Paid to Others on Your Behalf,* states that it paid **$4,190.75** to an unnamed "others" on my behalf. When asked about this "payment" which our client is being required to pay back, the dealership refused to elaborate more on this payment. Since the lack of disclosure about this certain payment when all other amounts paid are itemized on the same page, we have concluded that this was the amount **Credit Acceptance Corporation** paid *directly* to **Woodbridge Auto Sales** as compensation for the loan which Credit Acceptance Corporation valued the **$22,728.46** financed vehicle at only **$12,217.16** (Approx Black/Blue Book value). This compensation of **$4,190.75** is in conjunction with the *Portfolio Program* in which the dealer receives a *cash advance* from the servicer.

Our thorough research has led us to agree with the Consumer Financial Protection Bureau's (CFPB) alleged violations filed against Credit Acceptance Corporation with regards to this section (2).

CONCLUSION: **VIOLATION OF THE CONSUMER FINANCIAL PROTECTION ACT OF 2010 (CFPA), 12 U.S.C. 5331(a), 5536(a)(1), 5536(a)(3), VA CODE 6.2-303.**


### 3.SECURITIZATION OF CONTRACT; DISGUISED INVESTMENT CONTRACT


The Securities Exchange Commission (SEC) and Supreme Court have consistently interpreted that the type of transaction LAMONT A THOMAS was a part of, was an *investment contract* which subjects the transaction to securities reporting and federal securities laws. The so-called *Retail Installment Contract.* It is the balance sheet of the creditor that we have taken a special interest in. We want to ensure that the amounts (loan asset) reported on the lien holder's **RC balance sheet** as an *asset*, do not correspond with the same amounts reported as a *deposit liability* on the said balance sheet.

The creditor assumes that it provided the funds to the obligor to buy the vehicle in question. However, we have researched the **SEC** filings and we have found that, as of February 27, 2024, that *Credit Acceptance Auto Loans Trust 2024-A* proposed to issue Class A, B, C, Notes backed by the Trust's assets.

**Item 2.03 Creation of a Direct Obligation or an Obligation under an Off-Balance sheet Arrangement of a Registrant.** This gives insight into the nature of the notes sold. It reads:

*On February 27, 2024, Credit Acceptance Corporation (the "Company", "Credit Acceptance", "we", "our", or "us") entered into a $200.0 million asset-backed non-recourse secured financing (the "Financing"). Following this transaction, we conveyed consumer loans having a value of approximately $250.1 million to a wholly owned special purpose entity, Credit Acceptance Funding LLC 2024-A ("Funding 2024-A"), which transferred those consumer loans to a trust, which issued three classes of notes:*

| | | |
|---|---|---|
| **Note Class: A** | **Amount: $106,094,000** | **Interest Rate: 6.95%** |
| **Note Class: B** | **Amount: $43,893,000** | **Interest Rate: 7.68%** |

**Note Class: <u>C</u>**　　**Amount: <u>$50,013,000</u>**　　**Interest Rate: <u>8.30%</u>**

The funding (**$200.0 million**) for the servicer was provided by the investors who purchased the above notes in what we call a ***<u>Forward Sell contract</u>***. The payment to the noteholders would eventually come from the periodic monthly payments made by the obligor and other consumers on their *Retail Installment Contracts*. According to the Financing Agreement, the Financing will:

- Have an expected average annualized cost of approximately 7.8% including placement agent fees and other costs.
- Revolve for 36 months after which it will amortize **<u>based upon the cash flows on the conveyed loans;</u>** and
- Be used by us to repay outstanding indebtedness and for general corporate purposes.

The obligor's monthly auto loan payments will be deposited into the **Principal Collection Account,** as agent of the Trust, for the *benefit of the noteholders*. This in no way evidences any interest the servicer may have in the auto contract other than *servicing* the contract under the pre-existing *Sale and Servicing Agreement,* for the real party of interest, which is the investors who financed the vehicle to the obligor. Article 1 of the Sale and Servicing Agreement, the definition of *"Available Funds"* means:

*"With respect to any Distribution Date: (i) all Collections (other than Dealer Collections and Repossession Expenses) received by the Servicer, the Seller or the Originator during the related Collection Period with respect to the **Contracts and the Loans and paid over to the issuer**…"*

The servicer, following the *Sales and Servicing Agreement*, took out, or will take out **credit insurance** on the obligor's loan contract to insure itself in case of a default of the obligor. This is known as a ***credit default swap***. We contend that the excess **$15,661.76** interest the obligor is expected to pay over the life of the loan (**23.99% instead of the 12% maximum amount allowed by the Commonwealth of Virginia**), will be used to pay the premiums on the swap (and for other purposes).

We will request a copy of the ***<u>Contract File</u>*** because the Sales and Servicing Agreement states in the definition of *contract File* to include: ***<u>"the original or electronic instruments modifying the terms and conditions of such Contract and the original or electronic endorsements or assignments of such Contract".</u>***

The servicer, through funds from investors secured by the notes issued by the *Credit Acceptance Auto Loan trust 2024-A* (see 8-K filing as of February 29, 2024), advanced the dealer funds which are automatically assigned to the dealer's ***<u>open pool of advances</u>***. This means, money up front entices consumers to enter a so-called *"Retail Installment Contract"*, assigning the contract over to the assignee who would then remit the payments to the trustee of the said trust to the noteholders.

This agreement does not mention any obligation of the obligor to the servicer. Rather, the obligation is that of the dealer to the servicer. Page 4 of the 10-K filing states:

*All advances within a Dealer's pool are secured by the future collections on the related Consumer loans assigned to the pool.*

Once again, this agreement is not that of a loan or finance from the servicer to the obligor, but this is a contract where the obligor is really the ***accommodation party*** to the dealer's pre-existing **Dealer Servicing Agreement**. Our research reveals that the Retail Installment Contract is disguised really an investment contract. It is not a Consumer Loan as the servicer would like the obligor to think.

## 3 (A). OBLIGOR WAS ACCOMODATION PARTY TO DEALER AGREEMENT

The dealer, under the direction of the servicer, misrepresented the nature of the *Retail Installment Contract* between the obligor and the dealer. The obligor was presented as the *borrower* to the *Consumer Loan* (Retail Installment Contract), believing that the borrower was receiving a **loan** from the servicer facilitated by the dealer. Assuming the dealer and servicer were operating with professional integrity, the obligor agreed to the terms. Upon our research, we have discovered from the servicer's **10-K filing** that the servicer never loaned any money to the obligor that would make him directly obligated to the servicer. In the servicer's own words in its 10-K filing (**page 3**):

*"We are an indirect lender from a legal perspective, meaning the Consumer Loan is originated by the Dealer and **assigned to us**".*

In the servicer's own words, again, there was never a finance from them to the obligor that would support a simple contract. **Page 55** of form 10-K confirms this stance. The servicer stats:

*"For accounting purposes, the transactions described under the **Portfolio Program are not considered to be loans to consumers. Instead, our accounting reflects that of a lender to the Dealer.** The classification as a Dealer Loan for accounting purposes is primarily a result of (1) the Dealer's financial interest in the Consumer Loan and (2) certain elements of our legal relationship with the dealer".*

Given that the dealer's security interest in the obligor's vehicle was but only for a moment, we conclude that the obligor's relationship with the dealer was that of an ***Accommodation Party*** without proper disclosure or consideration. This assumption is because the dealer and servicer already had a pre-existing agreement where the assignment of the so-called consumer loans took place before our client ever applied for financing. This indeed was a loan from the servicer to the dealer under the **Portfolio program**.

The obligor was the *Accommodation Party* to the dealer's obligation to the servicer in which he provided the security interest (property) in the vehicle to secure the repayment of the advance made to the dealer by the servicer. The dealer, after executing the assignment of the vehicle to the servicer, received an approximate **$4,190.76** as a cash payment for the purchase of the

vehicle, plus the **$2,700** *down payment* the dealer coerced the obligor to make in order for the servicer to complete the transaction. This was another misrepresentation because the down payment went directly to the dealer under the **Portfolio Program** as part of their compensation for the transaction. The dealer did not inform our client that he was in fact an accommodation party to the instrument (Contract). This misrepresentation undermines the obligor's informed consent. We have a claim to recoup the instrument and/or its proceeds under **UCC 3-306,** and we have the standing to raise a defense and claim in recoupment under **UCC 3-305 (a) (d)** due to *fraud in the factum and misrepresentation, unlawful conversion of the instrument,* and a host of other Consumer Financial Protection laws.

## 3 (B) SECURITIZATION/INVESTMENT CONTRACT; TRUST ESTABLISHED

The dealer had a prior agreement with the bank, that, if our client were disclosed fully, would have given Mr. Lamont A Thomas additional data to make an informed decision. The advertisement presented to Mr. Thomas said that he would receive *financing* from Credit Acceptance Corporation. However, the transaction that took place was really an *investment contract.*

The Securities Exchange Commission (SEC) and Supreme Court have consistently interpreted that the type of transaction Mr. Thomas was apart of, was an *investment contract,* which subjects the transaction to securities reporting and federal securities laws. The so-called *Retail Installment Contract* was in fact an **investment contract.**

The contract assigned to Credit Acceptance Corporation was a **security** and thus, are subject to federal securities laws because:

1.  Credit Acceptance Corporation *invested money* – Credit Acceptance invested (advanced) in Woodbridge Auto Sales by providing the purchase price of the vehicle.
2.  The money invested was in a *common enterprise* – Credit Acceptance actively takes part in the automobile sale and origination of retail installment contracts through its two investment programs (Portfolio & Purchase) (see SEC **8-K** and **10-K** filings).
3.  With the *expectation of profit* – Credit Acceptance was *assigned* the *accounts receivable* in which they expect Lamont A. Thomas to make monthly payments on the account.
4.  *To be derived from the efforts of others* – Credit Acceptance's profits from this investment contract will be realized when Lamont A. Thomas makes his monthly installment payments*.

**\*Even though Credit Acceptance has an Automobile Receivables trust in which notes/certificates are issued to investors, the investors are only paid when the borrowers make their monthly installment payments. There are no payments that will be distributed to the investors on the account of capital appreciation.**

The Supreme Court in *Howey* and subsequent case law have found that an *"investment contract" exists when there* is the investment of money in a common enterprise with a reasonable

expectation of profits to be derived from the efforts of others. The so-called *Howey* test applies to **any contract, scheme, or transaction**, regardless of whether it has any of the characteristics of typical securities. The focus of *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the retail Installment Contract) but also n the circumstances surrounding the contract and the way it is offered, sold, or resold (including secondary market sales).

Federal securities laws require all offers and sales of securities, including those involving a retail Installment Contract, to either to be registered under it provisions or to qualify for an exempt form registration. The registration provisions require persons to disclose certain information to *investors*, and that information must be completed and not materially *misleading*. The dealership nor Credit Acceptance disclosed to the obligor that he would be an undisclosed third-party investor in the contract and the Automobile Receivables Trust.

The requirement for disclosures furthers the federal securities laws' goal *of providing investors with the information necessary to make informed investment decisions*. Had that information been disclosed to Mr. Thomas, he would have fully understood that his property would be held as the asset of the trust securing the payments on the notes issued by the Receivables Trust, thus, he would have ensured that he would be entitled to share in the profits generated from the notes issued. Although the trustee has legal title to his property, by *operation of law, Mr. Thomas retains equitable title and the status as beneficial owner of the proceeds generated by the trust's notes*.

This legal/equitable relationship establishes a *Constructive Trust* or *Implied Trust* based on the assignment of legal title to his property to the trustee for the benefit of the investors. This action established a trust relationship with the trustee of the trust and Lamont A. Thomas as his *equitable title* was *assigned to him by the trustee* of the Automobile Receivables trust, *by operation of law*.

**CONCLUSION: VIOLATION OF CONSUMER FINANCIAL PROTECTION ACT OF 2010, TRUTH-IN-LENDING ACT, MISREPRESENTATION, FRAUD IN THE FACTUM, SECURITIES LAWS VIOLATION UNDER THE SECURITIES ACT OF 1934, INVESTOR FRAUD, AND A HOST OF A LOT OF OTHER VIOLATIONS.**

## CONCLUSION

We have established beyond any doubt that the dealer conspired with the servicer to commit fraud upon Lamont A. Thomas, defraud investors, violate the Consumer Protection laws, and Truth-In-Lending Act. We are prepared to file arbitration immediately. We are also prepared to bring this matter to the attention of the Commonwealth of Virginia Attorney General, the Internal Revenue Services' Criminal Investigation Division. We will further request an audit of Credit Acceptances and Woodbridge Auto Sales financial books to ensure all taxes are being paid and to make sure financial assets aren't being moved off the books to limit any potential tax liability.

We are also open to re-negotiations regarding the contract, including the issuance of the attached security as a **_Debt/Equity Swap_** as LAMONT ANDRE THOMAS' **_equitable claim_** to the proceeds of the Automobile Receivables Trust generated from the sale of the notes backed by his private property. Lamont A. Thomas holds **_equitable title_** to the property assigned and under the **_principle of fairness and equity_**, he has the right to enjoy the proceeds only to the extent of his obligation on the account. As the bailor of Mr. Thomas, we have been assigned his **_equitable rights/title/interest_** in the proceeds generated by the trust. This principle has been confirmed by the Supreme Court and is in line with the **_Fifth Amendment_** of the U.S. Constitution. The amount stated on the **_financial asset_** tendered to the servicer represents his equitable title/interest in the proceeds stated above. We are assigning Credit Acceptance our interest in the proceeds to it via a **_Special Deposit_** to set off the obligation the trustee has to the equitable titleholder (Lamont A. Thomas) against the obligation the obligor has to the account.

If in any event you do not accept these terms, you must return the financial asset promptly. Any failure to do so will result in legal/equitable action against the Automobile Receivables Trusts' Trustee et.al. Further failure to return the instrument, or if the parties refuse to accept these generous terms, we will file the proper tax forms evidencing the equitable title-holder's unrestricted right to claim a portion of the proceeds made from the sale of the notes which legal title to his property is held in the trust as an asset backing payment on the said notes.

Consideration to our client is appropriate given that if Credit Acceptance defaults on its warehouse revolving line of credit, our client's private property will be put at risk of confiscation.

Thank you for your time and assistance in this intricate matter. We look forward to continuing working with you in the future.

Very Truly Yours,

_____
Accrual Accounting Collection Agency
On behalf of Lamont A. Thomas Private
Bank Estate & Trust
In Care of LAMONT ANDRE THOMAS